UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HEEBE ET AL. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO: 10-3452 |
| | * | |
| UNITED STATES OF AMERICA | * | SECTION: "C" (5) |
| | * | |

************************************

**PLAINTIFFS' POST-HEARING MEMORANDUM**

NOW INTO COURT through undersigned counsel come plaintiffs, Frederick R. Heebe, A.J. Ward, Shadowlake Management, L.L.C. ("Shadowlake"), Willow, Inc. ("Willow"), Fred Heebe Investments, Live Oak Homes Corporation ("Live Oak"), Heebe & Heebe, P.L.C., and River Birch, Inc. ("River Birch"), who respectfully submit the following post-hearing memorandum.

**INTRODUCTION**

Evidence and testimony presented at the evidentiary hearing overwhelmingly support this Court's previous ruling that the Government grossly exceeded the scope of its search warrant by searching and seizing materials from all seven businesses located at 2000 Belle Chasse Highway, Gretna, Louisiana, thereby callously disregarding the plaintiffs' Fourth Amendment rights. Before the hearing, it was obvious that, once the search began, the Government deliberately

ignored the building directory, the labeling, and the evidence of other businesses. Now, in light of the Government's testimony at the hearing, it is also obvious that the search was fatally flawed even before it started. The Government has admitted that, before the search, it knew other businesses were located at 2000 Belle Chasse Highway – it claims it was even investigating some of these businesses before the search – yet it deliberately omitted these businesses from the warrant, failed to exclude them during the search, and searched the entire building. Additionally, even if viewed in the most favorable light, the Government's shifting position on its handling of privileged material makes plain that the investigative team has had access to privileged documents, including material prepared in response to the Government's investigation. In sum, the evidence and testimony presented during the hearing not only support the Court's December 21, 2010 Order concluding that the Government callously disregarded the constitutional boundaries imposed by the Fourth Amendment and granting plaintiffs' motion for return of property, it inexorably commands that Order remain intact. Accordingly, the Government's motion for reconsideration should be denied.

## LAW AND ARGUMENT

A motion for reconsideration of a judgment "is an extraordinary remedy which should be used sparingly," and a motion for reconsideration "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem, Inc.*, 367 F.3d 473, 478-479 (5th Cir. 2004). While district courts enjoy "considerable discretion" in granting or denying a motion to vacate a judgment under Rule 59(e), courts typically consider four factors in exercising this discretion: (1) whether the judgment was based upon a manifest error of fact or law; (2) whether the movant presents newly discovered or previously unavailable evidence; (3) whether amendment is necessary to

prevent manifest injustice; and (4) whether an intervening change in controlling law has occurred. *Clancy v. Employers Health Ins. Co.*, 101 F.Supp.2d 463, 464-465 (E.D.La. 2000) (citations omitted).

Here, the Government has failed to satisfy any of these factors. In fact, the Government's arguments in support of its motion for reconsideration are premised on the demonstrably incorrect contentions that: (1) despite the plain language on the warrant itself, the search warrant was not limited to "the offices of River Birch"; (2) despite the objective indications that other businesses had operations at 2000 Belle Chasse Highway, such as a 2' x 3' building directory and clearly marked documents and file cabinets, the Government did not act unreasonably in searching and seizing from businesses other than River Birch; and (3) despite the woefully inadequate safeguards for handling privileged material, no irreparable injury has befallen the plaintiffs. Rec. Doc. 31-1 at pp. 4-7.

However, the testimony and evidence presented at the hearing overwhelmingly demonstrated that the Court's conclusions in its December 21 Order were correct on all scores. Indeed, each false premise the Government advanced in support of its reconsideration motion was exposed repeatedly, as was the unreasonable and unconstitutional behavior by Government agents in connection with the search of 2000 Belle Chasse Highway. In sum, the Government has completely failed to carry its heavy burden in support of its motion for reconsideration. For these reasons, and as more fully explained below, the Government's motion for reconsideration should be denied and all plaintiffs' property be returned just as this Court originally ordered some three months ago.

## I. The search warrant was limited to River Birch.

As the Court is well aware, the face of the warrant identified only a single business. Specifically, the warrant identified the property to be searched as "2000 Belle Chasse Highway, Gretna, Louisiana 70056 (further described in Attachment A)." Rec. Doc. 3-3 at p. 1. Attachment A to the warrant states: "The offices of River Birch Landfill are located at 2000 Belle Chasse Highway, Gretna, Louisiana, 70056. It is a three-story beige brick building with a sign in front that states River Birch Inc. and Willow Homes." *Id.* at p. 2 (emphasis added). Obviously, the search warrant was limited to River Birch.

Indeed, from the very inception of this case, the Government took the position that its search warrant was for the offices of River Birch. *See* Rec. Doc. 14 at p. 5 ( "In the present case, the warrant authorizes the search of 2000 Belle, Chasse Hwy., the offices of RBL."). The Government clung to that position for several months, but as of just a few weeks ago, now attempts to argue that its search warrant was for the entirety of 2000 Belle Chasse Highway, including any and all businesses located there. For the reasons advanced in plaintiffs' supplemental brief, this untimely argument need not, and should not, be considered by the Court. Rec. Doc. No. 61 at p. 3. But even if the Court were to consider this last ditch argument, the evidence presented during the hearing does not support it.

Although Agents Smith and Bezet danced around the issue of the scope of the warrant, Agent Scott Downie, who was briefed by Agent Bezet about the scope of the search in advance of the search, gave perhaps the clearest and most direct answer:

> Q. Did you understand that morning what the scope of the search warrant was?
>
> A. Yes, sir.

> Q. Can you relate to the Court what you understood the scope of the search warrant to be?
>
> A. The scope of the search warrant was – that pertained to me was computers, any type of computer file, any type of electronic document <u>that pertained to River Birch or any of its financial transactions</u>.

Tr. at 172 (emphasis added). This answer is consistent with the face of the warrant as well as common sense. Consequently, the Court correctly concluded that the search warrant was limited to the "offices of River Birch" and therefore the Government exceeded the warrant by searching six other businesses.

**II. The Government's search of all seven businesses located at 2000 Belle Chasse Highway was unreasonable under *Maryland v. Garrison*, 480 U.S. 79 (1987).**

In an attempt to circumvent the warrant's obvious facial limitation, the Government contends that, before the search, it "believed the only thing that was located at 2000 Belle Chasse Highway were the actual offices of River Birch itself." Tr. at 227. However, in light of the objective evidence and the Government's testimony at the hearing, this position is untenable. Agent Peter Smith, who obtained the warrant, and Agent Malcolm Bezet, the case agent, both testified that they knew before the search that 2000 Belle Chasse Highway housed numerous businesses in addition to River Birch. Despite this knowledge, the Government failed to include any of these companies in the warrant or to exclude them from the search itself. Even worse, the Government agents deliberately ignored objective evidence regarding the existence of these other businesses during the search. Thus, the Court correctly determined that the Government's search was illegal and the motion for reconsideration should be denied.

**A. Before the search, the Government knew or had reason to know that 2000 Belle Chasse Highway housed businesses in addition to River Birch and took no steps to include those businesses on the warrant or exclude them from the search.**

Unlike the police officers in *Garrison*, the Government knew, or had reason to know, that 2000 Belle Chasse housed businesses other than River Birch well before the search. FBI Agents Malcolm Bezet and Peter Smith both testified that the Government investigated Mr. Heebe's and Mr. Ward's business interests before the search. Even the most superficial research would have revealed that Shadowlake, Willow, Live Oak Homes, Heebe & Heebe, and Peter J. Butler, LLC were domiciled at 2000 Belle Chasse Highway. *See* Plaintiffs' Hearing Exhibits 5, 6, 7, and 8.

Indeed, the Government admitted that it reviewed this information on the Louisiana Secretary of State's free, publicly accessible database prior to the search. Agent Bezet testified that he reviewed River Birch's Secretary of State records before the search. Tr. at 11-12. These records show that Heebe & Heebe, PLC is located at "2000 Belle Chasse Hwy, Third Fl." Agent Bezet also admitted that, before the search, he researched some of Mr. Heebe's and Mr. Ward's other companies:

> Q. Now, if you could find the corporate information on River Birch, you would have been able to find the corporate information on any of the – any other of Mr. Heebe's or Mr. Ward's companies; is that right?
>
> A. That's correct.
>
> Q. And did you do any research on that <u>before you executed the search warrant</u>?
>
> A. On some of their other companies, yes.

Tr. at 12 (emphasis added). Agent Bezet conceded that these searches would have revealed that 2000 Belle Chasse Highway was the domicile address for companies other than River Birch:

Q. Doing any of these searches, though, you would see that 2000 Belle Chasse Highway is a registered address for other companies besides River Birch; correct?

A. Correct.

Tr. at 16.

In addition, FBI Agent Peter Smith testified that, although he was not sure, he thought the FBI actually searched the Secretary of State information by the 2000 Belle Chasse Highway address. *Id*. at 97. According to the Secretary of State, 2000 Belle Chasse Highway is the domicile address for River Birch, Shadowlake, Willow, Live Oak, Heebe & Heebe, and Peter J. Butler, LLC. Clearly, before the search, the Government knew that 2000 Belle Chasse Highway housed more than just River Birch.

Agent Smith also admitted that, on the date of the seizure, he knew Mr. Heebe and Mr. Ward were involved with Shadowlake, Parc Fontaine, Live Oak, and Willow. In fact, Agent Smith admitted that he expected to find documents of companies other than River Birch at 2000 Belle Chasse Highway:

Q. And based upon that did you have any reason to believe, after your having visited the offices at 2000 Belle Chasse Highway, did you have any reason to believe that there were any other offices located or any other businesses' offices located within that premises?

A. Willow Homes, I assumed was located there because of the sign.

Q. And you expected to find documents related to Willow Homes?

A. Right.

Tr. at 118. Significantly, Agent Smith, who authored the search warrant affidavit, failed to notify the Magistrate Judge about any other businesses on the third floor. Tr. at 129. Despite its

knowledge of these companies, the Government failed to include them in the warrant, failed to exclude them from the search, and failed to limit the search of 2000 Belle Chasse Highway in any way.

Even without searching the corporate records, the Government knew about Willow: there was a large billboard outside, and Agent Smith had been there before. Yet the Government failed to include Willow in the search warrant and took no precautions to ensure that Willow was not searched. Agent Bezet testified:

> Q. You knew that Willow was in this building before the search, right?
>
> A. That's correct.
>
> Q. But you didn't take any steps to make sure that Willow was not searched, did you?
>
> A. That's correct. It was commingled with River Birch. We searched River Birch, if Willow was in that, it was in that.

Tr. at 17.

However, the Government has offered no evidence that, before, during, or after the search, it had any reasonable belief that documents were commingled. Clearly it is not in the search warrant affidavit – Agent Smith, the author of the search warrant affidavit, testified that he did not even notify the Magistrate Judge who signed the warrant that there might be other companies on the premises. Tr. at 129. Nor could Agent Bezet, the case agent, provide any evidence of commingling. *Id.* at 38.

The Government also admitted that it "knew Peter Butler had an office" at 2000 Belle Chasse Highway. Tr. at 18. However, the Government failed to include Peter J. Butler, LLC in the search warrant or to exclude that business from the search. The Government's explanation for this failure was that it believes Peter Butler was "in-house counsel" for River Birch:

> He had left a large law firm, I believe it was Breazeale, Sachse & Wilson, although I don't know if I knew the name of it before, and he'd started working inside River Birch's space and had an office in River Birch's space. We thought that was because he had come onboard as in-house counsel.

Tr. at 56. Incredibly, the Government did nothing to verify this incorrect belief:

> Q. Well, [Agent Bezet,] did you do any research to see if Mr. Butler had any other pending cases for other clients at the time of the search?
>
> A. I did not.
>
> Q. And, in fact, Mr. Butler does represent other people – he's not in-house counsel for River Birch, is he?
>
> A. I don't know if he's only in-house counsel for River Birch or has other clients or not. He may have some, but I'm not sure about his legal – I haven't reviewed the stuff from his office. I wouldn't know.

Tr. at 20; *see also* Tr. at 56 (Agent Bezet stating that he did not do anything to verify whether or not Mr. Butler was representing any other people in state or federal court).

Contrary to the Government's belief, Peter J. Butler was not in-house counsel. Peter J. Butler, LLC is a separate corporate entity, and the Government could have easily determined that on the Secretary of State's website. Even worse, the Government deliberately ignored objective evidence in its possession that Peter J. Butler, LLC was a separate entity. Specifically, Agent Smith admitted that in 2008 he reviewed correspondence from Mr. Butler about this investigation on the letter head of Peter J. Butler, LLC listing an address of 2000 Belle Chasse Highway. Tr. at 90-91, *see also* Plaintiff's Hearing Exhibit 2. The Government has offered no reasonable explanation or justification for its unfounded belief that Peter Butler was in-house counsel for River Birch.

With all of its resources, and despite the fact that the investigation had been pending for at least a year before the search, the Government did nothing to corroborate its unreasonable belief that "the only thing that was located at 2000 Belle Chasse Highway were the actual offices of River Birch itself." Tr. at 227. In response to the Court's questions, Agent Bezet testified:

> Q. And other than what you've testified today, did you make any other efforts to discover what other tenants might be located at that third floor location?
>
> A. Prior to the search?
>
> Q. Uh-huh.
>
> A. No, we did not.

Tr. at 85.

Similarly, Agent Smith admitted that he made no efforts to check on other possible businesses even after visiting 2000 Belle Chasse Highway in December 2008:

> Q. I'm not talking about the scene, sir. I'm talking about when you went out there initially to meet with Mr. Ward and Mr. Butler some months before, whenever that was, after you were out there and you saw that there was Willow Homes at least, the presence of one company, you rode up on the elevator, did you make any effort after that point to discover if there was any other tenants, any other corporations, businesses, that were located at that third floor location?
>
> A. No.

Tr. at 128. Nor did Agent Smith, who authored the search warrant affidavit, notify the Magistrate Judge who signed the warrant that there were other companies on the premises:

> Q. All right. Did you bring that – did you specifically bring to his attention anything else about any other corporations that might be located at that third floor, other than the fact that [the Willow Homes sign] is part of the physical description of the building?

A. No.

Tr. at 128.[1]

Of utmost concern is the Government's claim that, although the search warrant only mentioned River Birch, the Government was investigating other companies belonging to Mr. Ward and Mr. Heebe. Agent Smith testified that he had reason to believe Shadowlake was involved in criminal activity but did not include Shadowlake in the warrant:

> Q. Shadowlake, Parc Fontaine, Calypso Bay, Willow Homes, Carol Sue, Riverview, Heebe & Heebe, did you have any information that any of these companies were engaged in or you had reason to believe that they were engaged in illegal activity?
>
> A. We had reason to believe that Shadowlake may have.
>
> Q. All right. Sir, you knew that then on the date that you obtained that warrant; is that right?
>
> A. Yes.
>
> Q. And you didn't include that company in the search warrant; is that right, sir?
>
> A. That's correct.

Tr. at 108-109. In light of this, the Government's search and seizure of Shadowlake is blatantly illegal.

Like Agent Smith, Agent Bezet also admitted that he was investigating companies other than River Birch. "We were focused on River Birch, and some of the other corporations, too, that are associated with it." Tr. at 15-16. Agent Bezet testified that he knew these other corporations were located on the third floor of 2000 Belle Chasse Highway: "Our warrant was for the third floor. We believed that that <u>those businesses</u> were controlled by River Birch and their principals,

[1] In light of this admission, it is unnecessary to review the search warrant affidavit. If no other companies were mentioned, the affidavit cannot possibly broaden the scope of the warrant.

and that all the businesses that are in there are controlled by River Birch and their principals." Tr. at 69 (emphasis added).

In addition to confirming the Court's previous ruling of an illegal search, Agent Bezet's testimony contradicts the Government's contention that before the search it "believed the only thing that was located at 2000 Belle Chasse Highway were the actual offices of River Birch itself." Tr. at 227.

**B. Even if the Government did not know about the other businesses before the search, the search was constitutionally invalid because the Government deliberately ignored evidence of other businesses during the search.**

As is discussed above, the Government knew there were other businesses on the premises well before the search, and that knowledge alone made the Government's search of the entire third floor unreasonable. However, even without this pre-search knowledge, the Government's raid would still have been unreasonable because all 24 searching agents saw evidence of other businesses as soon as they walked into 2000 Belle Chasse Highway.

**1. The building directory was in plain view.**

The Government has made the building directory a crucial issue before the Court. In its Motion for Reconsideration, the Government raised seven alleged "factual misperceptions" by the Court. Rec. Doc. 31-1 at p. 5-8. Two of these seven alleged errors relate to the building directory. Specifically, the Government contended (1) that the Court incorrectly determined the searching agents ignored the directory on the first floor when they entered the building and (2) that the Court mistakenly found that there was a directory on the third floor. The Court's first finding was absolutely correct – the directory on the first floor is impossible to miss and the agents' testimony that they did not see the directory is incredible. As for the second finding, the Government misinterpreted the Court's Order, because the Court did not make a finding that

there was a directory on the third floor. The Government's argument on this second issue is important, however, because it shows the Government's untenable, contradictory positions with respect to the directory: how can the Government adamantly argue that there was only a directory on the first floor and not the third floor, while at the same time deny seeing the first floor directory?

It is impossible to miss the first floor directory upon entering the building, especially for trained federal agents who are on heightened alert during a search warrant. Tr. at 21. Even to a lay person, the directory is plainly visible through the glass front door, which all 24 searching agents used:




Since anyone can see this directory from the outside of the building, the Government's conflicting explanations about why none of the 24 agents on the search saw this directory during their 12-hour search are not credible.

In his January 4, 2011 affidavit, Agent Bezet stated he did not see the directory because he used the stairs:

> The only sign listing different businesses in the building was located on the first floor. Individuals that enter the building and use the stairs, as the Affiant and the Agents that were with him did when initially executing the search warrant, do not pass any signs "listing seven different businesses on the third floor." Such a sign would only be visible to individuals that entered into the building and accessed the third floor using a single elevator.

Rec. Doc. No. 31-3 at p. 4-5. However, as is obvious from the photograph above, the directory is visible before you enter the glass front door, whether you take the stairs or the elevator.

At the February 24 hearing, Agent Bezet's testimony on this critical issue changed several times. First, because the directory is visible whether you take the stairs or the elevator, Agent Bezet abandoned the "stairs theory" and testified that he could not see the directory because the door to the elevator room was closed: "On the day of the search warrant when we got there before the business was opened, I believe that inside door was closed." Tr. at 24. However, the video surveillance shows that the door was open and that Agent Bezet was looking through it:




Tr. at 24, *see also* Plaintiffs' Hearing Exhibit 33.

When confronted with the surveillance that showed him looking through the open door, Agent Bezet reversed course again and admitted that he looked into the elevator room because he "wanted to see if there was anyone on the first floor, any people, if there's any <u>businesses</u> or if it's open down there." *Id.* at 25 (emphasis added). However, he still denied seeing the 2' x 3' directory, which is the <u>only</u> thing in that room and lists <u>seven businesses</u>, and is precisely the kind of evidence Agent Bezet claimed he was seeking. Agent Bezet testified: "I may have seen the sign, but I don't remember reading it, and that's my testimony about that. I don't remember reading that sign. I did not remember seeing it. And I wasn't aware of it until I was shown a picture of it at the U.S. Attorney's Office." Tr. at 25. This memory lapse is remarkable in light of the January 4 affidavit, in which Agent Bezet was sure that the "only sign listing different businesses in the building was located on the first floor." Rec. Doc. No. 31-3 at p. 4.

In the same January 4 affidavit, Agent Bezet testified that none of the other agents saw the directory either: "Individuals that enter the building and use the stairs, as the Affiant and the Agents that were with him did when initially executing the search warrant, do not pass any signs 'listing seven different businesses on the third floor.'" *Id.* (emphasis added). When asked to explain how he could make this statement for everyone on the search team, Agent Bezet testified that "When we discussed it in Peter Smith's office after the search, we were talking about the sign and everyone said I don't remember any sign like that." Tr. at 26 (emphasis added). However, when pressed, Agent Bezet admitted that he did not discuss this issue with "everyone," but only with one agent, Peter Smith:

> Q. So you and Agent Smith and who else said that they didn't remember seeing that sign?
>
> A. It was just me and Agent Smith that I remember discussing it. I didn't remember Bob being – Zummer being with us, but evidently they are.

*Id.*

Further, in his affidavit Agent Bezet led the Court to believe that he did not see the directory because he took the stairs and not the elevator. However, Agent Bezet failed to inform the Court that he used the elevator no less than 15 times during the course of the 12 hour search. Tr. at 29-30. Agent Bezet would have walked right past the directory on each of these 15 trips. Despite all of these trips, some of which occurred during "the initial part of the search," Agent Bezet still contends that "[t]he first time I ever saw the directory was well after the search when I saw a photograph of it at the U.S. Attorney's Office." Tr. at 25. Agent Bezet cannot seriously contend that he missed the directory every time, especially in light of his testimony that, during a search, he is on heightened alert and does not want to miss any important details. Tr. at 22.

Similarly, Agent Peter Smith testified that he also took the elevator a number of times and did not see the directory:

> Q. And in all of those five, six, seven, eight trips, you never saw this sign; is that right, sir?
>
> A. That's correct.

Tr. at 108.

Finally, at the evidentiary hearing, Agent Bezet repeatedly testified that he did not remember the directory or its location in the building:

> A. I did not see the sign when I – I did not remember where the sign was from the search warrant. I had no conscious recollection of reading it. It didn't make an impression on me on the search warrant day. It wasn't until the pictures later and until now.

Tr. at 28-29. However, in his January 4 affidavit, Agent Bezet was sure that "There was no sign on the third floor, as cited in this Court's Order, that listed different businesses located within the single office on the third floor. The only sign listing different businesses in the building was located on the first floor." Rec. Doc. No. 31-3 at 4. In fact, one of the Government's primary issues in its motion for reconsideration was that it believed the Court mistakenly found that there was a directory on the third floor. Rec. Doc. No. 31-1 at 5.

In its Motion for Reconsideration, the Government specifically asked the Court to make "credibility determinations on disputed issues of fact." Rec. Doc. 31-1 at p. 1. The Government has also made the building directory a crucial issue by citing it as two of its seven assignments of error. *Id*. at p. 5-9. The Government's shifting, contradictory testimony on the building directory is simply not credible.

**2. The Government ignored clear labeling.**

As an additional assignment of error, the Government contends the Court erroneously held that the searching agents "ignored clearly marked documents and file cabinets," claiming that "Agent Bezet 'observed no such labels.'" Rec. Doc. 31-1 at p. 5. In light of the testimony at the hearing, the Court was correct on this issue as well.

In his January 4 affidavit, Agent Bezet testified that "[d]uring the execution of the search warrant, I did not observe any labels on any offices or work spaces indicating that they housed different businesses or employees for businesses other than those listed on the billboard, River Birch and Willow Homes." Rec. Doc. No. 31-3 at p. 5. Agent Bezet further stated that he "observed no independent identifying information located on the third floor that would have alerted agents to other businesses' spaces housed within the common office space." *Id*. These statements are not credible in light of the objective evidence of other businesses and the Government's admissions at the hearing that it saw this evidence during the search. *See* Plaintiffs' Hearing Exhibits 13-28.

The Government saw labels, but the agents deliberately chose to ignore them. Contradicting his affidavit, Agent Bezet admitted at the hearing that "[t]hey had lots of file cabinets with other businesses and things like that." Tr. at 36. Although he did not "specifically remember seeing" the numerous binders labeled Parc Fontaine, Shadowlake, and Live Oak, Agent Bezet admitted that he "remember[ed] seeing binders with other business labels like that on them, yes." Tr. at 36. When asked about the Shadowlake Management news articles and posters on the walls, Agent Bezet conceded: "They had posters and stuff on the walls. But obviously those are not evidence of illegal activity, so I'm not reading all that stuff. I'm trying to

administer the search there. I mean, I'm sure they had things like that posted. I'm not denying that." Tr. at 36-37.

FBI Agent Michael Zummer testified that the Government discovered the presence of other businesses <u>at the beginning of the search</u>, during the initial protective sweep of the third floor:

> A. At first I was assigned to assist with the protective sweep and to make sure there weren't any other personnel left in the office and then I actually helped try to identify areas where – who worked in specific parts of office.
>
> Q. How did you go about doing that?
>
> A. It was – actually, it was difficult because there were no name tags or name plates, but I – sometimes I'd look at documents that were on the desk, sometimes people had mail that they brought in from home, to try to determine whose desk it was and I tried to look at the phones to see if whether there were any names or extension numbers.
>
> Q. So you made these determinations on-scene?
>
> A. Yes.
>
> Q. And when you – after making these determinations, were you able to determine if there were any other businesses operating within 2000 Belle Chasse Highway other than what was listed in the search warrant?
>
> A. <u>Yes. I mean, there appeared to be other entities operating within the same space.</u>

Tr. at 145-146 (emphasis added). Despite the determination that there were other businesses on site, the Government did nothing to limit the scope of its search, searched every room on the third floor, and seized materials from all but one office.

Nor did the Government even make a serious effort to determine what companies it was searching. Despite the presence of numerous employees at the beginning of the search, the

Government failed to interview any of them. Tr. at 39. The truth of the matter is that the Government simply did not care about labels or signs. There could have been neon signs on every door, and the Government still would have searched the entire third floor. Agent Bezet testified:

> Q. Isn't it correct that you or other searching agents went into file cabinets that were identified with the names of other companies and searched those file cabinets?
>
> A. That's true.
>
> Q. And, therefore, it gave you no hesitation or pause that those file cabinets were labeled with the names of other companies?
>
> A. It did not.

Tr. at 44. Even with respect to the building directory, Agent Bezet testified:

> Q. And even if you had seen that directory, would that have changed the parameters of your search whatever at all?
>
> A. Absolutely not.

Tr. at 68.

Similarly, when asked what the FBI did to make certain it did not review documents belonging to companies for which it did not have a warrant, Agent Peter Smith stated: "Well, we didn't do anything. We were going to search that premises for the documents listed in the search warrant." Tr. at 109-110.

With respect to the 4.7 terabytes of computer information it seized, the Government has admitted that it does not even know what it took. Agent Scott Downie, the FBI's computer technician, testified:

> Q. You did not have any idea what it was that you were taking?

A. The actual files on there, no. We can't go through and look at the files that are on them.

Q. So you didn't know if you were taking River Birch, Shadowlake, Willow, you just knew you were copying computers?

A. Oh, correct.

Tr. at 193. The Government took all of these computers despite Mr. Scott Manzella's undisputed information that two of the four seized servers belonged solely to Shadowlake. *Id*. In addition to the servers, the Government seized or imaged the personal workstation computers of every employee in the building, without examination and without determining what company these individuals worked for. *Id*. at 195.

Despite searching every room on the third floor and seizing materials from all but one, the Government contends it properly limited its search to the scope of the warrant:

Q. So [Agent Bezet] you did, in fact, make an effort not to go beyond the scope of the search warrant?

A. Absolutely.

Tr. at 79. The Government argued in closing:

> If anything, the agents went out of their way to accommodate, to limit their search, to limit their disruption to River Birch's business. They even called in the IT call guy. They didn't want to mess around with their computers and mess them up. They did not want to take things that were unnecessary. They did not want to go beyond the scope of the search warrant. They did their best to limit it and stay within the scope of the search warrant.
>
> That's not a callous disregard, Judge. They could have gone in there and just seized everything, pulled every computer out and walked out the door, but they did not do that. They did spent some 12 hours there, according to everybody's estimation. [2]

[2] The Government claims it called Scott Manzella, the "IT guy," to the scene to limit the amount of computer information "that was going to be taken from the premises." Tr. at 68. However, despite Mr. Manzella's truthful information about which computers belonged to which company, the Government seized everything except the firewalls, which contained no documents or emails.

Tr. at 237-238. The Government did nothing to limit its search – it searched every room in the building and seized documents and computers from all but one office.

**C. *Garrison* clearly supports the Court's finding that the Government conducted an objectively unreasonable search, and the Government cites no authority that casts doubt on the Court's Judgment.**

The Government admits that it knew there were other businesses on the third floor, yet it obtained a warrant for River Birch alone and did not even bother to tell the Magistrate Judge that there were other businesses on the premises. Even worse, the Government used that warrant to raid the entire building and did not exclude a single room from its search. Not only was this an invalid search from the beginning, it was deliberately conducted in a callous, unconstitutional way.

Beyond citing *Garrison* without any analysis or discussion, the Government has offered no legal authority that casts doubt on the Court's ruling. The Government contends that *Garrison* does not support the Court's judgment because "*separate apartments* were not involved." Rec. Doc. No. 31-1 at p. 7. However, it makes no difference that *Garrison* involved separate apartments and the present case involves separate businesses. The issue is whether the Government knew or should have known it exceeded the scope of the warrant.

The Supreme Court in *Garrison* held that "if the officers had known, <u>or even if they should have known</u>, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's [Garrison's] apartment from the scope of the requested warrant." 480 U.S. at 85 (emphasis added). The Court further explained that had the officers been aware of their error, they were under an obligation "to <u>discontinue</u> the search" as soon as the error was discovered. *Id.* at 86-87 (emphasis added).

Here, the Government cannot overcome the overwhelming evidence that, before the search, it knew 2000 Belle Chasse Highway housed other businesses in addition to River Birch and that during the search, the Government saw substantial evidence of other businesses. Despite this knowledge, the Government failed to limit its search in any meaningful way.

At the close of the evidentiary hearing, the Government stated that an Eleventh Circuit case with facts similar to ours supported its argument that the search of 2000 Belle Chasse Highway was appropriate. *United States v. Ofshe*, 817 F.2d 1508 (11th Cir. 1987), involved a warrant for one business but a search of seven businesses. Unlike the present case, the Government in *Ofshe* did not know until after the warrant was issued that there were separate businesses on the premises. *Id.* at 1514. In the search of 2000 Belle Chasse Highway, the Government knew about other businesses in advance. In *Ofshe*, the warrant was for "Appliance King, Division of Fed-Air," and "[o]f the seven offices in the building, six were used by Fed-Aire, Appliance King or appellant." *Id.* Unlike *Ofshe*, our warrant was for River Birch, and only six of the 24 rooms on the third floor were used by River Birch. Most importantly, in *Ofshe* "the agents followed exactly the authority of the warrant in that they searched only for the two safes and the Appliance King Division of Fed-Aire of Florida, Inc. premises. Their actions were reasonable." *Id.* Here, unlike *Ofshe*, the agents searched every room on the third floor of 2000 Belle Chasse Highway and seized documents and computers from every single business. They did not follow the authority of the warrant and they did not limit their search in any way. Accordingly, *Ofshe* does not support the Government's argument, and in fact puts the Government's callous disregard into sharper focus because it shows how reasonable agents could have limited their search to one that was constitutionally valid.

With respect to callous disregard for and irreparable injury to the plaintiffs' privacy rights, the Government's violations are continuing. While it is true that *United States v. Calandra*, 414 U.S. 338 (1974), does not normally allow suppression of evidence in a motion to return property, the Fifth Circuit has noted that suppression is an option when there is a substantial showing of irreparable harm. *United States v. Search of Law Office, Residence, and Storage United Alan Brown*, 341 F.3d 404 (5th Cir. 2003). As the Court has already found, the plaintiffs have been irreparably harmed by the seizure of attorney-client privileged documents, some of which were prepared in response to the Government's pending investigation. This harm is continuing and some of it may be preventable, because according to Agent Bezet the Government has not yet begun to review the 4.7 terabytes of computer data that it seized. Tr. at 63.

As just one example of irreparable harm, the Court well knows the manner in which three boxes labeled Attorney-Client Privileged were seized and the conflicting explanations given:

In its January 25 memorandum, the Government stated that it reviewed the Attorney-Client Privileged boxes "on-scene by the review team due to the labeling by the Petitioners" and only seized non-privileged documents. Rec. Doc. No. 41 at p. 3 (emphasis added).

In its February 14 memorandum, the Government stated that "there was no consultation on-scene by the 'clean team' of the investigatory team as to whether a document may be privileged. However, documents found by the investigatory team as possible containing privileged material were immediately given to the 'clean team' to be segregated for further review." Rec. Doc. No. 48 at p. 10 (emphasis added).

At the February 24 hearing, Agent Bezet testified that there was on-scene review of the boxes by the clean team and that the seizing agents "took the three boxes [labeled Attorney-

Client Privileged] to the taint team in Peter Butler's office and asked them if it was, in fact, privileged materials or could be, you know." Tr. at 81. Agent Bezet further testified that a final determination on privilege was made by an attorney. *Id*. If this is true, that determination could not have been made on scene because there were no Government attorneys on site.

On the other hand, Agent Zummer, who helped carry those three boxes out of Lea Forbes' office, testified that he did not bring the boxes to the clean team, but to the regular, non-privileged evidence control point. Tr. at 160. Agent Zummer testified that these boxes were reviewed at the evidence control point and a determination was made that they did not contain privileged materials: "My understanding is that they were reviewed on the scene and nothing privileged was found in there – or nothing potentially privileged was found in there, that I was told there was no communication with any attorney in those boxes." *Id*. at 159. Agent Zummer explained that this determination was made at the general, evidence control point: "At the time it was taken to the evidence control point, which is the term I used, they were determined to not be privileged or not even potentially privileged." Tr. at 165. In direct contradiction to Agent Bezet's testimony, these documents were neither reviewed by the clean team nor an attorney.

In light of the Government's cavalier attitude toward the handling of attorney-client privileged documents, the plaintiffs request that the Court enjoin the Government from continuing to review the seized computer servers, which the Government should not have taken in the first place and which Agent Bezet stated have not yet been searched. Tr. at 63.

In *Garrison*, the Supreme Court held that "if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's [Garrison's] apartment from the scope of the requested warrant." 480 U.S. at 85. The Court further explained that had the

officers been aware of their error, they were under an obligation "to discontinue the search" as soon as the error was discovered. *Id.* at 86-87 (emphasis added). In the present case, the Government knew it was searching numerous businesses in addition to River Birch without a valid warrant and did nothing. Accordingly, the Court should uphold its order requiring the Government to return the property it unlawfully seized.

**CONCLUSION**

For the foregoing reasons, the plaintiffs request that the Court make a finding that the Government's search of 2000 Belle Chasse Highway was objectively unreasonable and order the Government to return all property unlawfully seized from 2000 Belle Chasse Highway.

Respectfully submitted,

*/s/ William P. Gibbens*
Kyle D. Schonekas, 1187
William P. Gibbens, 27225
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
Poydras Center
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Telephone: (504) 680-6050
kyle@semmlaw.com
billy@semmlaw.com

Attorneys for Frederick R. Heebe, Shadowlake Management, L.L.C., Fred Heebe Investments, and Live Oak Homes Corporation

*/s/ Michael S. Walsh*
Michael S. Walsh, 8500
LEE & WALSH
257 Maximilian Street
Baton Rouge, LA 70802
Telephone: (225) 344-0474
Michael@leeandwalsh.com

Attorney for Willow, Inc. and Heebe & Heebe, P.L.C.

*/s/ Robert N. Habans, Jr.*
Robert N. Habans, Jr., 06395
HABANS & CARRIERE
10843 N. Oak Hills Parkway
Baton Rouge, Louisiana 70810
Telephone: (225) 757-0225
bobhab@bellsouth.net

Attorney for A.J. Ward, Jr

*/s/ Edward J. Castaing*
Edward J. Castaing
CRULL, CASTAING & LILLY
601 Poydras Street, Suite 2320
New Orleans, Louisiana 70130
Telephone: (504) 581-7700
ecastaing@cclhlaw.com

Attorney for River Birch, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2011, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

**Gregory M. Kennedy**, usalae.ecfcr@usdoj.gov
**Salvador Perricone**, usalae.ecfcr@usdoj.gov

*/s/William P. Gibbens*
WILLIAM P. GIBBENS