1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5    HEEBE, ET AL.                *    Docket 10-CV-3452-C
                                  *
6    versus                       *    New Orleans, Louisiana
                                  *
7    UNITED STATES OF AMERICA     *    February 24, 2011
     * * * * * * * * * * * * * * *

8

9                      PROCEEDINGS BEFORE THE
                    HONORABLE HELEN G. BERRIGAN
10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12

13   For the Plaintiffs:          Schonekas Evans McGoey & McEachin,
                                       LLC
14                                BY:  KYLE D. SCHONEKAS, ESQ.
                                  BY:  WILLIAM P. GIBBENS, ESQ.
15                                650 Poydras Street
                                  Suite 2150
16                                New Orleans, Louisiana  70130

17

                                  Crull, Castaing & Lilly
18                                BY:  EDWARD J. CASTAING JR., ESQ.
                                  601 Poydras Street
19                                Suite 2320
                                  New Orleans, Louisiana 70130
20

21

                                  Habans & Carriere
22                                BY:  ROBERT N. HABANS, JR., ESQ.
                                  10843 North Oak Hills Parkway
23                                Baton Rouge, Louisiana  70810

24

25

APPEARANCES CONTINUED:

For the Plaintiffs:          Lee & Walsh
                             BY:  MICHAEL S. WALSH, ESQ.
                             257 Maximilian Street
                             Baton Rouge, Louisiana  70802


For the Government:          U.S. Attorney's Office
                             BY:  GREGORY M. KENNEDY, ESQ.
                             BY:  SALVADOR R. PERRICONE, ESQ.
                             BY:  WILLIAM QUINLAN, JR., ESQ.
                             BY:  BRIAN KLEBBA, ESQ.
                             BY:  JAMES MANN, ESQ.
                             BY:  MICHAEL MCMAHON, ESQ.
                             BY:  PETER MANSFIELD, ESQ.
                             500 Poydras Street
                             Room HB-210
                             New Orleans, Louisiana 70130



Official Court Reporter:     Jodi Simcox, RMR, FCRR
                             500 Poydras Street
                             Room HB-406
                             New Orleans, Louisiana 70130
                             (504) 589-7780



Proceedings recorded by mechanical stenography, transcript

produced by computer.

# I N D E X

                                                                    Page

MALCOLM J. BEZET
     Direct Examination By Mr. Gibbens             8
     Direct Examination By Mr. Habans             42
     Direct Examination By Mr. Castaing           57
     Direct Examination By Mr. Walsh              60
     Cross-Examination By Mr. Kennedy             66
     Redirect Examination By Mr. Gibbens          82

PETER SMITH
     Direct Examination By Mr. Schonekas          87
     Direct Examination By Mr. Habans            114
     Direct Examination By Mr. Castaing          115
     Cross-Examination By Mr. Kennedy            117
     Redirect Examination By Mr. Schonekas       126

KYLE SCHONEKAS
     Direct Examination By Mr. Habans            131
     Cross-Examination By Mr. Perricone          138

MICHAEL ZUMMER
     Direct Examination By Mr. Kennedy           145
     Cross-Examination By Mr. Gibbens            156
     Cross-Examination By Mr. Habans             162

SCOTT DOWNIE
     Direct Examination By Mr. Perricone         169
     Cross-Examination By Mr. Gibbens            194
     Cross-Examination By Mr. Habans             198

JAMES MANN
     Direct Examination By Mr. Perricone         203
     Cross-Examination By Mr. Habans             215

1          <u>**MORNING SESSION**</u>

2          **(February 24, 2011)**

3                    * * * * *

4          **THE DEPUTY CLERK:**  All rise.

5          **THE COURT:**  Have a seat, please.

6          **THE DEPUTY CLERK:**  Civil Action 10-3452-C, *Frederick*

7    *R. Heebe, et. al. versus United States of America.*

8          **THE COURT:**  Is there anybody at the U.S. Attorney's

9    Office right now?  Who is going to actually speak?

10         **MR. KENNEDY:**  Judge, on behalf of the government, it

11   will be myself and Mr. Perricone, Greg Kennedy.

12         **THE COURT:**  All right.

13         **MR. GIBBENS:**  Your Honor, I think at some point

14   probably all of us on our side.  Mr. Schonekas and I for

15   Mr. Heebe; and then Mr. Habans represents Jim Ward;

16   Mr. Castaing represents River Birch; and Mr. Walsh represents

17   Willow, Inc., and Heebe & Heebe.  But I'll take the bulk of the

18   time, Judge.

19         **THE COURT:**  All right.  Now, does either side

20   actually have additional evidence you want to introduce?

21         **MR. KENNEDY:**  Nothing than what's been submitted

22   prior, Your Honor.

23         **THE COURT:**  What about from you all?

24         **MR. GIBBENS:**  Your Honor, the government has asked

25   for an evidentiary hearing on this on the -- and specifically

asked the Court to make a credibility determination between the
statements that the agents have submitted and the affidavits
that have been submitted to the Court and all the other
evidence that's been submitted.

We'd like an opportunity to call Agent Bezet, as
well as the other agents who were on the scene, because the
statement has been made that neither Agent Bezet nor any of the
other agents that were with him could see the directory when
they entered the building.

We'd also like to -- we also have pending a
motion to enforce judgment, and we'd like to call several of
the agents on that issue, as well as to what has been returned,
what has not been returned, and why certain -- what's happened
to certain attorney/client privileged materials and why they
have not been returned.

    **THE COURT:** Okay. Where are the agents?

    **MR. KENNEDY:** The agents are outside in the hallway,
Your Honor.

    **THE COURT:** Okay. All right. Do you have any
problem with them calling your witnesses?

    **MR. KENNEDY:** Judge, it would be repetitive. I think
what we asserted in our answers and pleadings was that the
agents did not see. I don't think it was ever a question of
whether they could see if they peered through certain doors or
certain things. They stated they did not see it. So just for

1  that point of clarification.

2             We'll be happy to present the agents for

3  testimony, but I think that that is the clarification.

4         **THE COURT:**  Well, do you want to call them or do

5  you --

6         **MR. KENNEDY:**  I intend to call several agents in our

7  case, Your Honor, for the motion for reconsideration, but we do

8  not intend to call all of the agents.

9         **THE COURT:**  Okay.  Well, maybe my question wasn't

10  clear.  I was asking -- I started off by asking if there was

11  any additional evidence that either side wished to present and

12  I thought you said no.

13        **MR. KENNEDY:**  No, I --

14        **THE COURT:**  So now you're saying yes.  Okay.  Fine.

15  Then let's cut to the chase and call your first witness.

16        **MR. KENNEDY:**  I apologize, Your Honor.  I

17  misunderstood.  I thought you meant other documents or photos.

18        **THE COURT:**  No problem.

19             By the way, just in terms of clarification since

20  we're talking about confusion, and maybe my order was not

21  particularly clear, but I never intended to say that there was

22  a directory on the third floor.  The reference was to the third

23  floor directory, which was actually on the first floor, that

24  said what was on the third floor.  That was what my intention

25  was.  It may not have been as artfully drafted as I thought.

1    But, no, the only directory is on the first floor, and I don't

2    challenge that.

3              Okay.  Do you want to call your first witness?

4              MR. KENNEDY:  Yes, Your Honor.

5              MR. GIBBENS:  Your Honor, we would ask to be able to

6    present first, Judge.  I mean, I know the underlying motion is

7    our motion and -- I mean, as long as the Court doesn't have an

8    objection to it.  I don't know if the government objects to

9    that.

10             THE COURT:  Do you care?

11             MR. KENNEDY:  We don't, Your Honor.

12             THE COURT:  Okay.  Go ahead.

13             MR. KENNEDY:  That's fine.

14             THE COURT:  Okay.

15             MR. GIBBENS:  Then we'd call agent Malcolm Bezet,

16   Your Honor.  We also ask for a sequestration of witnesses.

17             THE COURT:  I think they're all outside.  Are all the

18   witnesses outside?

19             MR. KENNEDY:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MR. KENNEDY:  Judge, if we could just get a point of

22   clarification as far as sequestration, a couple of witnesses

23   that Mr. Gibbens has subpoenaed is myself and Mr. Mann with the

24   U.S. Attorney's Office.  I'm assuming that does not apply.  I

25   don't know if they still have any intention of calling us as

1  witnesses, but I would just like a point of clarification on
2  that, if we could, please.
3          MR. GIBBENS:  We do, Your Honor.  We have no
4  objection to that.  I think there's the possibility that
5  Mr. Schonekas and I may also be witnesses, and as long as that
6  applies to both sides.
7          THE COURT:  All right.  I think your first witness is
8  here.
9          I'd ask the Marshal to check if anybody who
10 comes in if they're a potential witness in this case to,
11 please, ask them to stay out.
12         MR. CASTAING:  Mr. Duplessis just walked in, Judge,
13 and he possibly could be a witness.
14         THE COURT:  All right.  Then he needs to step out.
15 Please don't talk with anybody out in the hallway about this
16 case.
17         (WHEREUPON, **Malcolm J. Bezet**, having been duly sworn,
18 testified as follows.)
19         THE DEPUTY CLERK:  Please state your full name and
20 correct spelling for the record.
21         THE WITNESS:  My name is Malcolm, M-A-L-C-O-L-M, J.,
22 Bezet, B-E-Z-E-T.
23                    **DIRECT EXAMINATION**
24 **BY MR. GIBBENS:**
25 **Q.**   Agent Bezet, you're an FBI agent?

1          **MR. KENNEDY:**  Your Honor, before we get into -- can I

2    just ask, is there a possibility of moving the podium?  I can't

3    see anything that's going on at the witness stand.

4          **THE COURT:**  The podium is where it's always been.

5          **MR. SCHONEKAS:**  Maybe if he could swap seats with one

6    of the guys that isn't going to ask questions, Your Honor.

7          **MR. KENNEDY:**  Well, I'll try to go this way.  This is

8    fine.

9          **THE COURT:**  Or if you want to sit -- in a bench

10   trial, I sit in the jury box, if you want to sit over there.

11         **MR. KENNEDY:**  Thank you, Your Honor.

12         **THE COURT:**  All right.  Go ahead, Mr. Gibbens.

13   **BY MR. GIBBENS:**

14   **Q.**   You're an FBI agent; correct?

15   **A.**   Correct.

16   **Q.**   You've been an agent for eight years?

17   **A.**   Over eight years, but, yes.

18   **Q.**   As an agent, you've been trained in obtaining and

19   executing search warrants?

20   **A.**   That's correct.

21   **Q.**   Did you prepare the affidavit for the search warrant in

22   this case?

23   **A.**   I did not.

24         **MR. GIBBENS:**  Can we pull up Exhibit 1?

25

1  BY MR. GIBBENS:

2  Q.   The search warrant in this case was for the offices of

3  River Birch Landfill, was it not?

4  A.   That's correct.

5  Q.   The landfill itself is in Avondale, Louisiana; correct?

6  A.   The dump site, I believe, is in Avondale.  The offices for

7  the business are at 2000 Belle Chasse Highway.

8  Q.   But to figure out that the business offices were at 2000

9  Belle Chasse Highway, you all had to do some research on that,

10  correct, to find that out?

11  A.   That's correct.

12  Q.   Because --

13       MR. GIBBENS:  Let's go to Exhibit 3.

14  BY MR. GIBBENS:

15  Q.   -- if you look in the phone book --

16       MR. GIBBENS:  Can we zoom in a little bit on the

17  River Birch entry?

18  BY MR. GIBBENS:

19  Q.   If you look in the phone book, it gives you 2000 South

20  Kenner Road, Avondale, Louisiana, and that's not the location

21  you searched; correct?

22  A.   We searched -- that's correct, that's not the --

23  Q.   2000 Belle Chasse Highway.

24       If you look at --

25       MR. GIBBENS:  Let's go to Exhibit 4.

1  BY MR. GIBBENS:

2  **Q.**   River Birch's Web site also shows 2000 South Kenner Road

3  in Avondale; correct?

4  **A.**   Correct.

5  **Q.**   So you all were searching, not the landfill offices, but

6  the corporate offices which were at 2000 Belle Chasse Highway?

7  **A.**   I don't know what offices are at the dump.  We were

8  searching the business offices at 2000 Belle Chasse Highway.

9  **Q.**   To find out -- one place that you can look to find out

10  where River Birch's corporate offices are would be in the

11  Secretary of State corporate records.  Are you aware of being

12  able to access those?

13  **A.**   Yes.

14        **MR. GIBBENS:**  Let's pull up Exhibit 5.

15  BY MR. GIBBENS:

16  **Q.**   Did you or anybody on your team access the Secretary of

17  State records to look and see what -- what information they had

18  about River Birch?

19  **A.**   I'm not sure what other people accessed, but I have

20  accessed the Secretary of State Web site and I have seen that

21  before.

22  **Q.**   Okay.  So if you've seen that, you've seen -- you could

23  tell from this that the domicile address for River Birch, Inc.,

24  is at 2000 Belle Chasse Highway?

25  **A.**   That's correct.

1  **Q.**   You can also see that the registered agent, Heebe & Heebe,
2  PLC, is also at 2000 Belle Chasse Highway?
3  **A.**   That's correct.
4  **Q.**   Was that -- did you all check the Secretary of State
5  records before you obtained or executed the search warrant in
6  this case?
7  **A.**   I believe so.
8  **Q.**   So you knew before the search that Heebe & Heebe was
9  located at 2000 Belle Chasse Highway?
10  **A.**   I did not know Heebe & Heebe was located there.
11  **Q.**   But you at least had access to this document that had a
12  2000 Belle Chasse Highway address for Heebe & Heebe?
13  **A.**   I may have seen that before, but I don't remember seeing
14  that that was located there at the time.
15  **Q.**   Now, if you could find the corporate information on River
16  Birch, you would have been able to find the corporate
17  information on any of the -- any other of Mr. Heebe's or
18  Mr. Ward's companies; is that right?
19  **A.**   That's correct.
20  **Q.**   Did you do any research on that before you executed the
21  search warrant?
22  **A.**   On some of their other companies, yes.
23       **MR. GIBBENS:**  Let's pull up Exhibit 7.
24  **BY MR. GIBBENS:**
25  **Q.**   This is Live Oak Homes Corporation, and that's one of

1  Mr. Heebe's companies; correct?

2  **A.**   Yes.

3  **Q.**   That has a domicile address of 2000 Belle Chasse Highway?

4  **A.**   That's correct.

5  **Q.**   Were you aware of this before you executed the search?

6  **A.**   No, I was not.

7  **Q.**   But the records were certainly available?

8  **A.**   Well, yes, the information's available.

9  **Q.**   I mean, this -- anybody can get on the Internet, go to the

10 Secretary of State's site and pull it up?

11 **A.**   Well, you can't search the Secretary of State Web site by

12 address.  I believe it's only -- the only way I know to search

13 it are by the principals or the names of individuals or by

14 corporate names.  So it's not like you can just put in 2000

15 Belle Chasse Highway and every business that's domiciled will

16 pop up.  I don't believe you can do that.

17 **Q.**   But if you put in the name "Heebe" or the name "Ward,"

18 this record would have popped up?

19 **A.**   Yes.

20      **MR. GIBBENS:**  Let's go -- can we go to the second

21 page of that?  The next page.

22 **BY MR. GIBBENS:**

23 **Q.**   Same thing with Shadowlake Management, that's also at 2000

24 Belle Chasse Highway.  Were you aware that that was one of

25 Mr. Heebe's companies?

1   **A.**   I believe I had heard of Shadowlake before.  But as you

2   can tell, by the principals, I don't think that would pop up on

3   the Secretary of State Web site if you search under Heebe's

4   name.

5   **Q.**   So then -- if you hadn't heard of Shadowlake before the

6   warrant, the warrant definitely was not to search Shadowlake?

7   **A.**   The warrant was to search 2000 Belle Chasse Highway.

8   **Q.**   The offices of River Birch?

9   **A.**   Are located there, yes.

10  **Q.**   Then let's go to the next company on there, Willow, Inc.

11  Again, 2000 Belle Chasse Highway.  If you go down to the

12  "Officers," you've got Albert Ward is one of them, and also

13  Heebe & Heebe you've got there as 2000 Belle Chasse Highway --

14  **A.**   That's correct.

15  **Q.**   -- is that correct?

16         Just another way you can -- you know, you can't

17  search 2000 Belle Chasse Highway on the Secretary of State

18  site, but you can type in "2000 Belle Chasse Highway" into

19  Google or search that on the Internet.  Did you do that?

20  **A.**   Yes.

21         **MR. GIBBENS:**  Let's pull up Exhibit 8.  Go down under

22  "Places for 2000 Belle Chasse Highway."

23  **BY MR. GIBBENS:**

24  **Q.**   So that shows Peter J. Butler, LLC; Willow, Inc.; and

25  Shadowlake Management Company.  Did you do this search before

1  the search?

2  A.   No.  I believe we typed in the name "River Birch" and got

3  the 2000 Belle Chasse Highway that way.  I didn't just type

4  "2000 Belle Chasse Highway."  I think I searched under River

5  Birch's name.

6  Q.   Okay.  So when you searched under River Birch's name, you

7  didn't get the Web site that we just showed you that had the

8  Avondale address?

9  A.   I've seen that Web site before, yes.

10 Q.   But all the information that we just showed you is free,

11 you can get it over the Internet, and pretty much anybody with

12 a computer can find it; correct?

13 A.   Correct.

14 Q.   You didn't do any of this before the search?

15 A.   I did search the Secretary of State Web site.  I believe

16 we already established that --

17 Q.   You searched for --

18 A.   -- and googled "River Birch."

19 Q.   You searched the Secretary of State Web site for "Fred

20 Heebe" and "Jim Ward"?

21 A.   And for some of the companies that we knew about, we had

22 run them through there.  I had not gone through the Secretary

23 of State Web site for every corporation that he's ever been a

24 member or principal of at that point.  Our investigation wasn't

25 focused on all of his assets.  We were focused on River Birch,

1   and some of the other corporations, too, that are associated

2   with it.

3   Q.   Doing any of these searches, though, you would see that

4   2000 Belle Chasse Highway is a registered address for other

5   companies besides River Birch; correct?

6   A.   Correct.

7   Q.   Now, even if you had not done any kind of research

8   beforehand, you all knew that Willow was located in this

9   building before the search; right?

10  A.   It's on the billboard out front, Willow, Inc.

11  Q.   That was --

12          MR. GIBBENS:  Let's go back to Exhibit 1.

13          THE WITNESS:  Actually, I think it's Willow Homes, if

14  I'm not mistaken.

15          MR. GIBBENS:  To the second page.

16  BY MR. GIBBENS:

17  Q.   You even refer to it in the attachment to the search

18  warrant, that there's a sign and that "Willow Homes" is on it,

19  but there's no -- you have no authority to search Willow Homes?

20  A.   The authority was to search 2000 Belle Chasse Highway.

21  Q.   Well, but you limited it to the offices of River Birch

22  Landfill; correct?  What does it say in the top sentence?

23  A.   That's the attachment, but I believe the front part of the

24  warrant says, "2000 Belle Chasse Highway."

25  Q.   Okay.  Let's go to the front, page 1.  This says, "2000

1  Belle Chasse Highway, Gretna, Louisiana, further described in
2  Attachment A," and you further describe that as --
3          MR. GIBBENS:  Let's go back to the second page.
4  BY MR. GIBBENS:
5  Q.   -- "the offices of River Birch Landfill"; correct?
6  A.   That's where they're located, correct.
7  Q.   That's what you were intending to search?
8  A.   That's correct.
9  Q.   But despite knowing this -- seeing this sign out here, you
10 know, you obviously did some research before about other
11 businesses located at this building, you searched the entire
12 thing and didn't take any steps not to search Willow,
13 Shadowlake, Live Oak, or anything else in the building?
14         MR. KENNEDY:  Judge, I'm going to object.  It's
15 argumentative and compound as well.  It's getting into argument
16 at this point.
17         THE COURT:  It sounded a little compound.
18         MR. GIBBENS:  Sorry.
19         THE COURT:  Sustained.
20 BY MR. GIBBENS:
21 Q.   You knew that Willow was in this building before the
22 search; right?
23 A.   That's correct.
24 Q.   But you didn't take any steps to make sure that Willow was
25 not searched, did you?

1   A.   That's correct.  It was commingled with River Birch.  We
2   searched River Birch; if Willow was in that, it was in that.
3   Q.   But what steps did you take to make sure that you didn't
4   search Willow?  I mean, you say it's commingled, but what did
5   you -- at the time of the search, you just searched -- you
6   searched every room in the building; right?
7   A.   That's not correct.  We only searched the third floor of
8   that building.
9   Q.   Well, every room on the third floor?
10  A.   That's correct.
11  Q.   You didn't limit yourselves to any -- you know, you didn't
12  say, "We're not going to search any particular rooms."  You
13  searched every single one?
14  A.   There were no particular rooms that were not part of River
15  Birch as far as I can tell.
16  Q.   Well, when you seized -- you seized materials from all
17  these different companies; correct?  From Willow, from Live
18  Oak, from Shadowlake?
19  A.   That's correct.
20  Q.   So the documents themselves that you took told you these
21  other companies were there?
22  A.   That's correct.
23  Q.   Peter Butler's office, you knew that was there before you
24  executed the search; right?
25  A.   That's correct.  We knew Peter Butler had an office there.

1  **Q.**   Before you searched that office, you have to go through
2  some special Department of Justice policies to get authority to
3  search a lawyer's office; right?
4  **A.**   That's correct.
5  **Q.**   And that's because -- the reason for those policies is
6  because you don't want to go in and search information
7  belonging to other clients who aren't subjects of the
8  investigation?
9         **MR. KENNEDY:**  Judge, I'm going to object.  He's
10  testifying at this point.  It's not a question.  He's merely
11  stating facts.
12         **THE COURT:**  Overruled.  Overruled.
13             Can you answer the question?
14         **THE WITNESS:**  Can you repeat the question?
15  BY MR. GIBBENS:
16  **Q.**   Is the reason for that Department of Justice policy to
17  protect other clients' information from being searched as
18  opposed to the clients who might be the subjects of an
19  investigation?
20  **A.**   It's -- it's about you would want to protect other people
21  that's not related to the search warrant.  But you also don't
22  want to have the agents having privileged material that's the
23  subject's either.  Not all communications between a lawyer and
24  client are privileged, but we certainly wouldn't want to access
25  those.

1    **Q.**   But in this particular case, there was a specific concern

2    about other clients of Peter Butler aside from River Birch or

3    Mr. Heebe or Mr. Ward; correct?

4    **A.**   There was concerns about other clients of Mr. Butler's or

5    maybe even the parties of River Birch as well.

6    **Q.**   But, you know, despite knowing or being concerned that

7    there would be other clients' information there, the

8    government's taken the position that Mr. Butler was not a

9    separate law firm but was part of River Birch; is that right?

10    **A.**   We thought Mr. Butler was in-house counsel.  As an

11    attorney, Mr. Butler, I think he has an obligation to keep

12    client files for years.  I don't know what he stored in there.

13    We would have had no information about that, that of a risk

14    that other clients, either past or maybe he does side work we

15    wouldn't know, would be in that space.  We had a clean team.

16    **Q.**   Well, did you do any research to see if Mr. Butler had any

17    other pending cases for other clients at the time of the

18    search?

19    **A.**   I did not.

20    **Q.**   And, in fact, Mr. Butler does represent other people --

21    he's not in-house counsel for River Birch, is he?

22    **A.**   I don't know if he's only in-house counsel for River Birch

23    or has other clients or not.  He may have some, but I'm not

24    sure about his legal -- I haven't reviewed the stuff from his

25    office.  I wouldn't know.

**Q.**    But, in any event, the warrant did not give authority to
search Peter J. Butler, LLC.  It was just for River Birch?

**A.**    It was for 2000 Belle Chasse Highway.

**Q.**    Now, as far as the execution of the search, how many
search warrants have you executed?

**A.**    I couldn't tell you off the top of my head.  I've been in
the bureau eight years.  I've been on numerous search warrants.

**Q.**    More than ten?

**A.**    It could be.

**Q.**    But it's not an everyday occurrence, is it?

**A.**    No, it's not.

**Q.**    It's -- they're important and you put a lot of time and
effort into them; correct?

**A.**    Certainly.

**Q.**    When you go in on a search, I mean, you are -- you're
focused on everything, you're trying to take everything in;
right?

**A.**    Yes.

**Q.**    You're -- I mean, you don't want to miss any important
details?

**A.**    You wouldn't want to miss important details, no.

**Q.**    In this particular search, there were about 24 agents; is
that right?

**A.**    That sounds about right.

**Q.**    And it lasted about 11 hours?

1  A.   Yes, about 11 hours, maybe a little less.

2  Q.   You got there about 7:30 a.m. and left around 6:30?

3  A.   Right.

4  Q.   Let me first ask you about going into the building.  The

5  government filed a pleading before the Court's inspection of

6  the building and they said, "The government specifically

7  requests that the Court inspect all entrances and exits to 2000

8  Belle Chasse Highway.  Special Agent Bezet stated in his

9  affidavit that he did not enter the premises through the

10 entrance closest to the elevator, but instead used another

11 entrance to access the building and then used the stairway to

12 the third floor."

13          MR. GIBBENS:  Can we pull up Exhibit 10, please?

14 BY MR. GIBBENS:

15 Q.   Now, at the top left corner, that's the entrance closest

16 to the elevator; correct?

17 A.   I'm having trouble discerning from the diagram.  Let me...

18 Q.   Well, do you see the word "elevator" at the top?

19 A.   Okay.  I see it now.

20 Q.   Okay.  There's an entrance to the building there?

21 A.   Yes.  I see it.

22 Q.   You went in a separate entrance?

23 A.   I went in the entrance from the outside and went straight

24 up the stairwell.  I did not go in through the second door that

25 leads to the elevator.

1   Q.   Okay.  So you went in through the entrance right in front
2   of stair 1?
3   A.   Initially, yes.
4   Q.   Okay.  Now, that's the entrance that's a -- the main
5   entrance is a glass door underneath the green awning; do you
6   remember that?
7   A.   Yes, there's an awning there.
8   Q.   And that leads into the stairwell.  I mean, does this --
9   does this depiction generally -- is it generally accurate in
10  your recollection?
11  A.   Yes.
12  Q.   So you go in through the glass door and then directly in
13  front there's another door that leads into the elevator room?
14  A.   Yes, there was a closed door, I believe, there.  Yes.
15  Q.   It was closed?
16  A.   On the day of the search warrant, when we got there before
17  the business was opened, I believe that inside door was closed.
18  Q.   Okay.  So when you -- and you've stated in your affidavit
19  that when you went in, you took the stairs so you did not
20  see -- well, let me back up.
21        Directly through that door there is a -- that's where
22  the building directory is, in that little atrium to the
23  elevator; correct?
24  A.   Yes.  I saw it there when the judge came out for her
25  visit.

1   **Q.**   Okay.

2         **MR. GIBBENS:**  Let's go ahead to clip 1.

3         (WHEREUPON, the video clip was played.)

4         **MR. GIBBENS:**  Okay.  Go ahead and pause it for a

5   second.

6   **BY MR. GIBBENS:**

7   **Q.**   All right.  Now, that's Peter Smith; correct?

8   **A.**   Yes.

9   **Q.**   Directly behind him, is that you?

10   **A.**   It is.

11   **Q.**   Do you see that door knob in the bottom left corner?

12   **A.**   Okay.  I see it.

13   **Q.**   So that would mean that that door was opened when you

14   walked in; correct?

15   **A.**   I guess it could have.  I thought it was shut.

16   **Q.**   And this is the time when you went in and you didn't see

17   the directory; right?

18   **A.**   Right, right.

19   **Q.**   Okay.  So let's just play it through once and then I'll go

20   back again and I may have a couple of questions.

21         (WHEREUPON, the video clip was played.)

22   **BY MR. GIBBENS:**

23   **Q.**   So that's you right there.

24         (WHEREUPON, the video clip was played.)

25

1  BY MR. GIBBENS:

2  Q.   So, Agent Bezet, you're still saying you did not see the

3  directory when you walked in just then?

4  A.   The first time I ever saw the directory was well after the

5  search when I saw a photograph of it at the U.S. Attorney's

6  Office.

7  Q.   Okay.

8          MR. GIBBENS:  Let's go play that -- play that back

9  again.

10          (WHEREUPON, the video clip was played.)

11          MR. GIBBENS:  Okay.  Go ahead and pause it for a

12  second.  Can we -- I think we can advance it slowly.

13          Can you advance that for us, Andi, please?

14  BY MR. GIBBENS:

15  Q.   Okay.  What are you looking at right there, Agent Bezet?

16  A.   I wanted to see if there was anyone on the first floor,

17  any people, if there's any businesses or if it's open down

18  there.

19  Q.   So you looked in -- you looked into -- to do that you have

20  to look into that elevator room; correct?

21  A.   I may have seen the sign, but I don't remember reading it,

22  and that's my testimony about that.  I don't remember reading

23  that sign.  I did not remember seeing it.  And I wasn't aware

24  of it until I was shown a picture of it at the U.S. Attorney's

25  Office.

1   Q.   Agent Bezet --

2   A.   Yes.

3   Q.   -- in the affidavit you submitted to the Court, you said

4   not only did you not see the sign, but nobody else that was

5   with you saw the sign.

6   A.   Not to my knowledge, no.

7   Q.   Did you ask anybody else on the team if they saw that

8   sign?

9   A.   I did not.

10  Q.   So how could you say that nobody else saw that sign,

11  including you?

12  A.   When we discussed it in Peter Smith's office after the

13  search, we were talking about the sign and everyone said, "I

14  don't remember any sign like that."

15  Q.   When did you talk about that?

16  A.   After all this came to light.

17  Q.   After the motion to return property had been filed?

18  A.   It was after the search warrant, and after -- I believe it

19  was after the motion had been filed.  That's why it became an

20  issue.  We didn't know it was an issue until then.

21  Q.   So you and Agent Smith and who else said that they didn't

22  remember seeing that sign?

23  A.   It was just me and Agent Smith that I remember discussing

24  it.  I didn't remember Bob being -- Zummer being with us, but

25  evidently they are.

**Q.**   Do you remember anything else inside that room when you
looked in it?

**A.**   Not really, no.

**Q.**   Because the --

          MR. GIBBENS:  Let's go back to the floor plan real
quick.

BY MR. GIBBENS:

**Q.**   So you were looking in to -- through that door, which you
said was closed, but now you say you remember it was opened?

**A.**   I thought it was closed, but it looks like it's open.

**Q.**   And you were trying to look to see if anything was in that
vacant part of the building?

**A.**   Well, when you're entering a premises, you're looking for
people or making sure it's not an unsecured space or anything.
I mean, there's a lot of things you're looking for or thinking
about when you walk in a place.

**Q.**   Well, did you try that -- you see we've got the -- the
front door, the door to the elevator room, and then that third
door.  It didn't look like you even tried that door?

**A.**   No.

**Q.**   You just looked in the room and left?

**A.**   Right.

          MR. GIBBENS:  Let's pull up Exhibit 11.

BY MR. GIBBENS:

**Q.**   You didn't see that?

1  A.   I didn't remember seeing that until I saw the picture at
2  the U.S. Attorney's Office the first time.  But it confirms
3  that the third floor, 2000 Belle Chasse is River Birch.
4  Q.   And six other companies?
5  A.   No direct -- no suite numbers, no room numbers.  They all
6  say "Third Floor."  They're all commingled.
7  Q.   When you went in, you knew to go straight to the third
8  floor?
9  A.   Peter Smith had been there before.  He knew it was on the
10 third floor.  And the Google search, I believe, on the
11 Internet, it says, "River Birch, Third Floor, 2000 Belle Chasse
12 Highway."  And I believe it said that on the Secretary of
13 State's Web site too.
14 Q.   And it said that for Heebe & Heebe also?
15 A.   I saw it this morning.  It said that -- well, I don't
16 remember.  I'd have to look at it again.  It says it on that
17 sign there, though.
18 Q.   Now, you said in your affidavit that you couldn't see the
19 sign if you take the stairs, but you could see it if you take
20 the elevator; is that right?
21 A.   I thought it was by the elevator.  I didn't remember the
22 sign.  And I thought that the reason I didn't see the sign is
23 because I took the stairwell up.  I didn't remember where the
24 sign was.  I thought from the picture that it was -- they said
25 it was by the elevator.  I thought it was next to the elevator.

1  Q.   Well, you didn't say, "I thought," or, "I remember seeing
2  the sign there," in your affidavit, did you?
3  A.   I did not see the sign when I -- I did not remember where
4  the sign was from the search warrant.  I had no conscious
5  recollection of reading it.  It didn't make an impression on me
6  on the search warrant day.  It wasn't until the pictures later
7  and until now.
8  Q.   But you said that, "This sign would only be visible to
9  individuals that entered the building and accessed the third
10  floor using the single elevator."
11  A.   I thought that was true, yes.
12  Q.   And you didn't change this thought or story until you saw
13  these videos yesterday; is that right?
14  A.   Actually, until just now I didn't realize that door was
15  open.  I thought it had been closed until today.
16  Q.   Did you watch these videos last night?
17  A.   I didn't see that door knob.  I didn't notice it.
18  Q.   Right.
19        So it wasn't until just now when you realized that
20  door was opened that you had to say that door was opened?
21  A.   Right.
22  Q.   Now, even if you can't see the directory from the stairs,
23  you can see it if you use the elevator; correct?
24  A.   If you walk through that door and you were looking for it,
25  you would definitely see that sign.

1  **Q.**   You used the elevator during the search; right?

2  **A.**   Yes, I did.

3  **Q.**   How often?

4  **A.**   I don't know.  Towards the -- you know, the initial part

5  of the search where we were looking for documents, we used it

6  when we were taking things down and bringing them up.

7  **Q.**   Any idea about how many times you used it?

8  **A.**   I don't know.  I mean, we carried a lot of stuff down.  I

9  would say I made quite a few trips up and down that elevator.

10 **Q.**   More than ten?

11 **A.**   I don't know if it was more than ten, but it could have

12 been.  I mean, we took a lot of documents and we, you know,

13 carrying trash out and having people come up and down.

14 **Q.**   If I told you 15 times that you took the elevator, would

15 you dispute that?

16 **A.**   I wouldn't dispute it.  You'd have to show me the video,

17 but it could be 15 times.  Sure.

18 **Q.**   And every one of those 15 times, you would have walked

19 right past this directory?

20 **A.**   Right.

21 **Q.**   You said before that during a search, you're -- you're

22 trying to take in everything and you don't want to miss a

23 single detail?

24 **A.**   I wouldn't want to intentionally miss a detail, no.

25 **Q.**   But in all of those 15 times, you don't remember seeing

1   this directory?

2   A.   I don't remember seeing the directory.  But bear in mind,

3   too, when I went to the search, I was intending to search the

4   third floor of River Birch.  This sign is two floors below.

5   And in the third floor space, there's no differentiation

6   between any of these businesses.  There's no other signs like

7   that.  There's no suite numbers.  There's no room numbers.

8         The third floor is what I went there to search.  I

9   knew where it was.  So I wasn't looking for a directory to tell

10  me.  I went to the third floor.

11  Q.   But you would be interested in seeing a directory that had

12  six other businesses in the building that you wanted to search,

13  would you not?

14        **MR. KENNEDY:**  Judge, I'm going to object.  This has

15  been asked and answered about five times at this point.

16        **THE COURT:**  Overruled.

17        **THE WITNESS:**  Certainly, I would have been interested

18  if other businesses were separate and apart in there or

19  something of that nature.

20  **BY MR. GIBBENS:**

21  Q.   And so -- and this would have been a very important

22  indication of that, wouldn't it?

23  A.   It would be an indication that they had other businesses

24  that use that address.  Yes, it would.

25  Q.   And of the 24 other agents -- or the 23 other agents that

1  were with you, did you ask them -- you didn't ask any of them
2  about this directory, did you?
3  A.   No, I did not.
4  Q.   Before you submitted this affidavit that said, basically,
5  that nobody saw it?
6  A.   No, I did not.  Because I knew that we had initially taken
7  the stairs up the entry part of the warrant.  I didn't know if
8  the other people had taken the elevator or not.
9  Q.   All right.  Let's talk about when you got up to the third
10 floor.  You've also said in your affidavit that you, "Observed
11 no independent identifying information located on the third
12 floor that would have alerted agents to other businesses'
13 spaces housed within the common office space"?
14 A.   That's correct.
15 Q.   Okay.  You all had no trouble finding the Law Offices of
16 Peter J. Butler, didn't you?  I mean, the clean team set up
17 right away in there; correct?
18 A.   That's correct.
19 Q.   So didn't have to have -- I mean --
20 A.   I believe we had that.  I'm not sure if they asked
21 someone, but I believe they did.
22 Q.   Who did they ask?
23 A.   I don't know.  But there's no signs that say "Law Offices
24 of Peter Butler," or anything of that nature that would direct
25 you to his office.

| | |
|---|---|
| 1 | **Q.** But you all found it? |
| 2 | **A.** It's our job, yes. |
| 3 | **Q.** Let me show you some other things that were up there. |
| 4 | **MR. GIBBENS:** Let's go to Exhibit 13. |
| 5 | **BY MR. GIBBENS:** |
| 6 | **Q.** Did you see this plaque for Willow Homes? |
| 7 | **A.** I don't remember seeing that. I'm thinking I was looking |
| 8 | for River Birch items. But I knew Willow Homes was there from |
| 9 | the billboard out in front of the business. |
| 10 | **MR. GIBBENS:** Let's go to Exhibit 14. |
| 11 | **BY MR. GIBBENS:** |
| 12 | **Q.** See these boxes that say "Scanned Leases"? |
| 13 | **A.** Sure. |
| 14 | **Q.** What did that have to do with River Birch? |
| 15 | **A.** Well, one, just because it has a label on it doesn't mean |
| 16 | that's what's in the box. So I don't know if those were, in |
| 17 | fact, scanned leases from the label. And I don't know if River |
| 18 | Birch has leased land out or they leased vehicles or what. I |
| 19 | wouldn't be able to tell from that label whether or not there |
| 20 | was the evidence that we were seeking in those boxes. |
| 21 | **Q.** But you know that Shadowlake is a real estate management |
| 22 | company; correct? |
| 23 | **A.** Actually, I wasn't sure at that point. I mean, I know |
| 24 | that Shadowlake is a real estate management company, but I'm |
| 25 | not sure if it's like an apartment complex. I'm not sure of |

1   the details of Shadowlake at this point.

2   **Q.**   But -- so looking at leases would put you on notice that

3   this might be Shadowlake?

4   **A.**   I would say no.  I mean, I don't know if they have other

5   corporations.  It could be Shadowlake.  Heebe and Ward are very

6   wealthy men with lots of interests.  I don't know if that's

7   Shadowlake or other companies they have or if it's River Birch

8   or what just based on that picture.

9   **Q.**   But there's nothing that would make you think that scanned

10  leases had anything to do with River Birch.  You're just saying

11  you didn't know what was in those boxes?

12  **A.**   I didn't know what was in those boxes.

13          **MR. GIBBENS:**   Let's go to Exhibit 15.

14  **BY MR. GIBBENS:**

15  **Q.**   Did you see this?

16  **A.**   I don't remember reading that label.  I mean, there's a

17  ton of stuff in there.

18  **Q.**   But there were labels on file cabinets; correct?

19  **A.**   There were labels on some file cabinets.  Many file

20  cabinets weren't.

21  **Q.**   This one is Calypso Bay.  I mean, what does that have to

22  do with River Birch?

23  **A.**   But just because it's a label doesn't mean that's what's

24  in the file cabinet, or that there's nothing commingled in that

25  file cabinet.  I can't judge a book by its cover or a file

1  cabinet by its label.  I wouldn't know what's in it based on
2  that.
3  Q.   But you have -- to search something you have to know
4  you've got authority to search it, don't you?
5  A.   Right, and I had a warrant for 2000 Belle Chasse Highway.
6  Q.   For the offices of River Birch?
7  A.   Which are located there, yes.
8  Q.   You knew Willow was there; correct?
9  A.   Willow Homes, yes.
10 Q.   You knew there were other companies there?
11 A.   Well, I mean, I don't know if their corporate headquarters
12 are there or what their business involvement is there, if they
13 have other places, if they're still active, if they're
14 inactive, if they -- I don't know the ins and outs of the
15 complex business relationships of Ward and Heebe and the
16 companies they have there.
17        MR. GIBBENS:  Let's go to Exhibit 16.
18 BY MR. GIBBENS:
19 Q.   These are some binders labeled "Calypso Bay."  Do you
20 remember seeing those?
21 A.   I don't remember seeing those, but I'm sure there probably
22 were binders like that there.
23        MR. GIBBENS:  How about 17.  Let's go to 17.2.
24 BY MR. GIBBENS:
25 Q.   Parc Fontaine Condominium Association, did you see that?

1    A.   I'm sure there were file cabinets with labels like that

2    and binders there that had others label on them for other

3    businesses.

4              MR. GIBBENS:  Let's see No. 18.  Zoom into 18.2.

5    BY MR. GIBBENS:

6    Q.   Do you see these, "Collections/Parc Fontaine,"

7    "Collections Re: Esplanade"?

8    A.   Sure.

9    Q.   Did you see those?

10   A.   Yeah.  They had lots of file cabinets with other

11   businesses and things like that.

12             MR. GIBBENS:  Let's go to 19.

13   BY MR. GIBBENS:

14   Q.   Some other -- you know, Parc Fontaine Condominium

15   Association, Shadowlake Management, Live Oak Homes.  Did you

16   see those?

17   A.   I don't specifically remember seeing them.  But I remember

18   seeing binders with other business labels like that on them,

19   yes.

20             MR. GIBBENS:  Exhibit 20.  Go to 20.2.

21   BY MR. GIBBENS:

22   Q.   Business card of Shadowlake Management.  Did you see that?

23   A.   I don't remember the card holder, no.

24   Q.   21, "Sensitive Planning Design Gives Shadowlake Its

25   Appeal."  Did you see that one?

A.    They had posters and stuff on the walls.  But, obviously,
those aren't evidence of illegal activity, so I'm not reading
all that stuff.  I'm trying to administer the search there.  I
mean, I'm sure they had things like that posted.  I'm not
denying that.

Q.    22, "Apartment Association of Louisiana."  That's got
nothing to do with River Birch, does it?

A.    I didn't seize it.

Q.    23.

       MR. GIBBENS:  Let's zoom in to the next one, 23.2.

BY MR. GIBBENS:

Q.    Above "Shadowlake Apartments, Gretna, Louisiana."  Did you
see that one?

A.    Yes.  There were lots of stuff like this that was not
related to River Birch that we did not take.

Q.    But you said that there was no indications that there were
any other businesses up there?

A.    What I said was that there were no indications of other
spaces.  If you read that again, I think you'll see that's what
it says.

Q.    So if you walk into this office and you see, let's say,
this poster on the wall --

       MR. GIBBENS:  Let's go back to Exhibit 21.

BY MR. GIBBENS:

Q.    -- that on the wall --

1          MR. GIBBENS:  Exhibit 20 -- 20.2, I'm sorry.

2     BY MR. GIBBENS:

3     Q.    -- that on the bookshelf --

4          MR. GIBBENS:  Exhibit 19.

5     BY MR. GIBBENS:

6     Q.    -- those on the bookshelves, that's not indication that

7     that office doesn't belong to River Birch?

8     A.    If a man has 20 corporations that he runs from his home

9     and I go into his home and see strewn about throughout his

10    residence evidence from his 20 corporations, that doesn't mean

11    I can't search that space if I have a warrant for that address.

12          These are commingled and there are no discernable

13    space that says exclusively, "This is the offices of

14    Shadowlake.  These are the offices of River Birch," or some of

15    the other companies on that placard.

16    Q.    When you got the search warrant and -- did you all get it

17    from Judge Moore?

18    A.    I believe so, yes.

19    Q.    Did you all go to Judge Moore and say, "We're going to go

20    search a commingled enterprise"?

21    A.    I didn't.  I'm not the affiant.  I didn't go to Judge

22    Moore.

23    Q.    You're not aware of any evidence that was provided to the

24    judge who authorized this affidavit that there was anything

25    commingled.  This was a warrant that was just for River Birch;

1 is that right?

2 **A.**    It was for 2000 Belle Chasse Highway, and we knew that

3 Ward and Heebe have a lot of companies and used things to hide

4 their activities.

5 **Q.**    So you knew that there were other companies when you went

6 in from the beginning?

7 **A.**    I knew Willow Homes was on the billboard out front for

8 sure.

9 **Q.**    You didn't have a warrant to search Willow Homes; right?

10 **A.**    I had a warrant for 2000 Belle Chasse Highway.

11 **Q.**    But nothing -- you had no probable cause for Willow Homes.

12 You didn't even try to establish that?

13         **MR. KENNEDY:**  Judge, I'm going to object.  This has

14 been gone -- this is really getting to a point of argument.

15 He's answered and they keep going back and forth.

16         **THE COURT:**  Yes.  We are getting redundant, so please

17 move on to something new.

18         **MR. GIBBENS:**  Sure.

19 **BY MR. GIBBENS:**

20 **Q.**    When you also arrived at the scene, there were a number of

21 employees present; correct?

22 **A.**    There were several employees present, yes.

23 **Q.**    You didn't interview any of them to ask them where they

24 worked, did you?

25 **A.**    Well, they're in the office.  I knew they worked at that

1   location.

2   **Q.**   But you didn't ask them what business they worked for?

3   **A.**   I didn't interview the employees.  We just moved them from

4   the space to secure the scene initially.

5   **Q.**   You didn't ask them to help you identify what rooms

6   belonged to what businesses?

7   **A.**   As far as we knew, it was all River Birch and maybe

8   commingled with other things.

9   **Q.**   One employee that was interviewed -- one person that was

10  interviewed was Scott Manzella.  Do you know who that is, the

11  computer guy?

12  **A.**   I'm not sure if he's an employee or a contractor, but he's

13  their computer guy.

14  **Q.**   He told you all what computer servers belonged to what

15  businesses; correct?

16  **A.**   He described what the computer servers were used for and

17  what -- I guess what businesses they were used for, yes.

18  **Q.**   You were able to verify that?

19  **A.**   No.  Just because a person tells you that this is how the

20  business had me set them up, I have no way of knowing, and

21  neither would he, what the employees of that business have

22  saved, stored, moved about on those systems.  He knows what

23  they're describing and what they're labeled, but the full

24  content of a computer server, having terabytes of information,

25  what is or is not on there would be impossible to determine on

1   the site quickly.

2   **Q.**   But you were able to verify the information he gave you

3   about what computers belonged to what businesses, weren't you?

4   I mean, that's what you say in your affidavit.

5   **A.**   Yeah, that what computers belong to what businesses.

6   Sure.

7   **Q.**   So even after he told you that, and you verified that they

8   belonged to Shadowlake or Willow or Live Oak Homes, you

9   searched all those computers too?

10  **A.**   We searched -- well, we imaged them on-site.  We don't

11  actually do the search there.

12  **Q.**   Right.

13          But you imaged all of them?

14  **A.**   We didn't image all of the computers, no.

15  **Q.**   Well, you didn't image the firewalls, but you imaged

16  everything that had documents or data on them; correct?

17  **A.**   We imaged any computers that we thought could have had

18  evidence that we were seeking using the warrant.

19  **Q.**   Despite what company they belonged to?

20  **A.**   Well, you don't know if that's -- all of the company's

21  records are on there.  It's a computer.  Any of the employees

22  can store any information they want on there.  And those

23  employees and the principals are controlled by River Birch and

24  its principals.

25          **MR. GIBBENS:**  Could I have one second, Your Honor?

1          **THE COURT:**  Yes.

2          **MR. GIBBENS:**  I have no further questions, Judge.

3          **THE COURT:**  Anybody else from the defense?

4          **MR. HABANS:**  Just a couple, Your Honor, if I could.

5          **THE COURT:**  The defense -- I don't know what to call

6 you.

7          **MR. HABANS:**  Actually, the plaintiff, Judge.

8          **THE COURT:**  The plaintiff, right.

9                    **DIRECT EXAMINATION**

10 BY MR. HABANS:

11 Q.   Agent Bezet, my name is Bob Habans.  I represent Jim Ward.

12 I have just a couple of questions.

13         I understood you to say you were not the affiant on

14 the search warrant.  Who was?

15 A.   Peter G. Smith.

16 Q.   Peter Smith.

17         Did you participate in drafting the affidavit in

18 support of the search warrant?

19 A.   I had input into it.  You know, Peter asked me about

20 different aspects of it.

21 Q.   Did you have input into drafting the warrant itself, that

22 is the first two pages that identified the space to be searched

23 and the documents to be seized?

24 A.   We had done -- yes, we had done surveillance on that

25 location.

1  Q.   Did you have the assistance of an AUSA in the preparation
2  of the affidavit?
3  A.   Yes.
4  Q.   Who was the AUSA that helped?
5  A.   I believe it was Greg Kennedy.
6  Q.   And did you have assistance from an AUSA in the drafting
7  of the search warrant itself, the wording on the first two
8  pages?
9  A.   I believe Greg Kennedy assisted with that.
10 Q.   Isn't it a practice or a procedure that for a federal
11 agency to request the issuance of the search warrant, an AUSA
12 has to approve its drafting and content?
13 A.   I'm not sure if it actually has to be approved by its
14 drafting, but I'm not sure about the procedure for that.
15 Q.   And is --
16 A.   I haven't been the affiant on the search warrant before.
17 Q.   Have you since learned that Mr. Kennedy or some other AUSA
18 was the assistant who approved the search warrant and helped
19 present it to the magistrate judge?
20 A.   I wasn't there when it was presented to the magistrate
21 judge.
22 Q.   You do understand that a search warrant -- you said -- you
23 talked before about rights to search areas and spaces.  You do
24 understand that the search warrant is an authorization to
25 search issued by the United States District Court?

1   A.   Yes.

2   Q.   You do understand that it's qualified?

3   A.   Define that.

4   Q.   Not -- it's limited, it's not unlimited.

5   A.   Well, yes.

6   Q.   Do you understand that you have any duty upon discovering

7   the existence of other companies that occupy a space to be

8   searched, that you have a responsibility to discontinue the

9   search if you discover that you're searching companies not

10  identified in the search warrant?

11         **MR. KENNEDY:**  Judge, I'm going to object.  That's

12  testifying at this point also, and, again, it's a compound

13  question.

14         **THE COURT:**  Did you understand the question?

15         **THE WITNESS:**  I believe I did.

16         **THE COURT:**  Okay.  Overruled.

17         Go ahead.  You can answer.

18         **THE WITNESS:**  Absolutely not.  I mean, if I have a

19  search warrant for the home of a, say, a bank robber where I'm

20  looking for evidence and I find out he has a live-in girlfriend

21  in his apartment, I don't have to get a new search warrant for

22  her.  They cohabitate together within that space.

23         These businesses are no different than that.

24  They all share the same office space completely.  The same

25  people control them.  These aren't separate businesses with

1  separate offices that exclude one from another.  They're
2  commingled.
3  **BY MR. HABANS:**
4  Q.    You saw Mr. Gibbens' slides, which I won't take time to go
5  over again.  Isn't it correct that you or other searching
6  agents went into file cabinets that were identified with the
7  names of other companies and searched those file cabinets?
8  A.    That's true.
9  Q.    And, therefore, it gave you no hesitation or pause that
10  those file cabinets were labeled with the names of other
11  companies?
12  A.    It did not.
13  Q.    Now, did you have anything to do in preparation for the
14  search warrant with the briefing of a clean team?
15  A.    Yes.
16  Q.    Who briefed the clean team?
17  A.    I briefed all the agents, you know, before the search
18  warrant.  I don't believe the clean team had additional
19  questions that they asked another agent on the search warrant
20  scene.
21  Q.    Maybe you misheard, sir.  I asked you:  Who briefed the
22  clean team?
23  A.    I said that I did, and I believe --
24  Q.    I didn't understand that.
25  A.    Again, I did, and Agent Zummer answered questions for the

1  clean team at the search scene.

2  Q.   We understand, sir, that the clean team focused on Peter

3  Butler Jr.'s office.  Is that what you understand?

4  A.   Absolutely.

5  Q.   Is it your understanding further that the clean team did

6  not on-site review other privileged information that was

7  discovered within the files and records of other companies

8  which were searched?

9  A.   That's not true.  If something was thought to be

10 privileged that was found in another part of the search, it was

11 brought to the clean team for them to review.

12 Q.   In preparation for the search warrant, did you all have

13 discussions of how you identify privileged information?

14 A.   Yes.

15 Q.   The obvious things, such as on attorney letterhead,

16 indicative of possible privilege, therefore, should be referred

17 to the clean team?

18 A.   We did not say just because something has attorney/client

19 letterhead it's indicative of being privileged, no.

20 Q.   Well, isn't the idea of a clean team to avoid having the

21 searching agents who are involved in the case read privileged

22 information?

23 A.   Yes, it is.

24 Q.   But, yet, that didn't happen in this search, did it; that

25 is the clean team wasn't the first eyes to look at a number of

1  these documents?  They were read by the searching agents,
2  weren't they?
3  **A.**   Yes.  If they were found outside of the offices and an
4  agent saw that and they thought it was privileged, they brought
5  it to the clean team.
6  **Q.**   When you said, "Outside the offices," you mean outside
7  Peter Butler's office?
8  **A.**   Outside Peter Butler's office and his secretary's -- or
9  there was a secretary -- I don't know if it was just his -- I
10  know it wasn't just his -- in the space in front of his office.
11  **Q.**   So then the agents made a qualitative decision as to
12  whether or not a document was privileged by reading it and then
13  delivering it to the clean team?
14  **A.**   By reviewing it and bringing it to the clean team, yes.
15  **Q.**   Whereas they wouldn't have taken presumptive -- a position
16  presumptively that correspondence from a lawyer to his client
17  might be privileged and that that determination should be made,
18  in the first instance, by the clean team?
19  **A.**   Could you repeat that?
20        **MR. HABANS:**  Could you read it back, please, ma'am?
21        (WHEREUPON, the requested portion of the record was
22  read by the court reporter.)
23        **MR. KENNEDY:**  Judge, I'm going to object.  He's
24  asking this witness to speculate on what other witnesses -- or
25  other persons may or may not have done.

1    **THE COURT:**  Why don't you rephrase it.

2    **MR. HABANS:**  Yes, ma'am.

3  BY MR. HABANS:

4  **Q.**   Were you the supervising agent on the execution of the

5  search warrant?

6  **A.**   My supervisor is Peter Smith, but I was case agent for the

7  search warrant.

8  **Q.**   Then I guess the answer would technically be *yes* for the

9  question; is that right?

10  **A.**   The case agent makes decisions on the scene about the

11  search.  My supervisor was on scene as well, is the answer.

12  **Q.**   All right.  So you were the one that were making decisions

13  regarding whether or not a document should be read by an

14  investigative case agent as opposed to an agent appointed

15  simply for purposes of serving on the clean team?

16  **A.**   I don't understand your question.

17  **Q.**   You said -- you told these agents that you were the

18  supervising as regards the execution of the search warrant that

19  they could read privileged documents and then decide whether to

20  give them to the clean team?

21  **A.**   Absolutely not.  What the statement was, "If, in your

22  search, you find something that you think might be privileged,

23  you don't read it and process it.  You take that document to

24  the clean team immediately and have them review it and make a

25  determination whether or not it is, in fact, a privileged

1  document."

2  **Q.**   Who explained to these searching agents how to identify a

3  privileged document?

4  **A.**   I briefed them on what to do if they found something

5  privileged.  But as far as what could constitute a privileged

6  document, there's numerous things:  It can be notes, it could

7  be drafts.  I mean, just about any document has a potential to

8  be privileged.  It's attorney/client communications that you're

9  concerned about.

10 **Q.**   Sir --

11            **THE COURT:**  Let me jump in.  What instructions did

12 you tell the investigating team about privileged documents?

13 What specifically did you tell them they needed to look for,

14 not look for, whatever.

15            **THE WITNESS:**  When we initially did the search

16 warrant -- we don't have clean teams on all the search warrants

17 we do, just ones where we think we're likely to encounter

18 privileged material.  We thought we were likely to encounter

19 privileged material because we had a law office in there.  So

20 that's why the clean team was in there.

21            I didn't expect to find privileged documents in

22 the rest of the search.  As the things cropped up, it was kind

23 of like a surprise.  There were only a few that we found, you

24 know, as we were going through the search.

25            And once it became apparent that we found a

few -- because the attorneys for River Birch were present on
the scene and they had objected -- we told the people,
"Whatever you find that you think could be privileged, out of
an abundance of caution, bring it to the privilege team that's
in Peter Butler's office and let them make the determination
before you seize it."

THE COURT:  Okay.  So you did not initially tell any
of the investigating agents about privileged documents?

THE WITNESS:  Not in -- well, I did in the law office
part, the clean team members --

THE COURT:  Right.  I understand that.  I understand
the clean team.

THE WITNESS:  -- but not outside of that, no.

THE COURT:  Okay.  Then the -- you're saying the
attorneys -- some of the attorneys pointed out that there was
some privileged documents that were being looked at or
reviewed?

THE WITNESS:  Early in the search, I believe Gordy
Hyde had found a document, or whatever, that had a cover sheet
on it, like a -- like he was referring to a fax cover sheet or
something.  I didn't see it, but I heard about it.  And we told
the agents then, "If you find anything that's privileged, take
it to the clean team."

THE COURT:  What did you tell them that they could do
in terms of -- could they read a document?  What instructions

1    did you give them?  I mean, it's one thing to say, "I told them

2    if they find something privileged."  How did they know -- did

3    you give them any instructions about how they could determine

4    if something was privileged?  Yes or no?  If you did, you did;

5    if you didn't, you didn't.

6             **THE WITNESS:**  I didn't, I don't believe.  I mean, I

7    trusted them to know what *privileged* is.  We've encountered

8    this in other parts of our job.  You know, I expected them, as

9    agents, to know if something could be privileged,

10   attorney/client.  Yeah.  What I mean to say is, I didn't take

11   all the agents outside and brief them about what to do if they

12   found privileged --

13            **THE COURT:**  What is your understanding of what an

14   agent can do if he sees a document -- let's say it's on

15   attorney letterhead, can that agent read the entire document to

16   make an assessment as to whether it's privileged?

17            **THE WITNESS:**  I wouldn't, no.  Well, you know

18   attorney/client letterhead -- the attorney/client -- just

19   because an attorney and a client have something in their office

20   on a letterhead doesn't make it privileged.  It has to do with

21   the communications about their case or their trial or whatever.

22            If you found something that went to a third

23   party, like there's a letter that's from an attorney to

24   Jefferson Parish, you know, it's outside -- it's not between

25   the attorney and the client anymore, it has a third party in

1    it, it would break the privilege.  Or if it was something that

2    was the crime fraud exception because it's a conspiracy between

3    the parties.

4              But as far as making a determination like that,

5    as an agent, I wouldn't want to make that determination.

6              THE COURT:  If you see a letter that's addressed, the

7    top of the letter says the name of the client, okay, and it's

8    on the attorney letterhead, do you feel you can read that

9    document to determine if the content of that document is, in

10   fact, privileged?

11             THE WITNESS:  I would stop reading the document based

12   on the letterhead and have someone make a determination for me.

13             THE COURT:  Okay.  Go ahead.  I'm sorry.  Pardon the

14   interruption.

15             MR. HABANS:  No, I appreciate the help.

16   BY MR. HABANS:

17   Q.   Agent Bezet, if I understood that last series of answers,

18   then the agents weren't instructed by you supervising this

19   search, with the benefit of having another supervisor there,

20   they weren't instructed not to read documents to determine

21   privilege.  They weren't -- they weren't instructed not to read

22   the documents at all.

23             You said you wouldn't, but did the other people?  You

24   didn't tell them not to, did you?

25   A.   No, I did not tell all the agents not to read privileged

1  communications --

2  **Q.**  And you weren't in any --

3  **A.**  -- outside of Peter Butler's office.

4  **Q.**  Pardon me.

5      And you weren't in any meetings that prepared for the

6  search where that was communicated to these agents except as

7  relates to Peter Butler's office?

8  **A.**  I don't remember if we said, if you find anything, before

9  the search, to bring it to the clean team.But we said it

10  afterwards when we found some documents that were privileged --

11  or not -- I don't know if they were privileged, but they could

12  have been.

13  **Q.**  I understand you said Mr. Schonekas and Gibbens may have

14  objected to the reading of letterhead documents on firm -- law

15  firm letterhead --

16  **A.**  They did.

17  **Q.**  -- and that was when you had some conversation with the

18  other agents; right?

19  **A.**  They made an objection early in the search warrant.  We

20  had conversations about it with other agents, yeah.

21  **Q.**  Tell me, weren't there some boxes in one of the offices

22  that were labeled on the outside of the box in bold print

23  "Attorney/Client Privileged Documents"?

24  **A.**  Yes, there were.

25  **Q.**  Those were taken by you all as well, weren't they?

1   A.   Yes, they were.

2   Q.   Were those read by any of the agents other than the clean

3   team?

4   A.   They were read by the clean team.

5   Q.   I asked:  Were they read by any other agents other than

6   the clean team?

7   A.   I can't speculate on what other people did.  I mean, the

8   boxes were brought to the clean team is my understanding.  The

9   clean team made a determination.  They were checked into

10  evidence.  I read the documents once the determination was made

11  that they weren't privileged.

12  Q.   The documents that were in the box that said

13  "Attorney/Client Privileged Documents"?

14  A.   That's correct.

15  Q.   And somebody made that determination that those weren't

16  privileged?

17  A.   Yes.

18  Q.   Who made that determination?

19  A.   It was one of the clean team members.  The two members

20  were Kevin Hatton and Chris Bower.  I don't know which one.

21  Q.   Those are FBI agents?

22  A.   They are.

23  Q.   What about an attorney who reviewed those documents for

24  privilege?  Were there any attorneys, to your knowledge, who

25  reviewed those documents for privilege?

1    A.    Not those particular three boxes.

2    Q.    Do you know if those documents were copied before they

3    were returned?

4    A.    I do not know if they were copied.  I'd have to check and

5    see.

6    Q.    Who would?

7    A.    We could determine it from the -- going into the evidence

8    room and taking a look.  We make notes of the documents that

9    were copied.

10   Q.    Sir, during the search early in the morning, are you aware

11   of the fact that some of the agents -- or one of the agents had

12   blank grand jury subpoenas that were issued on United States

13   District Court, Eastern District of Louisiana subpoenas for the

14   grand jury, and that agents -- or one agent filled in the names

15   of civilians on the scene at the beginning of the search

16   warrant, got their name and directed -- and handed them a

17   subpoena commanding them to attend the grand jury?

18          Were you aware of that?

19   A.    Yes.

20   Q.    Where did you all get those subpoenas from, the blank

21   subpoenas?

22          MR. KENNEDY:  Judge, I'm going to object.  This has

23   nothing to do with the evidence that was taken in this

24   particular case.

25          THE COURT:  Yes.  We're getting far afield from

1  the --

2       **MR. HABANS:**  May I address that, Your Honor?

3       **THE COURT:**  Sure.

4       **MR. HABANS:**  I really believe it goes to the callous

5  disregard by the federal government of the rights granted to it

6  by the United States District Court, not only in connection

7  with the execution of a search warrant, but that no officer of

8  the court, I believe you will learn, discreetly decided what

9  citizens are going to be commanded under the authority of this

10  court to attend a grand jury.

11       And I think that's a serious problem, and I

12  think it goes to the good faith and the credibility

13  determination that the government wants you to make.

14       **THE COURT:**  Okay.  Well, you verified that they did

15  do that, so let's move on to something else.

16       **MR. HABANS:**  Can I just ask who they got those

17  subpoenas from?

18       **THE COURT:**  Okay.

19       **MR. KENNEDY:**  Judge, I'm going to object to that.

20  It's not relevant to this particular case.

21       **THE COURT:**  No, that's okay.  Go ahead.  He can ask

22  that question.

23       **THE WITNESS:**  I believe it was Greg Kennedy.

24  BY MR. HABANS:

25  Q.   Okay.  You testified earlier -- and this is, I think, my

1  last question -- that you had determined that Peter Butler was

2  in-house counsel or that was your belief.  On what did you base

3  that belief?

4  **A.**  He had left a large law firm, I believe it was Breazeale,

5  Sachse & Wilson, although I don't know if I knew the name of it

6  before, and he'd started working inside River Birch's space and

7  had an office in River Birch's space.  We thought that was

8  because he had come on board as in-house counsel.

9  **Q.**  Just to follow-up, did you do anything to verify whether

10  or not Mr. Butler was representing any other people in courts

11  in state or federal court?

12  **A.**  No, I did not.

13        **MR. HABANS:**  That's all I have.  Thank you, sir.

14        **THE COURT:**  Okay.  Please plow new ground.

15        **MR. CASTAING:**  No, it will be, Judge.

16        **THE COURT:**  Okay.

17                      **DIRECT EXAMINATION**

18  BY MR. CASTAING:

19  **Q.**  Agent Bezet, my name is Eddie Castaing.  I represent River

20  Birch, the company.

21        Do you recall on that day meeting an employee of

22  River Birch named Mike Drawe?

23  **A.**  I don't know if I met Mike Drawe.  I believe he was there.

24  I saw Mike Drawe there, yes.

25  **Q.**  Okay.  Did -- well, let me ask you this:  How was it that

1  the computer guy, Scott Manzella, came to the scene of the
2  search?

3  A.   I think we called him.

4  Q.   Who called him?  Did you call him or did you have an
5  employee call him?

6  A.   I think Scott Downie called him.

7  Q.   Who did?

8  A.   Scott Downie.

9  Q.   Okay.  Do you have any recollection that maybe you
10 asked -- you or Peter Smith asked Mike Drawe to call the
11 computer guy and he did call Scott Manzella and that's why
12 Scott Manzella came to the scene?

13 A.   Scott Manzella was brought to the scene because we found
14 out about him from River Birch employees, I believe.

15 Q.   Okay.  And that employee could be Mike Drawe?

16 A.   It could be, yes.

17 Q.   Now -- well, let me ask you this:  Did you determine who
18 the employees were actually employed by, the ones that you
19 found on the scene on September 23rd?

20 A.   No, we did not.  I did not ask them who they were employed
21 by.  We didn't know who all worked for River Birch at that
22 point.

23 Q.   But they were there, were they not?  I mean, there were
24 employees there when you got there?

25 A.   There were employees there when we got there, but it was

1  early and all the employees weren't there.  So we had agents

2  downstairs with subpoenas and as people would show up for work,

3  they issued them subpoenas.

4  Q.  Well, let me ask you this:  Do you recall asking Mike

5  Drawe -- I mean, are you aware that Mike Drawe was the only

6  River Birch employee, actual employee, at the building that

7  day?

8  A.  I'm not aware of that.

9  Q.  You wouldn't know that because you didn't ask anybody?

10  A.  No.

11  Q.  Okay.  Do you recall asking someone to help you out with

12  some keys to a file cabinet that was locked?

13  A.  That wasn't me.

14  Q.  That was not you?

15  A.  No.

16  Q.  Okay.  No problem.

17          So do you ever recall riding in an elevator with an

18  employee that was assisting you in obtaining keys or documents

19  or anything else?

20  A.  I don't remember that, no.

21  Q.  Okay.  But let me ask you this:  There were employees or

22  at least individuals who worked there who were available for

23  you to interview or other agents to interview for direction as

24  to where certain companies were located?

25  A.  Well, when we first got there, you know, it was early in

1  the morning and all the employees weren't there.  We moved the

2  employees out.  After we moved them out of the space and

3  started doing our preparation to do a search warrant, I don't

4  know who interacted with the employees.

5  **Q.**   But specifically, that might not have -- that might have

6  been another agent who used the cooperation of Mike Drawe to

7  get keys to unlock a file cabinet?

8  **A.**   It could have been, but we wouldn't have relied on the

9  parties to a search warrant to tell us where we should look and

10 where we shouldn't look.  I mean, that --

11 **Q.**   But if something was locked, you might ask an employee to

12 help you out, "Where's a key?  We want to get into this

13 closet"?

14 **A.**   To keep from damaging the property, certainly.

15 **Q.**   Right.  Okay.

16        **MR. CASTAING:**  Thank you, sir.

17                    **DIRECT EXAMINATION**

18 **BY MR. WALSH:**

19 **Q.**   Good morning.  I'm Michael Walsh.  I represent Heebe &

20 Heebe and Willow Homes.

21        Did you go into the room where the computers were?

22 **A.**   Yes.

23 **Q.**   Did you label the computers based on what Scott Bezet told

24 you -- Scott Manzella?

25 **A.**   I didn't label the computers.

1  **Q.**   Who did?

2  **A.**   That would be -- the people who examined those are CART

3  agents.  That would be either Scott Downie or Larry Robinson,

4  maybe Larry Jones.  Those are computer specialists.

5  **Q.**   Were you there when the computers were imaged?

6  **A.**   Yes, I was there at the third floor.

7  **Q.**   Were the computer tapes that were imaged submitted to the

8  clean team for review prior to the agents reviewing them?

9  **A.**   No.

10 **Q.**   So the agents looked at all the data that was on all the

11 servers without the clean team looking at them?

12 **A.**   No, you don't process the computers on-site.  I mean,

13 those are terabytes of data.  It's impossible.  We don't review

14 that.

15 **Q.**   I got that.  I'm talking about when it got back to the FBI

16 office, who looked at the computer tapes?  The clean team first

17 or the agents first?

18 **A.**   The clean team did.  We have the computers set up where

19 you can search the different computers themselves.  I brought

20 one of the clean team agents down, Chris Bower, and had him

21 look through Peter Butler's computer.

22 **Q.**   Did he look through Heebe & Heebe's computer?

23 **A.**   No, he did not.

24 **Q.**   You did, though?

25 **A.**   I haven't look through it, no.  I haven't processed the

1    computer information yet.

2    **Q.**   You're aware that on some of the hard drives there's a

3    program called PCLaw which has client data on it?

4    **A.**   I'm not aware of that at all.

5    **Q.**   You haven't looked at that?

6    **A.**   No.

7    **Q.**   If I told you that there was a computer billing system on

8    one of the hard drives that would have other clients of the law

9    firm on there, would that be privileged information?

10   **A.**   It depends on the content.  I wouldn't know.  I haven't

11   seen that.  I don't know about that.

12   **Q.**   I'm asking you:  Would that be privileged?

13   **A.**   I'm not -- repeat your question.

14   **Q.**   If you looked in the PCLaw that had a billing entry and

15   that said, "Conference with U.S. Attorney about possible plea

16   agreement," would that be privileged, if the lawyer billed for

17   that?

18          **MR. KENNEDY:**  I'm going to object.  He's asking for a

19   legal conclusion of the witness.

20          **THE COURT:**  Sustained.

21          **MR. WALSH:**  I'll move on.

22   BY MR. WALSH:

23   **Q.**   So you haven't looked at any of the hard drives from Heebe

24   & Heebe?

25   **A.**   I have not.

1  **Q.**   Has anybody else?

2  **A.**   No.  Heebe & Heebe wasn't the focus of our search.  If

3  it's on there, it's --

4  **Q.**   But you're aware Heebe & Heebe had an office there and it

5  was a law firm authorized to do business in the state of

6  Louisiana based on the search of the corporate database of the

7  Louisiana Secretary of State's Office?

8  **A.**   I am now, but at the time I didn't know that Heebe & Heebe

9  was in there.

10  **Q.**   Were you aware Fred Heebe was a lawyer?

11  **A.**   I was aware that he had -- well, wait, he was almost

12  United States Attorney at one point.  He was nominated for

13  that.

14  **Q.**   Were you aware that Adie Heebe is a lawyer?

15  **A.**   I didn't know about Adie Heebe at the time.  So I was not

16  aware of that, no.

17  **Q.**   Who did you think the other Heebe was?

18        **MR. KENNEDY:**  Judge, I'm going to object.  It's

19  argumentative.  He's answered he does not know who that person

20  was.

21  **BY MR. WALSH:**

22  **Q.**   If it's Heebe & Heebe, who's the other Heebe?

23        **THE COURT:**  Well, if you know.  Do you know?

24        **THE WITNESS:**  I don't know.

25        **THE COURT:**  Okay.  Go on.

BY MR. WALSH:

**Q.**   You didn't follow through on that?  But you knew Peter Butler was --

**A.**   I didn't know the business -- I didn't know Heebe & Heebe was in there, so there was no following through about that.

**Q.**   But you knew Peter Butler was a lawyer?

**A.**   Absolutely.

**Q.**   And on Willow, was there any review of the Willow hard drives?

**A.**   I haven't had time to review the computer stuff yet. We've just been concentrating on the documents because of the volume of materials.

**Q.**   Did the clean team look at the Willow hard drives?

**A.**   No.  They were in Peter Butler's office, not Willow's.

**Q.**   The computers were -- of Willow's were in Peter Butler's office?

**A.**   No.  The -- the clean team was on-site to handle Peter Butler's office.

**Q.**   Right.

**A.**   The clean team doesn't review all the other stuff.  They don't search the rooms.  They don't search the computers in the rooms.  No, they did not.

**Q.**   What I'm asking about is when you image a hard drive, my understanding is, you just basically copy it onto a big hard drive and take it back to the FBI office; correct?

1  **A.**   That's pretty much it.

2  **Q.**   Has Willow's computer information been reviewed by you or

3  the clean team?

4  **A.**   No.

5  **Q.**   It hasn't been looked at at all?

6  **A.**   We may have done -- well, I did some keyword searches to

7  see if something popped up.  It could have been searched in one

8  of those.  But as far as taking Willow's hard drive and going

9  through that hard drive in detail, I have not done that at this

10 point.

11 **Q.**   Are you aware that there was or was not a hard drive for

12 Heebe & Heebe?

13 **A.**   I was not aware of that.  There could have been.

14 **Q.**   And for --

15 **A.**   I mean, I don't know if it would have been labeled as,

16 "Heebe & Heebe," or if it would have just been, "Desk in room

17 such and such."  Because there's no -- nothing in the space

18 that says, "This is Heebe & Heebe."  There's no office for

19 Heebe & Heebe.  There's no delineated space for Heebe & Heebe.

20         So I wouldn't know how a hard drive that could have

21 been used by somebody affiliated with that would have been

22 used.  There would be no way for me to determine that at this

23 time, you know.

24 **Q.**   So when you looked at the hard drives, the one you looked

25 at, there's no delineation on them as to, "This is Heebe &

1  Heebe," or, "This is Fred Heebe," or anything?

2  **A.**   I haven't seen that.  Now, I know that Fred Heebe has a

3  computer, you know, or from their office, or something like

4  that, and it would say, "From this office," and that would be

5  Heebe's computer.  I haven't looked at how it's labeled or

6  described yet.

7             **MR. WALSH:**  Thank you.  I have no further questions.

8             **THE COURT:**  Anything more from the plaintiff?

9             **MR. GIBBENS:**  No, Your Honor.  But before we tender

10  the witness, I wanted to offer Exhibits 1 to 28 and 32.

11             **THE COURT:**  Okay.  Those are admitted.

12             **MR. KENNEDY:**  No objection.

13             **THE COURT:**  All right.  Go ahead, Mr. Kennedy.  Your

14  witness.

15             **MR. GIBBENS:**  We tender the witness.

16             **MR. KENNEDY:**  Thank you, Your Honor.

17                         **CROSS-EXAMINATION**

18  BY MR. KENNEDY:

19  **Q.**   Special Agent Bezet, first of all, let's just talk about

20  the computers themselves and in terms -- were you familiar with

21  Attachment B of the search warrant?

22  **A.**   Yes.

23  **Q.**   Did Attachment B allow you to seize computer and

24  computer-related items that were found in 2000 Belle Chasse

25  Highway?

1  A.    Yes.  It's in the first paragraph, I believe.

2  Q.    Okay.  In the first paragraph of that, it does

3  specifically allow for those types of software and computer

4  peripherals, all the items that are contained or having to do

5  with computers?

6  A.    Absolutely.

7  Q.    Where were the computers located at 2000 Belle Chasse

8  Highway?

9  A.    Well, you have some computers throughout the office.  You

10  have another room.  I believe it was in the front of Demaris

11  Winters' office maybe.  It has a closet full of servers in it.

12  Q.    Okay.  Specifically, the servers that are at issue here

13  regarding -- that were imaged, they were all in Demaris

14  Winters' one location within 2000 Belle Chasse Highway?

15  A.    Yes.

16  Q.    Okay.  You didn't find servers spread out elsewhere?

17  A.    No.

18  Q.    Was there any indication when you first arrived on the

19  scene as to what those servers did or were involved in as far

20  as any businesses within 2000 Belle Chasse Highway?

21  A.    No.

22  Q.    And you brought along, you said, Scott Downie, as well as

23  two other computer tech guys, in order to process that

24  information?

25  A.    Yes.

1  Q.   Generally, what is your procedures as far as computers on

2  scene?  What do you do with those?

3  A.   Well, if we can image them so that we don't disrupt the

4  business, we'll do that, which is what we did in this case.  If

5  you run into time constraints where it's just getting so long,

6  we'll take individual items and image them back at our offices.

7  Q.   You stated specifically that you were responsible for

8  calling Mr. Manzella and asking him to come to the scene?

9  A.   I may have.  I don't remember if I called him or not.  I

10 remember he was called to help with the computers.

11 Q.   Okay.  But he was called, and what was the purpose of

12 having him come to the scene?

13 A.   To save time, to keep the agents from having to go through

14 every single machine and -- the volumes of information can be

15 overwhelming.

16 Q.   Was this in an effort to limit the amount of information

17 that was going to be taken from the premises?

18 A.   Absolutely.

19 Q.   Was it an effort to limit your search on the computers

20 themselves?

21 A.   Yes, it was.

22 Q.   Now, the -- getting back to the beginning of the search

23 warrant here.  Just to start at the beginning, you said that

24 you were involved in the briefing outside?

25 A.   Yes.

1 **Q.** Okay. And you came into the building itself?

2 **A.** I did.

3 **Q.** At any point in time do you recall seeing the directory in

4 the third floor?

5 **A.** I did not recall seeing that directory.

6 **Q.** Let me ask you this: Much has been made, you went up and

7 down, according to the defense -- or excuse me, the plaintiffs,

8 approximately 15 times. And even if you had seen that

9 directory, would that have changed the parameters of your

10 search whatsoever at all?

11 **A.** Absolutely not.

12 **Q.** Could you explain to the Court why not?

13 **A.** When you look at the sign all it says is "Third Floor,"

14 for every single business. They all say the same thing. There

15 are no suite numbers. There are no office numbers. There's no

16 information on that sign that would say which business was what

17 or they were, in fact, separate.

18 Our warrant was for the third floor. We believed

19 that those businesses were controlled by River Birch and their

20 principals, and that all the businesses that are in there are

21 controlled by River Birch and their principals.

22 **Q.** Okay. Who are the principals?

23 **A.** Jim Ward, Fred Heebe.

24 **Q.** Now, when you got to the third floor itself, was there

25 anything -- any independent signs on the walls whatsoever at

all that would indicate that there were separate and distinct
offices within the premises of 2000 Belle Chasse Highway on the
third floor?

A.    No, there's not.  You come up the stairwell or off the
elevator, you see a set of glass doors with no signs, no
writing, no lettering.  You walk through those doors, there's a
single receptionist.  None of the offices have "Shadowlake's
Office," or anything like that written on the doors.

You walk into the center of the floor and it's a
cubed-farm bullpen, you know, where just cubes set up there.
There's no -- there's not even signs on the desk that say who
sits at those desks.  It's not the kind of a business where the
general public appears to come in and you'd have to direct them
to different places or whatever.

There's no signs or indicators of separate spaces for
separate businesses.

Q.    When you got inside of the actual office space within the
third floor within the interior of it, was there anything that
would have alerted you or given you a reason to believe that
there were separate and distinct offices or businesses being
run within that third floor?

A.    Not separate and distinct businesses, no.

Q.    Much has been made about the directories or the binders
that were on there.  Was that indicative to you of a separate
and distinct business or a business space?

A.   No.

Q.   Those -- that particular area that was referenced by the
defense, that bookcase area, was it marked or delineated as
being a separate office space that housed Shadowlake or any
other -- Live Oak or any other apartment complex business?

A.   No, it was not.

Q.   Was there any indication to you that you now had gone from
River Birch to a separate and distinct office space?

A.   No.

Q.   Was there any indication to you anywhere on the third
floor that you had gone from one office space to another?

A.   No.

Q.   In your -- well, first of all, when you first got to the
scene, what is it you and the agents do?

A.   We went on scene, notified them that we had a search
warrant, and removed the employees from the space to secure the
area.

Q.   Okay.  Did you then inspect the spaces?

A.   Yes.  We were preparing for the entry photos to be taken
and the entry sketch -- or the sketch of the premises.

Q.   At any point in time, when you did your initial inspection
of the third floor office space, did it appear to you as if any
of that area was not within the scope of the search warrant?

A.   Absolutely not.

Q.   As far as the law office, or as they term it, a law

1   office, did you know that there was a separate and distinct law

2   office contained within 2000 Belle Chasse Highway?

3   A.   No.  It was a room within there where Peter Butler had a

4   desk and there was a secretary that sat in front of him.

5   Q.   Okay.  That office space, was it separated by anything or

6   anything on the walls that would have indicated it was a

7   separate and distinct law office?

8   A.   No.

9   Q.   The clean team, the purpose for the clean team, can you

10  explain to the Court exactly why it was contained in the

11  warrant that there would be a clean team on scene?

12  A.   Because we knew that there was a law -- there was a

13  lawyer's individual office that was going to be on the

14  premises.  We thought it possible, or even likely, that there

15  may be privileged material in there, and out of an abundance of

16  caution, we set up a clean team to make sure that we didn't

17  seize any of that.

18  Q.   So that was specifically for the purposes of where Peter

19  Butler was --

20  A.   Specifically for Peter Butler.

21  Q.   -- and particular documents themselves?

22  A.   We would not have had that had his office not been in

23  there.

24  Q.   Then the rest of the office space, you were aware of the

25  fact that there was, in fact, a business going on; is that

1  correct?

2  A.    Absolutely.

3  Q.    And in your experience as an agent, you were already

4  asked, you've been on a number of search warrants; isn't that

5  correct?

6  A.    Yes.

7  Q.    Those involved businesses?

8  A.    Yes.

9  Q.    As part of your experience, do you generally always have a

10 taint team?

11 A.    No.

12 Q.    Okay.  Why is the reason for that?

13 A.    One, it's rare to come across things that would be

14 attorney/client privileged stored in homes; and second of all,

15 it just becomes prohibitive.  I mean, the manpower to have

16 these on scene when you probably aren't going to use them or

17 need them at all, it's a -- it taxes our resources.

18 Q.    The taint team itself, as far as potentially privileged

19 documents that were found outside of the office, was that the

20 specific purpose as to why the taint team was there?

21 A.    The specific purpose of the taint team was for items from

22 Peter Butler's office.  But that was just because we had them

23 on-site, we could have them make a determination at that point

24 as opposed to having it done later.

25 Q.    And as far as your review of documents, do you make a

1  cursory review of documents to determine some type of
2  privilege?
3  **A.**    If I was on the search warrant and I picked something up
4  and I saw a letterhead on it or, I don't know, something that
5  would indicate that it was from an attorney/client or spousal
6  privilege or something like that, then I would have to look at
7  it to determine that and make a cursory review.
8  **Q.**    But you would have to make an initial determination; isn't
9  that correct?
10  **A.**    Yes.  I couldn't know it otherwise.
11  **Q.**    Then once you made an initial determination, would you
12  continue to read on further in the document?
13  **A.**    No.
14  **Q.**    And in this particular circumstance, were items turned
15  over to the taint team that were potentially privileged on the
16  scene?
17  **A.**    Yes.
18  **Q.**    Were those, in fact, segregated out --
19  **A.**    At that point they were, yes.
20  **Q.**    -- from what was taken from the regular investigation?
21  **A.**    Unless the taint team made a determination that it
22  obviously wasn't privileged, you know, and it was found
23  somewhere else, they might have put it back in with the
24  evidence or returned it where it was if it wasn't relevant.
25  **Q.**    Okay.  In getting back to the actual search itself, the

1   defense has shown you -- or excuse me, the plaintiff, again,
2   has shown you a number of items regarding file cabinets and
3   things like that.  When you encountered and you went in to
4   search the scene itself, were you able to tell which file
5   cabinets were exclusively River Birch or belonged to other
6   businesses exclusively or storage areas?
7   A.   When you look at the file cabinet, all you can see is what
8   the label -- the label may or may not be accurate.  It may have
9   commingled things.  It may be hiding illegal things.  It may
10  not have anything in it at all.  It may just be an old label.
11  You can't tell based on that.  You have to open the file
12  cabinet drawer and look inside it to see what's in it.
13  Q.   I'll show you, just for the sake of offering these --
14       MR. KENNEDY:  May I approach the witness, quickly,
15  Your Honor?
16       THE COURT:  Has the plaintiff seen the documents?
17       MR. KENNEDY:  Yes, we've provided copies to the
18  plaintiffs.
19       THE COURT:  All right.
20  BY MR. KENNEDY:
21  Q.   Could you look at those and see if they accurately
22  describe the areas you saw on that date, please.
23  A.   (WITNESS COMPLIES.)
24       All right.  I've reviewed them.
25  Q.   Do they depict the scene as you saw them on that

1    particular day?

2    **A.**    Yes, they do.

3    **Q.**    I want to show you also Exhibits 1 and 2, which also have

4    been previously provided.  Is this an accurate diagram of the

5    floor at that point, as well as the log -- the photo log?

6    **A.**    Yes.  It's our sketch of the floor, not to scale, of

7    course, and it's our photo log.

8    **Q.**    Okay.  Agent Bezet, if you could go through the photos and

9    what you just identified.  I'm not going to belabor the point.

10   But if you could just pull out the photos for the Court's

11   review regarding the file cabinets and offices that contain

12   file cabinets that are both labeled and unlabeled.

13   **A.**    Separate the file cabinets?

14   **Q.**    Yes, please.

15   **A.**    (WITNESS COMPLIES.)

16          I've done so.

17   **Q.**    In those pictures, just so -- approximately how many

18   pictures do you have?

19   **A.**    24 -- 25.  25.

20   **Q.**    Just take, for example, Government's Exhibit No. 5, could

21   you explain to the Court, do you see any labels or individual

22   labels on a number of those file cabinets?

23   **A.**    Most of them don't have labels on them.

24   **Q.**    Without having labels, or even if they do have labels, are

25   you able to determine what exactly is contained inside of those

1  particular file cabinets?

2  **A.**   Absolutely not.

3  **Q.**   Did you, in fact, find River Birch items next to or

4  commingled with items that were not related to River Birch?

5  **A.**   Yes.

6  **Q.**   Was that located throughout the office as well?

7  **A.**   Yes, it was.

8  **Q.**   So, therefore, were you able to limit your search to any

9  particular area that would have contained only River Birch

10  items?

11  **A.**   No, I was not.

12  **Q.**   Why was that?

13  **A.**   There was no way to determine which areas could exclude

14  River Birch or their personnel from storing their materials in.

15  **Q.**   Okay.  As far as your knowledge going into the search

16  warrant, did you have any knowledge prior to the execution or

17  the initiation of the search warrant that there were separate

18  and distinct offices located at 2000 Belle Chasse Highway?

19  **A.**   Not separate and distinct offices, no.

20  **Q.**   As a matter of fact, all the Plaintiff's Exhibits that

21  they just showed to you, they all listed an address of 2000

22  Belle Chasse Highway; isn't that correct?

23  **A.**   That's correct.

24  **Q.**   Okay.  There was no delineation of any separate office

25  space or any separate suite numbers or any other separate

1   partitioning information that would have indicated to you they
2   were separate and distinct?
3   A.   No, there was nothing to distinguish them.
4   Q.   Those businesses, and which had been cited by the
5   plaintiffs, have you since come to learn that -- who controls
6   or who are the principals in those businesses?
7   A.   Yes, I have.
8   Q.   Who is that?
9   A.   It's Fred Heebe or Jim Ward, either as principals directly
10  or through employees they had opened those corporations.
11  Q.   So as far as on scene, you guys get there, you allow --
12  you allow the attorneys to actually enter the business; isn't
13  that correct?
14  A.   They were allowed to enter.
15  Q.   Why was the reason for that?
16  A.   Peter Smith had called and determined that they could be
17  there, so he let them in.
18  Q.   Okay.  So the FBI determined that they were going to
19  actually allow the attorneys for the plaintiffs to actually
20  have access to the building during the search; isn't that
21  correct?
22  A.   Yes, they were given access.
23  Q.   You did not exclude them from that?
24  A.   No, we did not.
25  Q.   Okay.  No reason to hide anything from the attorneys

1  whatsoever at all; isn't that correct?

2  A.    That's correct.

3  Q.    The search was conducted in the full view of the

4  attorneys; isn't that correct?

5  A.    Yes.  They walked throughout the search as it was

6  conducted.

7  Q.    Initially, during the entirety of the search, were their

8  movements restricted in any way?

9  A.    No.

10  Q.    So they were free to observe what the agents were doing

11  and what was taking place?

12  A.    Yes.

13  Q.    As far as the binders and the other information that were

14  located within the office space at 2000 Belle Chasse Highway,

15  and which the plaintiffs made reference to, to your knowledge,

16  was anything even taken from those items?

17  A.    We didn't take anything that wasn't related to the search

18  warrant.  I mean, some of the binders that they showed weren't

19  related, so we didn't take those.  I don't --

20  Q.    So they were left on scene?

21  A.    Yes, yes.

22  Q.    Also other areas that contained combined River Birch, as

23  well as other areas, were things left on the scene at that

24  particular time?

25  A.    Far more was left than was taken.

1  Q.   Could you explain to the Court how it was that you tried

2  to limit your search?

3  A.   We tried to limit our search to what was relevant.  I

4  mean, we couldn't process all the information in that place in

5  years.  I mean, it's an entire third floor of a bank building.

6  We tried to parse it down to just what was, A, was in the

7  warrant, which we were allowed to take, and also what was

8  relevant to our investigation to make it where we could process

9  it.

10         We didn't want extraneous things covering up the

11  relevant information.  We didn't take things just to take them.

12  Q.   So you did, in fact, make an effort not to go beyond the

13  scope of the search warrant?

14  A.   Absolutely.

15  Q.   And, again, much has been made of this, but what did you

16  believe the area to be searched was?

17  A.   The third floor of 2000 Belle Chasse Highway.

18  Q.   Prior to the execution of the search warrant, did you have

19  any idea of what Shadowlake did or what specifically it was

20  responsible for?

21  A.   I knew that they had a bunch of apartment complexes.  The

22  ins and outs of how they managed those or what they did with

23  them, I wasn't sure.

24  Q.   Okay.  When you got on scene, was there anything to show

25  you that there was any independent office space for Shadowlake

1    Management or Shadowlake Apartments?

2    **A.**    Nothing that showed it was independent.

3    **Q.**    The items that were shown to you by the plaintiffs on the

4    wall, would that indicate to you that there was a separate and

5    distinct business being run or office space being reserved for

6    that business?

7    **A.**    Absolutely not.

8    **Q.**    As far as the boxes that the plaintiffs made mention to

9    regarding those three particular boxes that were labeled

10   "Attorney/Client Privilege," were they, in fact, brought over

11   to the U.S. Attorney's Office for a final determination by an

12   AUSA as to whether they were privileged?

13   **A.**    Yes.

14   **Q.**    The items that were contained in there, are you going to

15   take it on face value just because something says

16   "Attorney/Client Privilege," in fact, whether or not it's going

17   to contain any type of documents regarding that?

18   **A.**    No, not on face value.

19   **Q.**    What did the agents do in particular to make a

20   determination on scene as to whether or not that contained --

21   **A.**    They took the three boxes to the taint team in Peter

22   Butler's office and asked them if it was, in fact, privileged

23   materials or could be, you know.

24   **Q.**    Then there was a final determination made by an attorney?

25   **A.**    Yes.

1          MR. KENNEDY:  One second, Your Honor.

2               Thank you.  I tender the witness.

3          THE COURT:  Brief redirect.

4          MR. GIBBENS:  Yes, Your Honor.

5          THE COURT:  Mr. Kennedy, did you want to offer those

6    exhibits?

7          MR. KENNEDY:  Yes, I did, Your Honor.  I would offer

8    Government's Exhibits, I believe, it's No. 1 through --

9          THE COURT:  What are the numbers?

10         THE WITNESS:  The last one is 36.

11         THE COURT:  Okay.  1 through 36.

12         MR. KENNEDY:  Yes, Your Honor, please.

13         THE COURT:  All right.

14         MR. KENNEDY:  Thank you.

15         THE COURT:  I assume there's no objection from the

16   plaintiff.

17         MR. GIBBENS:  No objection, Your Honor.

18         THE COURT:  All right.  Those are admitted.

19              Okay.  Go ahead.

20                   REDIRECT EXAMINATION

21   BY MR. GIBBENS:

22   Q.   Agent Bezet, about the computers, you said that they were

23   located in Demaris Winters' offices; correct?

24   A.   I said that the server --

25   Q.   The computer servers.

A.    The servers.

Q.    She is a Shadowlake Management employee; correct?

A.    I believe she is.

Q.    You said that there was no indication of what those computers -- there was no labeling on those computers; is that right?

A.    I don't remember -- I'm not the computer person who did the search.  I know that the labels that were in the pictures, the Post-it notes, we put those labels on the computers, if they had some on them or not.  I didn't do the computer part of the search.

Q.    But if that -- so you're not disputing then that some of those computer servers were labeled?

A.    I'm not saying they were or were not.

Q.    You just don't know.

A.    I didn't see the -- I mean, I can look at the pictures and tell you from the initial entry photographs, but I didn't do the search of the computers.

Q.    You've said that there were no signs up in the different offices?

A.    No signs differentiating, "This is the office of something."

Q.    But, I mean, the labeling of the offices is not the only indication of what an office is; is that right?  I mean, it's the contents too; correct?

1    A.    I wouldn't say the contents define the business that's

2    located at a place.  I mean, my cubicle is full of knickknacks

3    and other things.  It doesn't make it my home.  I mean, I don't

4    understand what you're --

5    Q.    Well, if you walk into an office and it's all full of

6    Shadowlake materials, just because there's not a sign on the

7    door that says "Shadowlake," that doesn't mean that it's not

8    Shadowlake.

9    A.    Well, how would I know if the office is all full of

10   Shadowlake materials unless I search the office and determine

11   that all the materials within it are Shadowlake's?  I couldn't

12   look at it initially and determine that, no.

13   Q.    But you could look at the pictures on the wall and the

14   signs on the bookshelves and the binders.  I mean, doesn't

15   common sense tell you that if you look at a binder -- at a file

16   cabinet that says -- where every single one is labeled,

17   "Collections Parc Fontaine," "Collections Re: Esplanade," that

18   is going to be a Shadowlake Management file cabinet?

19          MR. KENNEDY:  Judge, I'm going to object.  First of

20   all, it's going beyond the scope of cross --

21          THE COURT:  Well, it's plowing old ground.  We've

22   been here before.  So let's move on to something new or have a

23   seat.

24          MR. GIBBENS:  Yes, Your Honor.

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1  BY MR. GIBBENS:

2  **Q.**  One last question.  On the -- as far as the privileged

3  documents that were turned over by the general search team to

4  the clean team, aside from the three boxes labeled

5  "Attorney/Client Privilege," did you all turn over anything

6  else except for what either myself or Mr. Schonekas objected

7  to?

8  **A.**  Yes, I believe other documents were turned over to the

9  clean team.

10  **Q.**  How many?  Any idea how many?

11  **A.**  You'd have to ask the clean team members themselves, but I

12  think it was around maybe 20.

13         **MR. GIBBENS:**  I have no further questions, Judge.

14         **THE COURT:**  All right.  Let me just ask you a couple

15  of things just for clarification.  I understand that because

16  of -- well, for whatever reasons that you did not exclude any

17  offices from your search on the third floor; is that correct?

18         **THE WITNESS:**  That's correct.

19         **THE COURT:**  I also understand that you did not

20  exclude any of the other corporate entities that were on that

21  floor, Shadowlake, Willow, all those were likewise searched?

22         **THE WITNESS:**  We didn't exclude any entities, no.

23         **THE COURT:**  Any of the other entities.  Okay.

24         Other than what you've testified today, did you

25  make any other efforts to discover what other tenants might be

1  located at that third floor location?

2      **THE WITNESS:**  Prior to the search?

3      **THE COURT:**  Uh-huh.

4      **THE WITNESS:**  No, we did not.

5      **THE COURT:**  Okay.  All right.  That's all I have.

6  You may step down.

7          Let's talk a little bit about scheduling since

8  you have other people outside and I wasn't -- what's your

9  estimate about how much time you'll need for this, and we

10 obviously need to take a break here and there?

11     **MR. GIBBENS:**  Your Honor, I think we have -- let's

12 see.  We have about eight or nine more witness, Judge, who will

13 not be as long.  But I still think it might take another, you

14 know, probably two to three hours.

15     **THE COURT:**  Okay.  How do you want to structure the

16 day?  It's 11:40 now.  We can continue on.  I have something at

17 2:30 that, hopefully, won't take too long, but otherwise my day

18 is -- the day is wide open.

19     **MR. GIBBENS:**  I think, Judge, if we could do one more

20 witness and then break for lunch and then, hopefully, we can

21 come back and finish up.

22     **THE COURT:**  All right.  That's fine.  Is that okay

23 with you, Mr. Kennedy?

24     **MR. KENNEDY:**  Judge, we have several witnesses.  I

25 don't know who they're going to call.  They may or may not be

1  in addition to --

2          THE COURT:  Is there going to be some overlap, you

3  think?

4          MR. KENNEDY:  Yes.

5          MR. GIBBENS:  I'm sure there are.  I mean, we've

6  got -- I'm sure there will be some overlap, Judge.

7          THE COURT:  All right.  Why don't you call your next

8  witness then.

9          MR. SCHONEKAS:  I'd call Peter Smith, Your Honor.

10         (WHEREUPON, **Peter Smith**, having been duly sworn,

11  testified as follows.)

12         THE DEPUTY CLERK:  Please state your full name and

13  correct spelling for the record.

14         THE WITNESS:  Peter, P-E-T-E-R, Smith, S-M-I-T-H.

15                    **DIRECT EXAMINATION**

16  BY MR. SCHONEKAS:

17  Q.   Good morning, Mr. Smith.  My name is Kyle Schonekas.  I

18  represent Mr. Heebe.

19         We met on the morning of the search; is that correct,

20  sir?

21  A.   Yes.

22  Q.   You are an FBI agent; is that correct, sir?

23  A.   Yes, sir.

24  Q.   How long have you been employed by the FBI?

25  A.   A little over 20 years.

1   Q.    And your educational background.  What is your
2   undergraduate and/or graduate degrees in, sir?
3   A.    Undergraduate in criminal justice.
4   Q.    Now, sir, you've received specialized training from the
5   FBI; is that correct?
6   A.    Yes.
7   Q.    You've received training in the obtaining of search
8   warrants, have you not?
9   A.    To an extent, yes.
10  Q.    You've received training in the execution of search
11  warrants, have you not?
12  A.    Yes.
13  Q.    You've also participated in the drafting of affidavits in
14  order to obtain a warrant; is that correct?
15  A.    Yes.
16  Q.    You're supposed to review it and make sure that it's
17  accurate; is that right, sir?
18  A.    Yes.
19  Q.    The reason you want to make sure it's accurate is that
20  you're submitting this to the court in order to go to someone's
21  premises without their authorization; is that right?
22  A.    Yes.
23  Q.    There are legal requirements, as you understand them, in
24  terms of obtaining a search warrant; is that right?
25  A.    Yes.

1  **Q.**   You are supposed to describe with particularity the
2  premises that are to be searched; is that right?
3  **A.**   We describe the premises to be searched.
4  **Q.**   Correct.
5          Now, sir, in advance of this search -- I mean, this
6  was a very unusual search, was it not?
7  **A.**   I wouldn't say it was unusual.
8  **Q.**   Well, how many agents did you have there that day?
9  **A.**   All total, probably about 18.  Somewhere in that ballpark.
10  I'm not sure of the total.
11  **Q.**   Just a little while ago it was 23 or 24 agents.  You
12  disagree with that?
13  **A.**   It sounds a little high, but I don't have the exact
14  number.
15  **Q.**   Now, sir, prior to obtaining this search warrant to search
16  the offices of River Birch at 2000 Belle Chasse Highway, I take
17  it you did some research before you obtained that warrant; is
18  that right?
19  **A.**   Yes.
20  **Q.**   And, in fact, you've been investigating Mr. Heebe and
21  Mr. Ward for some time; is that right?
22  **A.**   Yes.
23  **Q.**   And, in fact, as part of that process, you went online and
24  you searched their business interests, did you not, sir?
25  **A.**   Not that I recall.

1   **Q.**   Well, did you have someone do that for you?

2   **A.**   Somebody else I think did that, yes.

3   **Q.**   Right.

4        In fact, you found out that they had any number of

5   corporate entities; is that right, sir?

6   **A.**   I knew they had more than one business, yes.

7   **Q.**   Right.

8        In fact, on the date of the seizure, you knew they

9   had a company by the same of Shadowlake, did you not?

10   **A.**   Yes.

11   **Q.**   You knew they had a company by the name of Parc Fontaine,

12   did you not?

13   **A.**   Yes.

14   **Q.**   You knew they had a company by the name of Calypso Bay; is

15   that correct?

16   **A.**   That, I don't recall.

17   **Q.**   You knew they had a company by the name of Willow, did you

18   not?

19   **A.**   Yes.

20   **Q.**   You knew they had a company by the name of Riverview;

21   correct?

22   **A.**   No.

23   **Q.**   How about Live Oak?  You knew about Live Oak, did you not?

24   **A.**   I've heard of Live Oak.

25   **Q.**   You knew they had a company -- or rather Mr. Heebe and his

1  sister had a law firm by the name of Heebe & Heebe; is that
2  correct?
3  **A.**  That, I don't recall either.
4  **Q.**  All right.  Sir, with respect to all of the companies that
5  you've just acknowledged that you knew the existence of, you
6  didn't include any of them on the search warrant; is that
7  right, sir?
8  **A.**  No.
9  **Q.**  Now, sir, you knew that particular address, not just
10 because you all had surveilled the premises, but because you,
11 yourself, had been there before, had you not, sir?
12 **A.**  Yes.
13 **Q.**  In fact, the reason you knew that premises was Mr. Butler
14 had written a letter to the FBI complaining about the actions
15 of Mr. Derrick Shepherd; is that right?
16 **A.**  I think he may have written it to the U.S. Attorney's
17 Office, but we got it, yes.
18 **Q.**  Not only did your office get it, but you were the guy that
19 was assigned to go out and to interview Mr. Ward at the offices
20 of Peter Butler at 2000 Belle Chasse Highway; is that right;
21 sir?
22 **A.**  We interviewed Mr. Ward in Mr. Butler's presence in
23 Mr. Ward's office at 2000 Belle Chasse Highway.
24 **Q.**  Well, sir, do you deny that you received a letter from
25 Mr. Butler indicating that his law office was at 2000 Belle

1  Chasse Highway?

2  **A.**  No.

3  **Q.**  So you knew that, that he had an office there?

4  **A.**  Yes.

5  **Q.**  You didn't list the offices of Peter Butler to be searched

6  on your application for this search warrant, did you, sir?

7  **A.**  We had --

8  **Q.**  Can you answer my question, sir:  Did you list

9  Mr. Butler's law offices on the search warrant?

10       **MR. KENNEDY:**  Judge, can he have an opportunity to

11  answer the question before he gets cut off and told to answer

12  the question?

13       **THE COURT:**  Well, answer the specific question.  If

14  you need to explain your answer, go ahead.  But answer first:

15  Was Peter Butler's office listed in the affidavit?

16       **THE WITNESS:**  No.

17       **THE COURT:**  Okay.

18       **THE WITNESS:**  In the affidavit or the warrant?

19       **THE COURT:**  Well, the warrant.  I don't know.  Which

20  was it, Mr. Schonekas?

21       **MR. SCHONEKAS:**  I haven't seen the affidavit.  I'd

22  like to see it, Judge.

23       **THE COURT:**  Yeah, well, I haven't either.  So I don't

24  know that -- is your question the warrant or the affidavit?

25

BY MR. SCHONEKAS:

**Q.**   Well, let's take what I have seen, the warrant.  The search warrant itself, you didn't list that; is that correct?

**A.**   That's correct.

**Q.**   Now, did you go to Judge Moore and obtain this search warrant, sir?

**A.**   Yes.

**Q.**   Did you tell Judge Moore that you were going to be searching law offices?

**A.**   He was told there would be a clean team involved.

**Q.**   All right.  Sir, did you make a prima facie showing to Judge Moore that there was criminal activity by a lawyer sufficient that it warranted the searching of an attorney's offices?

            **MR. KENNEDY:**  Judge, I'm going to object.  This is specifically beyond the scope.  We're here to determine what they did and their actions in the execution of the search warrant, not what went into the actual signing or the affidavit of the search warrant itself.  It's irrelevant.

            **THE COURT:**  Well, I think it's more than that. Overruled.  Go ahead.

            **MR. SCHONEKAS:**  Thank you.

BY MR. SCHONEKAS:

**Q.**   Would you answer the question, sir?

**A.**   Could you repeat it again, please?

1    **Q.**    Sure.  Did you tell Judge Moore, in order to get the

2    authorization to search Mr. Butler's offices, because you said

3    you did that, right, you told him you were going to go to

4    Mr. Butler's office?  Correct?

5    **A.**    We told him there would be a clean team there and an

6    attorney's office would be searched.

7    **Q.**    No, sir.  My question is very simple:  Did you tell Judge

8    Moore that you were going to search Peter Butler's office, an

9    attorney?

10   **A.**    We told him we knew there was an attorney's office on the

11   premises at 2000 Belle Chasse Highway and we had a clean team

12   going with us to handle that search.

13   **Q.**    Sir, could you answer my question --

14            **MR. KENNEDY:**  Judge, he has.

15   **BY MR. SCHONEKAS:**

16   **Q.**    -- did you tell Judge Moore that you were going to search

17   the law offices of Peter Butler?  Did you tell him that?

18            **MR. KENNEDY:**  Objection.

19            **THE COURT:**  Overruled.

20            Did you say specifically --

21            **THE WITNESS:**  I don't know if I told him

22   specifically.

23   **BY MR. SCHONEKAS:**

24   **Q.**    You just said, "We're going to search some lawyer's office

25   who might be there and we're going to have a clean team look at

1   the documents"; is that correct?

2   **A.**   I don't want to sound difficult, but, you know, we told

3   him that, you know, Peter Butler's office was in 2000 Belle

4   Chasse Highway and we had a clean team that was going to be

5   part of the search.

6   **Q.**   So is your testimony now, sir, that you told him that it

7   was Mr. Butler's offices that were going to be searched?

8   **A.**   No.  My testimony, again, and I don't want to sound

9   difficult, is that we were going to search 2000 Belle Chasse

10  Highway and we knew Peter Butler had an office there.

11  **Q.**   But you specifically mentioned that Mr. Peter Butler had

12  an office there; is that right?

13          **MR. KENNEDY:**  Objection.  It's been asked and

14  answered.

15          **THE COURT:**  We'll, it's been answered different ways.

16  So do you recall, and if you don't recall, that's fine, but do

17  you recall whether you told Judge Moore that it was Peter

18  Butler's office that was going to be searched or was within the

19  warrant -- you know, your --

20          **THE WITNESS:**  I can't specifically recall saying

21  that.

22          **MR. SCHONEKAS:**  Thank you.

23          **THE COURT:**  Move on to something else.

24          **MR. SCHONEKAS:**  I'll move on.

25

1  BY MR. SCHONEKAS:

2  Q.   All right.  Sir, now, with respect to the authorization

3  that you got to search this law office and this representation

4  that you were going to have a clean team, did you make a prima

5  facie showing that the attorney, whoever it might be -- I know

6  you didn't mention his name -- was engaged in criminal

7  activity?

8          MR. KENNEDY:  Objection.  It makes for a legal

9  conclusion.  The search warrant was signed by the court.  There

10  was evidently a legal order given by the court, therefore, this

11  is beyond the scope, and it's irrelevant.

12          THE COURT:  Yeah.  He can't decide whether it's prima

13  facie or not.  You can ask him if he gave any information to

14  Judge Moore along those lines.

15          MR. SCHONEKAS:  That's -- I agree, Judge.  In fact, I

16  don't embrace the government's determinations on that issue.

17          THE COURT:  All right.

18  BY MR. SCHONEKAS:

19  Q.   My question is very simple:  Did you tell -- did you show

20  Judge Moore or represent to him that the lawyer whose offices

21  were located at that address that you intended to search was

22  engaged in criminal activity?

23  A.   I can't remember if we --

24          MR. KENNEDY:  Judge, again, I'm going to object.

25  We're getting into specifics of what was in the affidavit and

1   what was the information that may or may not have been
2   presented to the court at that particular time.
3              This is beyond the scope.  You're getting into a
4   *Franks* hearing.  You're getting into things that are not
5   relevant.  There's a reason why the document is sealed, Your
6   Honor, and this is nothing more but a blatant attempt to
7   discovery and trying to unseal the document.
8              **THE COURT:**  No, I don't think so.  He said he doesn't
9   remember.  So move on to something else, Mr. Schonekas.
10             **MR. SCHONEKAS:**  I will.  Thank you, Judge.
11  BY MR. SCHONEKAS:
12  **Q.**    Mr. Smith, did you go so far as to look at a phone book to
13  determine River Birch's business address?
14  **A.**    No.
15  **Q.**    Would you take my representation, if you had gone to that
16  trouble that it would have listed an address in Avondale?
17  **A.**    I'm not going to dispute that.
18  **Q.**    All right.  Sir, did you all -- I say "you all."  I don't
19  want you to assume that it's just you -- but did anybody make a
20  Google search for that address, put in *2000 Belle Chasse*
21  *Highway* and see what businesses you could pull up?
22  **A.**    Somebody may have.  I didn't do it, but somebody may have.
23  **Q.**    Did they relate to you the results of that inquiry?
24  **A.**    I can't recall if they did or not.
25  **Q.**    That's something you would typically do, would you not,

1  sir?

2  **A.**   Case-by-case basis.

3  **Q.**   All right.  Did anybody make a search of the Secretary of

4  State's Web sites?

5  **A.**   Yes.

6  **Q.**   All right.  What searches did you make of the Secretary of

7  State's Web sites?

8  **A.**   Well, I didn't do it.  Somebody else did it.

9  **Q.**   All right.  Tell me what you understand they did.

10  **A.**   They searched the Secretary of State's Web site.

11  **Q.**   All right.  Well, particularly, do you know whether or not

12  they searched for the search *River Birch*?

13  **A.**   I want to say they searched by address, but I'm not sure

14  what they actually searched.

15  **Q.**   All right.  Do you think they went so far as to make a

16  search of River Birch, its corporate records?

17  **A.**   I would assume they did, but I can't be 100 percent.  I

18  would assume they did.

19  **Q.**   Well, are you aware that if you did that that the agent

20  for service of process for River Birch was Heebe & Heebe?  Did

21  you know that prior to today?

22  **A.**   No, I did not.

23  **Q.**   They didn't tell you that?  Correct?

24  **A.**   Who didn't tell me that?

25  **Q.**   Any of your employees --

1    **A.**   No.

2    **Q.**   -- that were doing these checks that you say you all do?

3    **A.**   No.

4    **Q.**   All right.  Did you make any searches of the Secretary of

5    State's Web sites for the names *Fred Heebe* or *Jim Ward*?

6    **A.**   I didn't, no.

7    **Q.**   Somebody in your office did though; right?

8    **A.**   Right.  I believe they did.

9    **Q.**   If they had done that, they would have determined those

10   companies that I just read off to you would have appeared; is

11   that right, sir?

12   **A.**   I don't know if they would have or not.

13   **Q.**   But you -- you didn't -- they didn't tell you about that;

14   is that right?

15   **A.**   Not that I recall.

16   **Q.**   Did you all check the domiciles of any of these companies;

17   do you know?

18   **A.**   No.

19   **Q.**   Prior to today, for purposes of this hearing, did you make

20   inquiries of any of your agents to see if any of them had done

21   anything like that that would have shown that, in fact, there

22   were other businesses there?

23   **A.**   We did some Secretary of State searches, I know that.  I'm

24   not sure about the Google searches.

25   **Q.**   Now, sir, you came into the building through what

1   stairwell?  Do you recall?

2   **A.**    The rear.

3   **Q.**    The rear.

4           All right.  Did you take the steps or take the

5   elevator?

6   **A.**    The steps.

7   **Q.**    You take the steps.  All right.

8           Do you recall whether you ever looked through the

9   door and saw any signage?

10  **A.**    I know I looked through the door, but I don't recall

11  seeing a sign.

12  **Q.**    So you looked in that direction, but you just didn't see

13  it; is that right?

14  **A.**    Correct.

15  **Q.**    Now, sir, at some juncture Mr. Gibbens showed up; is that

16  correct?

17  **A.**    Yes.

18  **Q.**    You knew Mr. Gibbens from when he used to work at that

19  prior place of employment with the U.S. Attorney's Office; is

20  that right?

21  **A.**    Yes.

22  **Q.**    He used to be a good guy back then; right?

23           **MR. KENNEDY:**  Judge, I'm going to object.

24           **MR. SCHONEKAS:**  It was a fatal attempt at humor.  I

25  apologize, Judge.  I'll move on.

1     **THE COURT:**  Okay.  I'll note that he was smiling, and

2  we'll move on.

3     **MR. SCHONEKAS:**  Thank you.

4  **BY MR. SCHONEKAS:**

5  **Q.**   In fact, Mr. Gibbens wasn't initially admitted, was he,

6  Mr. Smith, to the premises?

7  **A.**   That's correct.

8  **Q.**   In fact, Mr. Gibbens had to call Mr. Kennedy and complain

9  that he was not being allowed into the premises; is that right?

10  **A.**   I don't know if he actually called Mr. Kennedy.  I called

11  Mr. Kennedy.  I don't know if he called Mr. Kennedy.

12  **Q.**   A decision was made by whom to allow Mr. Gibbens into the

13  premises?

14  **A.**   Mr. Kennedy.

15  **Q.**   He told you to let him in?

16  **A.**   Right.

17  **Q.**   All right.  Then at some later point in the morning, oh,

18  say around 9:00, 9:30, you got to meet me; right?

19  **A.**   Yes.

20  **Q.**   And, in fact, what we did, Mr. Gibbens and I, was roving

21  about the premises observing the search; is that correct?

22  **A.**   Yes.

23  **Q.**   Did we at any time obstruct or interfere with you or your

24  agents?

25  **A.**   Yes.

1  **Q.**   All right.  Who interfered with you, sir?

2  **A.**   Well, me, personally, or my agents?

3  **Q.**   That you observed.  Tell me what you observed that either

4  Mr. Gibbens or myself did to interfere with this search?

5  **A.**   Later in the day, we had used the kitchen as a staging

6  area to check evidence in.

7  **Q.**   That's where Mr. Bokelberg was; correct?

8  **A.**   Correct.

9  **Q.**   All right.  Go ahead.

10  **A.**   As agents were trying to get in there, Mr. Gibbens was in

11  the way, as were you.  And at one point, I asked him to step

12  back please and he refused, and he was just in the way.  That's

13  what I observed.

14  **Q.**   All right.  In fact, what Mr. Gibbens was trying to do was

15  he was trying to see what it was --

16         **MR. KENNEDY:**  Objection.  This is testifying at this

17  point.

18         **MR. SCHONEKAS:**  No.  It's going to be a question if

19  he'll let me finish it.

20         **THE COURT:**  All right.  Go ahead, but -- go ahead.

21  Go ahead.

22  **BY MR. SCHONEKAS:**

23  **Q.**   What you observed Mr. Gibbens do was he was trying to get

24  around to see what you all were putting in the boxes; is that

25  right, sir?

**A.** Well, I'm not going to say what he was doing. I just
asked him to step back a few feet and he wouldn't.

**Q.** But what he was doing was he was kind of careening around
to look and see what was being put in the boxes; would you
agree with me?

**A.** Again, I'm not going to say what he was doing. I mean, if
that's what he was doing, that's what he was doing, but I'm not
going to say that's what he was doing.

**Q.** So you told him to get back and then you placed a call to
the U.S. Attorneys; is that correct?

**A.** I'm not sure if I placed a call to them or they called me.

**Q.** You complained about Mr. Gibbens?

**A.** Well, I started hearing some other things that went on
from the agents there.

**Q.** Right. In fact, what happened -- what went on as well
was, I observed one of your agents reading a piece of
correspondence on my firm letterhead --

      **MR. KENNEDY:** Objection, Your Honor. Now he's
stating what he observed.

      **THE COURT:** "Did you see. Did you see." Go ahead.
Ask him if he saw it --

**BY MR. SCHONEKAS:**

**Q.** Let me ask you this, sir: Was it ever related to you by
one of your agents that I had complained bitterly about your
agents reviewing attorney/client communications? Was that ever

1  related to you?

2  A.  Yes.

3  Q.  After we complained about the review of attorney/client

4  communication, a call was made and you were told to tell

5  Mr. Gibbens and me to get out and that if we didn't we'd be

6  arrested; is that right, sir?

7  A.  Well, the call about the incident you refer to about

8  the -- your firm's letterhead being examined, that was early in

9  the search.  The call about discussing you and Mr. Gibbens to

10  leave the scene, that was later in the day.  That was in the

11  afternoon.

12  Q.  Well, particularly, sir, did you observe my interaction

13  with your agent who was reviewing my correspondence?

14  A.  No, I didn't.

15  Q.  So this was just related to you by another agent?

16  A.  Actually, Mr. Gibbens said it too.

17  Q.  It was that we were complaining because they were reading

18  our correspondence to our client, that was what was related to

19  you; is that right, sir?

20  A.  Basically, yeah, they were reviewing potentially

21  privileged material.

22  Q.  You spoke to somebody.  Who was it, Mr. Mann?

23  A.  Which time are you talking about?  There was a call to the

24  U.S. Attorneys after this incident about the privileged

25  material, then there was a call later on with the U.S.

1    Attorney's Office.  In the morning, I spoke to Mr. Kennedy

2    about the privileged material.  Later on, I spoke to Mr. Mann

3    in the afternoon.

4    Q.    Right.

5          What did Mr. Mann tell you to do, sir?

6    A.    He told me, "If they're interfering, they need to be told

7    to leave the scene."

8    Q.    All right.  Sir, did you tell them that if they didn't

9    leave the offices, where they were observing things, that they

10   would be arrested?

11   A.    I didn't tell them that, no.

12   Q.    Mr. Mann told you to say that though; right?

13   A.    He did tell me to say that, yes.

14   Q.    You conveyed that promise to Mr. Gibbens, did you not,

15   sir, that if we didn't leave, we would be arrested?

16   A.    No.  I didn't tell Mr. Gibbens that.  I told him he had to

17   leave.

18   Q.    Oh, I'm sorry.  What you did, in fact, was you handed the

19   phone to Mr. Gibbens and let Mr. Mann convey that promise; is

20   that right, sir?

21   A.    Correct.

22   Q.    Sir, you all took documents and computers from virtually

23   every room; is that right?

24   A.    Probably, yeah.

25   Q.    Yeah.  The only ones --

1    A.    Well, let me back -- not documents from every room.

2    Q.    Right.  Well, in fact, the only rooms that you didn't take

3    documents from were the reception area, where there were no

4    documents; the restrooms, where there were no documents; and

5    the hallway, where there were no documents.  Is that right,

6    sir?

7    A.    No.

8    Q.    You took documents from those rooms?

9    A.    No.  There were other rooms we didn't take any documents

10   from.

11   Q.    And, in fact, what happened was -- did you meet Mr. Drawe,

12   Mike Drawe; do you remember him?

13   A.    If he's an older, white-haired gentleman --

14   Q.    Yes, sir.

15         You met him; correct?

16   A.    Basically, just when we went in, made entry, that's about

17   it.  I told him why we were there.

18   Q.    Let me ask you this:  Did these guys, your agents, have

19   guns on them?

20   A.    Yeah, probably.

21   Q.    They were visible; is that right, sir?

22   A.    No.

23   Q.    The guns were not visible?

24   A.    No.

25   Q.    So if a witness has testified otherwise, they would not be

1    truthful, is that right, that their guns were not visible?

2  **A.**    No.

3  **Q.**    Your testimony is that it was not apparent that they were

4    carrying weapons; is that right, sir?

5  **A.**    When we made entry it was not apparent we were carrying

6    weapons.

7  **Q.**    All right.  Sir, let me ask you this:  Did you direct

8    Mr. Drawe to get their IT person down there?

9  **A.**    No, I didn't.

10  **Q.**    You just said, "Hey, Mike, would you mind asking your IT

11    guy to come down?"

12  **A.**    I didn't do that.

13  **Q.**    Well, who made the request of Mr. Drawe?

14  **A.**    I don't know.

15  **Q.**    It wasn't you?

16  **A.**    No.

17  **Q.**    Well, in any event, the IT guy for all of these companies

18    was summoned to the scene; is that right?

19  **A.**    That's correct.

20  **Q.**    He was told to provide passwords to these computers, was

21    he not, sir?

22  **A.**    I don't know about that either.

23  **Q.**    You're not aware of that?

24  **A.**    No.  The IT people would handle that with him, interacted

25    with him.

**Q.** So you were not aware that the access to some of these companies' computers were password protected?

**A.** It doesn't surprise me. But I wasn't told that he was -- their IT person was told to give them their passwords.

**Q.** All right. Sir, there's been a little bit of testimony or ambiguity about access to the building. Isn't it true, sir, that everyone came up and down that same entranceway that contained both the elevator and the stairwell?

**A.** Yes.

**Q.** No one used the stairwell by the Belle Chasse Highway; is that correct?

**A.** Not that I know of, no.

        **MR. SCHONEKAS:** Pull up Exhibit 12, please.

**BY MR. SCHONEKAS:**

**Q.** All right. Sir, this is a photograph that was taken by the *Times-Picayune* on the date that the judge went out there, and this was actually taken from across the parking lot.

        Is it your testimony -- so let me ask you this first: How many trips up and down did you make that day?

**A.** I couldn't tell you. Five, six, seven, eight. I don't know.

**Q.** In all of those five, six, seven, eight trips, you never saw this sign; is that right, sir?

**A.** That's correct.

**Q.** Notwithstanding your knowledge of these -- let me ask you

1  this:  Did you have any information -- and you don't need to
2  tell me the source of it -- on the date of the search that any
3  of the companies that I've just described, Shadowlake, Parc
4  Fontaine, Calypso Bay, Willow, Riverview, Heebe & Heebe, were
5  engaged in any criminal activity?

6          On the date of the search, did you have any
7  information to that effect?

8          **MR. KENNEDY:**  Judge, I'm going to object.  It's
9  beyond the scope of this hearing.

10          **THE COURT:**  Overruled.

11          **THE WITNESS:**  What were the companies again,
12  Shadowlake, Parc Fontaine?

13  **BY MR. SCHONEKAS:**

14  **Q.**    Shadowlake, Parc Fontaine, Calypso Bay, Willow Homes,
15  Carol Sue, Riverview, Heebe & Heebe, did you have any
16  information that any of these companies were engaged in, or you
17  had reason to believe that they were engaged in, illegal
18  activity?

19  **A.**    We had reason to believe that Shadowlake may have.

20  **Q.**    All right.  Sir, you knew that then on the date that you
21  obtained that warrant; is that right?

22  **A.**    Yes.

23  **Q.**    And you didn't include that company in the search warrant;
24  is that right, sir?

25  **A.**    That's correct.

**Q.**    Sir, you didn't see a plaque for Willow Homes while you were there during the search?

**A.**    I believe the sign out front said *Willow Homes*.

**Q.**    You saw that?

**A.**    Right.

**Q.**    All right.  What about the plaque inside the offices, did you see that?

**A.**    No.

**Q.**    You had no idea Willow Homes was headquartered there; is that right?

**A.**    Well, I knew Willow -- from the sign out front, I knew Willow Homes was there.

**Q.**    All right.  What action did you take, sir, to make certain that you didn't review documents belonging to these companies for which you had not obtained the warrant?  What did you do?

**A.**    Well, we didn't do anything.  We were going to search that premises for the documents listed in the search warrant.

**Q.**    Sir, were you aware of an effort that was made to interview Mr. Butler's secretary subsequent to this search and seizure?

**A.**    When you say "subsequent," what kind of time frame are you talking about?

**Q.**    After September 23rd, 2010.  In fact, more recently within the last couple of months, are you aware that Mr. Bezet --

        **MR. KENNEDY:**  Judge, I object.  We're looking at the

1    actions -- the actions of what they did at the time of the
2    search warrant, not what they did post.
3            **THE COURT:**  Yes.  This is far afield.
4            **MR. SCHONEKAS:**  Well, Judge, the reason being is --
5            **THE COURT:**  And you didn't ask Mr. Bezet about this
6    either.
7            **MR. SCHONEKAS:**  I didn't get to examine him, and
8    there was --
9            **THE COURT:**  Well, that's not my problem.
10            **MR. SCHONEKAS:**  I understand, Judge.  But it goes to
11   the use of materials that were obtained as a result of the
12   illegal search which Your Honor has ordered the return of.
13            **MR. KENNEDY:**  Judge --
14            **MR. SCHONEKAS:**  In other words, it goes to contempt,
15   Your Honor.  We've sought a contempt citation against the
16   government for not turning this stuff over.  And, in fact, what
17   they're doing is they're using it.
18            **THE COURT:**  Well, ask -- okay.  Go ahead and ask the
19   question and let's see if he knows.  Go ahead.
20   BY MR. SCHONEKAS:
21   **Q.**   Sir, are you aware of an effort to interview Mr. Butler's
22   legal secretary?
23   **A.**   It's my understanding she was Mr. Butler's secretary and
24   Mr. Ward's secretary, but, yes.
25   **Q.**   All right.  And are you aware, sir, that, in fact, they

1  showed to -- and her name is Ms. Fridge; correct?  Nancy

2  Fridge?

3  A.    Yes, sir.

4  Q.    Your agents showed her a document from Mr. Butler's law

5  files; is that correct?

6  A.    That, I don't know.

7            MR. KENNEDY:  Judge, I'm still going to object.

8            THE COURT:  He says he doesn't know.

9            MR. SCHONEKAS:  All right.  I'll cover that with --

10           THE COURT:  He says he doesn't know.

11           MR. KENNEDY:  Well, I'm objecting to the whole line

12  of questioning here, Judge.

13           THE COURT:  Well, I overruled that objection.  So go

14  on to something else, if you can, please, Mr. Schonekas.

15           MR. SCHONEKAS:  I'm moving quickly, believe it or

16  not, Judge.

17           THE COURT:  Please keep moving, even quicker.

18  BY MR. SCHONEKAS:

19  Q.    Sir, did you accept any of the directives or requests that

20  either Mr. Gibbens or I made that day during the course of this

21  search and seizure?

22  A.    I'm not sure what you mean.

23  Q.    When we said, "Hey, stop looking at that," did your agents

24  stop that?

25  A.    Stop -- the privileged material, you're talking about?

1   **Q.** Anything we asked you to do or not to do, did you all do

2   it? You all didn't do that, did you, sir?

3   **A.** I'm not sure what you mean.

4   **Q.** Well, sir, you heard the incident related to you where I

5   complained --

6   **A.** Right.

7   **Q.** -- about the review by --

8        **THE COURT:** Let me jump in, because I think the

9   question was kind of vague.

10         At various junctures when Mr. Gibbens or

11   Mr. Schonekas asked you to do something or not do something, do

12   you know if any of your agents complied?

13        **THE WITNESS:** The only incident that I know about was

14   the privileged matter.

15        **THE COURT:** Which we already discussed?

16        **THE WITNESS:** Right.

17        **THE COURT:** All right.

18        Go on. Move on to something else.

19   **BY MR. SCHONEKAS:**

20   **Q.** Now, sir, in fact, Mr. Gibbens and I made a request for a

21   copy of the search warrant, do you recall that, during the day?

22   **A.** Yes.

23   **Q.** You told us that, "Sorry, I can't give it to you. All I

24   have is one"; right?

25   **A.** I gave Mr. Gibbens a copy to look at.

1  **Q.**   You did?

2  **A.**   Yes.

3  **Q.**   You're sure of that?  You don't remember saying that was

4  the only copy you had and he could look at it briefly; do you

5  recall that?

6  **A.**   Well, yeah, I gave him a look at it.  Yeah, right.

7  **Q.**   You let him look at it; you didn't let him have a copy?

8  **A.**   Not -- yeah.  I gave him a copy at the end of the day, but

9  I did let him look at it.  Because I saw you looking at it

10  also.

11  **Q.**   When you allowed Mr. Gibbens to look at it, you allowed us

12  to look at it briefly; is that correct?

13  **A.**   I don't remember how long you had -- it wasn't -- you had

14  it for a little while.  It wasn't two minutes.

15          **MR. SCHONEKAS:**  One second, Judge.

16          **THE COURT:**  Okay.

17          **MR. SCHONEKAS:**  That's all I have.  Thank you.

18                Thank you, Mr. Smith.

19          **THE COURT:**  Okay.  Briefly.

20                    **DIRECT EXAMINATION**

21  BY MR. HABANS:

22  **Q.**   Mr. Smith, I'm Bob Habans.  I represent Jim Ward.

23                Were you the agent who handed out the blank grand

24  jury subpoenas to the civilians who were present on the morning

25  of the search?

1    A.    No, sir.

2    Q.    Do you know who did that?

3    A.    I believe it was Tommy -- Thomas Redman and Amy Peralta

4    from HUD-OIG.

5    Q.    The names were obtained from the people who showed up to

6    go to work in the building; is that right?

7    A.    I believe so, yes.

8    Q.    They were just filled in with a ballpoint pen and handed

9    back to the witnesses -- to these civilians, who were showing

10   up for work, directing them to go to the grand jury; is that

11   right?

12   A.    Yes, sir.

13            **MR. HABANS:**  That's all I have.  Thank you.

14                    **DIRECT EXAMINATION**

15   **BY MR. CASTAING:**

16   Q.    Mr. Smith, my name is Eddie Castaing.  I represent River

17   Birch.

18            Do you recall speaking to Mike Drawe on the day of

19   the search?

20   A.    If I did, it was probably when we made entry and I just

21   asked him to step away from his desk and he'd have to leave the

22   premises.

23   Q.    Okay.  By the way, all the employees, anybody who was

24   working there did cooperate, did they not?

25   A.    Yes.

1  Q.   I mean, no one stood in the way or refused any instruction
2  that you all gave?
3  A.   No.
4  Q.   Okay.  Do you recall asking someone to get some keys to a
5  locked cabinet or locked file cabinet?
6  A.   Yes, I do remember that.
7  Q.   Okay.  You said -- what's the answer?
8  A.   I do remember that.
9  Q.   You remember that.
10        All right.  Do you remember if it was kind of the
11 older gentleman with the white hair?
12 A.   It could have been.  I'm not sure if it was him or not.
13 It could have been him.
14 Q.   Okay.  Well, do you remember that whoever it was actually
15 went on a search for the key with you?  Do you recall that?
16 A.   I don't remember having to search for it.  I thought he
17 found it in a desk drawer, but I can't be sure.
18 Q.   Okay.  But do you recall going with him in the elevator to
19 go down or down the stairs to go look for someone who could
20 direct this man to the key?
21 A.   No, I don't remember that.
22 Q.   You don't remember that.
23        You don't remember coming up on the elevator with
24 this man?
25 A.   I could have.  But I don't remember going down, escorting

1 somebody to look for the key.

2 Q.   Okay.  But you do admit that you made numerous trips that

3 day after your initial entry on the elevator?

4 A.   Yes.

5 Q.   Okay.  That's both entering the building and going out of

6 the building?

7 A.   Yes.

8         **MR. CASTAING:**  Thank you.

9         **MR. WALSH:**  No questions, Your Honor.

10        **THE COURT:**  All right.  Mr. Kennedy?

11        **MR. KENNEDY:**  Yes, Your Honor.

12                    **CROSS-EXAMINATION**

13 BY MR. KENNEDY:

14 Q.   Agent Smith, you testified previously that you had an

15 opportunity to give the search warrant document to both

16 Mr. Schonekas as well as Mr. Gibbens?

17 A.   Yes.

18 Q.   Did you restrict that or did you place a time limit on

19 them whatsoever at all and the time that they had to look at

20 it?

21 A.   I told them I would need it back, but I let them look at

22 it.

23 Q.   Okay.  You didn't tell them when you needed it back or

24 anything else, did you?

25 A.   No.

1  **Q.**  You allowed them to look at that document at their
2  leisure; isn't that correct?
3  **A.**  Yes.
4  **Q.**  Then once they looked at that document, they did, in fact,
5  give it back to you; isn't that correct?
6  **A.**  Yes, they did.
7  **Q.**  At that point they never told you anything at all about
8  any other businesses located at 2000 Belle Chasse Highway, did
9  they?
10  **A.**  No.
11  **Q.**  At any point in time did any other employees ever inform
12  you that there were other businesses located within the offices
13  at 2000 Belle Chasse Highway at the time of your search?
14  **A.**  No, they didn't.
15  **Q.**  Did they ever point out the fact that what was contained
16  in the affidavit on Attachment A, the description, the sign out
17  in front, that you were going beyond the scope of the warrant
18  because it says, "Willow Homes," on the sign?
19  **A.**  No.
20  **Q.**  So nobody ever informed you on the scene whatsoever at
21  all?
22  **A.**  No.
23  **Q.**  What did you base your description on in the attachment?
24  Where did you come up with the attachment, the description?
25  **A.**  Well, I've been to River Birch a few times and Agent Bezet

1    had gone by and taken a picture.

2    **Q.**    Okay.  So you were basing this upon your own personal

3    experience and also that of Agent Bezet?

4    **A.**    Yes.

5    **Q.**    Based upon that, did you have any reason to believe --

6    after you having visited the offices at 2000 Belle Chasse

7    Highway, did you have any reason to believe that there were any

8    other offices located -- or any other businesses' offices

9    located within that premises?

10   **A.**    Willow Homes, I assumed was located there because of the

11   sign.

12   **Q.**    And you expected to find documents related to Willow

13   Homes?

14   **A.**    Right.

15   **Q.**    Now, let's be clear:  In terms of the documents

16   themselves, when you go and search a business, would you expect

17   to find documents related to other businesses controlled by

18   those persons?

19   **A.**    Yes.

20   **Q.**    Would that restrict your search in any manner whatsoever

21   at all?

22            **MR. SCHONEKAS:**  I'm going to object.  It calls for a

23   legal opinion, Your Honor.

24            **MR. KENNEDY:**  Judge, I'm asking if it restricts his

25   search.

1          **THE COURT:**  No, it's overruled.  Overruled.  You can
2   answer the question.
3          **THE WITNESS:**  No, it doesn't.
4   BY MR. KENNEDY:
5   **Q.**   Okay.  So it would not restrict your search and,
6   therefore, would you -- would you -- just because there's
7   documents or binders located, would that give you any
8   indication that there was any other separate office or premises
9   in operation at 2000 Belle Chasse Highway?
10  **A.**   Say that again, please.
11  **Q.**   Just because there's binders or other documents, would
12  that change your opinion that there were no other offices or
13  businesses located at 2000 Belle Chasse Highway?
14  **A.**   Well, if I saw binders and stuff with other businesses'
15  names on it, I would assume they had other businesses there.
16  **Q.**   Okay.  But I'm saying those documents themselves, did they
17  indicate a separate and distinct office space to you?
18  **A.**   No, they didn't.
19  **Q.**   Okay.  Was there any reason that, after having seen those
20  documents, that you would have changed your opinion as to the
21  description of what you were searching?
22  **A.**   No.
23  **Q.**   The letter to the FBI regarding -- from Mr. Butler, as a
24  result of that, you went out and interviewed Mr. Ward; isn't
25  that correct?

1  A.    Yes.

2  Q.    Where did you go?

3  A.    2000 Belle Chasse Highway.

4  Q.    Did you contact Mr. Ward, in fact?

5  A.    I think he did set it up.  I think we did contact him to

6  set it up.

7  Q.    Okay.  When you got there, Mr. Butler was already there;

8  isn't that true?

9  A.    Yes, he was.

10  Q.    Okay.  That's because he maintained an office inside of

11  there?

12        MR. SCHONEKAS:  I'm going to object.  It calls for

13  speculation.  How does he know why Mr. Butler was there?

14        MR. KENNEDY:  Judge --

15        THE COURT:  If he knows.  Do you know if he had an

16  office there at that time?

17        THE WITNESS:  I can't remember if I knew he had an

18  office there at that time or not.

19        MR. KENNEDY:  Judge, I'll clarify.  I don't believe

20  that was my question, Judge.

21  BY MR. KENNEDY:

22  Q.    But what I'm asking specifically:  At that time were you

23  aware that Mr. Butler was going to be there?

24  A.    Yes.

25  Q.    Okay.  Did you know prior to going there that there was

1   any separate and distinct law office being run by Mr. Butler at
2   that time?

3   A.   Not at that location, no.

4   Q.   Going to the location and being present with Mr. Butler
5   and Mr. Ward, was there anything there that would indicate to
6   you at that time that Mr. Butler had a separate and distinct
7   law office at that time?

8   A.   No, because we went directly to Mr. Ward's office.

9   Q.   The employees that were subpoenaed, they were subpoenaed
10  because you were trying to determine whether -- what their
11  relation --

12              MR. SCHONEKAS:  Objection.  Leading.

13              MR. KENNEDY:  Judge, it's cross-examination.

14              MR. SCHONEKAS:  It's -- identity is the test.

15              THE COURT:  Yeah.  He's your witness.  He's your
16  witness in a sense -- in effect.

17              MR. KENNEDY:  But, Judge, I can still cross.

18              THE COURT:  Well, yeah.  No, no, no.  But you
19  can't -- he's not a hostile witness to you.  You can do a
20  non-leading question.  Go ahead.  Come on, you know how to do
21  that.  Go ahead.

22  BY MR. KENNEDY:

23  Q.   Special Agent Smith, what was the purpose of subpoenaing
24  those witnesses at the time of the morning of the execution of
25  the search warrant?

1  **A.**   Well, we wanted to identify them and see what they knew

2  about the ongoing investigation.

3  **Q.**   Did you know what those employees did for -- within 2000

4  Belle Chasse Highway prior to going into the premises?

5  **A.**   No, I did not.

6  **Q.**   Did you know even afterwards what they did?

7  **A.**   Maybe -- no, I didn't, actually.

8  **Q.**   Okay.  Now, you've referred specifically to --

9  Mr. Schonekas asked you as far as complaints from other agents

10  regarding what Mr. Gibbens' and Mr. Schonekas' actions were.

11  Could you explain what those were, please?

12  **A.**   Well, I later learned that they appeared to be

13  eavesdropping on conversations the agents were having during

14  the search.  One is Mr. Schonekas -- two agents were searching,

15  I believe it was Mr. Heebe's office, and they were setting

16  aside documents that they were going to seize, and

17  Mr. Schonekas picked some of those documents up, started

18  looking at them.  Those were a couple that come to my mind

19  right now.

20  **Q.**   When you're searching, do you allow people that are

21  related to the business or the persons being searched to allow

22  and go through documents or go through evidence that's being

23  set aside?

24  **A.**   No.

25  **Q.**   So did you consider that to be interference with the

1   execution of your search warrant at that point?

2   A.   Yes.

3   Q.   Are those items that you related to Mr. Mann on the phone?

4   A.   Yes.

5   Q.   When you related those items to Mr. Mann, did you, in

6   fact, make any complaints regarding whether or not there was

7   actual interference going on with the execution of your search

8   warrant at that point?

9   A.   Yes.

10  Q.   Okay.  At what point did you call Mr. Mann?  What time?

11  A.   It was in the afternoon.  I'm saying maybe 2:00, 3:00.

12  Q.   So it was --

13  A.   And it was a call from the U.S. Attorney's Office.  I

14  didn't call them.  I didn't call him; it was a call from your

15  office.

16  Q.   Okay.  You spoke to him specifically and it was at that

17  time that the U.S. Attorney's Office contacted you, according

18  to your testimony?

19  A.   Right.

20  Q.   At that point in time you relayed your concerns to

21  Mr. Mann?

22  A.   Yes.

23  Q.   You stated before that Mr. Mann discussed the possibility

24  of arresting those persons that might be interfering with the

25  execution of your search warrant.  Is that what took place?

1    A.    Yes.

2    Q.    Okay.  Was that based upon information that you gave to

3    him?

4    A.    I assume it was.

5    Q.    Okay.  I mean, neither Mr. Mann nor myself were present at

6    the scene, were we?

7    A.    No, you weren't.

8    Q.    Okay.  So everything that we got was being relayed through

9    you guys?

10   A.    From the agents on the scene.

11   Q.    Okay.  At that point was there a determination whether or

12   not anybody would be arrested at that point?

13   A.    It wasn't determined we were definitely going to arrest

14   anybody, no.

15   Q.    Okay.  Now, the question was asked previously regarding

16   any evidence of illegal activity on the part of other entities.

17   In Attachment B there were specifically questions or

18   searches -- within the search warrant on Attachment B it

19   specifically asked for other entities controlled by Heebe and

20   Ward; isn't that correct?

21   A.    Yes.

22   Q.    There's a list of other personal things, documents of

23   other businesses you were looking for?

24          MR. SCHONEKAS:  Objection.  Leading, Your Honor.

25          THE COURT:  Go ahead.  I want to move this along.

1  You can answer the question.

2  **THE WITNESS:**  Yes.

3  **BY MR. KENNEDY:**

4  **Q.**   The purpose of the search warrant, were you searching for

5  documents relating to illegal activities of River Birch?

6  **A.**   Yes.

7  **Q.**   Was that also in addition to the principals of River

8  Birch, Fred Heebe and Jim Ward?

9  **A.**   Yes.

10  **Q.**   Those other companies, are those, in fact, controlled by

11  Fred Heebe and Jim Ward?

12  **A.**   Yes.

13  **Q.**   Was there anything unusual about the execution of this

14  search warrant?

15  **A.**   The fact that the attorneys were there -- the defense

16  attorneys were there, I found that unusual.

17  **Q.**   Had you ever experienced that before?

18  **A.**   No, I hadn't.

19        **MR. KENNEDY:**  One second, please.

20            I tender the witness.

21        **MR. SCHONEKAS:**  Very brief redirect, Your Honor.

22                   **REDIRECT EXAMINATION**

23  **BY MR. SCHONEKAS:**

24  **Q.**   Mr. Smith, with respect to the grand jury subpoenas that

25  were being handed out that day to the employees, the ones who

1  were being written in --

2  **A.**   Uh-huh.

3  **Q.**   -- do you know whether or not the grand jury had

4  authorized you to issue those subpoenas?

5          **MR. KENNEDY:**  Judge, I'm going to object.  It's

6  beyond the scope, also.

7          **MR. SCHONEKAS:**  He raised it, Your Honor.

8          **MR. KENNEDY:**  Judge, I raised --

9          **THE COURT:**  It's overruled.  Overruled.

10          Do you know?  Do you know?

11          **THE WITNESS:**  The U.S. Attorney's Office, you know,

12  gave us permission to do it.

13          **THE COURT:**  Okay.

14  BY MR. SCHONEKAS:

15  **Q.**   All right.  Sir, now, with respect to the interference

16  that Mr. Kennedy had asked you about, do you recall after you

17  handed the phone to Mr. Gibbens and Mr. Mann spoke to him, do

18  you recall Mr. Gibbens coming to you and saying, "Peter, what

19  did I do to interfere?"  Do you recall that?

20  **A.**   Not off the top of my head, no.

21  **Q.**   You don't recall telling him, "Billy, I had no complaint

22  with you.  I didn't request that"?

23  **A.**   No, I don't recall saying that.

24  **Q.**   Are you saying you didn't say it or you just can't

25  remember?

1  **A.**   I don't recall saying it.  I don't think I said it.

2  **Q.**   But you're not sure?

3  **A.**   I don't think I said that.

4        **MR. SCHONEKAS:**  Thank you.  That's all I have, Judge.

5        **THE COURT:**  Okay.  I have a couple of questions I

6  wanted to ask you.

7             When you went out to meet with Mr. Ward and

8  Mr. Butler, I assume at that point you saw the sign about

9  Willow Homes outside?

10        **THE WITNESS:**  Out front on Belle Chasse Highway?

11        **THE COURT:**  Uh-huh.

12        **THE WITNESS:**  Yes, I saw that sign.

13        **THE COURT:**  Okay.  Can I also assume that you

14  probably took the elevator rather than climb three flights of

15  stairs to go up to the meeting?

16        **THE WITNESS:**  Yes, I did.

17        **THE COURT:**  Okay.  Did you -- what efforts did you

18  make after you were out there, if any, to find out what other

19  tenants might be located at that third floor location?

20        **THE WITNESS:**  After we were out there, I didn't make

21  any efforts to see what other tenants would be there.

22        **THE COURT:**  Pardon me?

23        **THE WITNESS:**  After we were there on the scene, I

24  didn't make any efforts to see --

25        **THE COURT:**  I'm not talking about the scene, sir.

1  I'm talking about when you went out there initially to meet

2  with Mr. Ward and Mr. Butler some months before, whenever that

3  was, after you were out there and you saw that there was Willow

4  Homes, at least the presence of one company, you rode up on the

5  elevator, did you make any effort after that point to discover

6  if there was any other tenants, any other corporations,

7  businesses, that were located at that third floor location?

8         THE WITNESS:  No.

9         THE COURT:  Okay.  Did you disclose to the magistrate

10  that there was -- either in the affidavit or by verbally that

11  there was another company, Willow Homes, located in that -- on

12  that third floor?

13         THE WITNESS:  It's in the attachment, I know.  It's

14  in the warrant.  Also, in the affidavit.

15         THE COURT:  Okay.  That there was another company out

16  there on the third floor, Willow Homes?

17         THE WITNESS:  Well, the sign.

18         THE COURT:  All right.  Did you bring that -- did you

19  specifically bring to his attention anything else about any

20  other corporations that might be located at that third floor,

21  other than the fact that it's part of the physical description

22  of the building?

23         THE WITNESS:  No.

24         THE COURT:  Okay.  All right.  You may step down.

25         MR. SCHONEKAS:  Might this be an appropriate time,

1    Judge, to break?

2            **THE COURT:**  Yes.  How much time would you all like to

3    have for lunch?

4            **MR. SCHONEKAS:**  An hour.

5            **THE COURT:**  An hour.  Okay.  I'll be back here, let's

6    say -- it's 12:23, let's just say 1:30.

7            **MR. SCHONEKAS:**  Thank you, Judge.

8            **THE COURT:**  Okay.  See you at 1:30.

9                      **(LUNCHEON RECESS)**

10                      * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2          **(February 24, 2011)**

3                    * * * * *

4          **THE DEPUTY CLERK:**  All rise.

5          **THE COURT:**  Have a seat.  Call your next witness,

6     please.

7                    **MR. HABANS:**  Kyle Schonekas, please, Your Honor.

8                    (WHEREUPON, **Kyle Schonekas**, having been duly sworn,

9     testified as follows.)

10                   **THE DEPUTY CLERK:**  Please state your full name and

11    correct spelling for the record.

12                   **THE WITNESS:**  Kyle Schonekas, S-C-H-O-N-E-K-A-S.

13                   **DIRECT EXAMINATION**

14    BY MR. HABANS:

15    **Q.**    Mr. Schonekas, what's your profession?

16    **A.**    I'm an attorney.

17    **Q.**    How long have you been an attorney?

18    **A.**    Ooh, a long time.  Since '78.

19    **Q.**    On the date of the execution of this search warrant about

20    which we are discussing today, did you have any involvement in

21    attending the scene of the search warrant?

22    **A.**    I did.

23    **Q.**    Tell us how that came to be.

24    **A.**    I received a call from the client and said that there

25    were, oh, 20, 30 agents with guns and that were raiding their

1  offices and could we please get over there as soon as possible.

2  **Q.**   Did you do that?

3  **A.**   I did.

4  **Q.**   Did anyone else from your firm, also, attend the search?

5  **A.**   Mr. Gibbens was already there when I got there.

6  **Q.**   About what time did you arrive?

7  **A.**   I want to say I got there around, oh, 9:00.

8  **Q.**   All right.  Was the search already underway when you got

9  there?

10  **A.**   Yes, sir.

11  **Q.**   Were you admitted in when you got there?

12  **A.**   I was.

13  **Q.**   Had Billy Gibbens already gone upstairs into the offices?

14  **A.**   Correct.

15  **Q.**   What did you do during the course of the search?

16  **A.**   I walked the halls.  I observed -- I attempted to observe

17  what was going on and attempted to observe what was being

18  seized.

19  **Q.**   Did you have occasion to see the search warrant?

20  **A.**   I was shown it very briefly by Mr. Smith.

21  **Q.**   Were you given a copy of the search warrant?

22  **A.**   He claimed that he only had that one copy and that he

23  couldn't give it to us.

24  **Q.**   Did there come a time, any time during the day, when a

25  copy of the search warrant was either given to you or left at

1    the facility?

2    A.    No, sir.

3    Q.    Do you know if -- did you leave before the very end of the

4    search?

5    A.    What happened was -- I guess it was about 12:30 or so -- I

6    left Billy and went next door to a little restaurant to get

7    some takeout food to bring back for Billy and I to eat.

8    Q.    All right.  Are you aware of the fact that a copy of the

9    search warrant was left in the kitchen when the agents

10   departed?

11   A.    I didn't hang around for the eventual departure, which

12   wasn't until about 6:30 that evening.

13   Q.    All right.  So if that happened, you'd be unaware of it?

14   A.    Correct.

15   Q.    I understand.

16         Please tell me if you observed any of the agents

17   reviewing matters that you thought presumptively were

18   privileged?

19   A.    Yes, sir, I did.

20   Q.    Tell us about the first time during the day and the

21   circumstances.

22   A.    Just beyond the reception area, there's an agent that

23   appears on the video -- I don't know his name -- a short guy,

24   had in his hand correspondence from my office with the

25   letterhead that I recognized.  And I walked over and looked to

1   see what it was and saw that it was, in fact, communication

2   from my office to the client.  And I said, "That's

3   confidential.  Put it down."  And he refused to do so.

4   Q.   Well, I was going to ask next:  What did he do in response

5   to your admonition that that was privileged?

6   A.   He looked at me as though I was from the moon, like, "What

7   are you doing?"  And I raised my voice and said, you know, "Put

8   that down.  That's confidential.  That's attorney/client

9   communication."

10  Q.   I know you may only be able to tell us the facts of what

11  you observed after that communication, but what did he do with

12  the document?

13  A.   Continued to read.

14  Q.   You're assuming he read it.  He continued to look at it as

15  if he was reading it?

16  A.   He kept his face pointed in that direction and did nothing

17  in response to my very loud complaint.

18  Q.   All right.  Did there come any other occasion when you

19  observed an agent reviewing a document that you were concerned

20  might be privileged?

21  A.   I did, yes, sir.  It was in Mr. Heebe's office in the

22  front.  There was a piece of handwritten correspondence from

23  Mr. Butler to Mr. Heebe concerning a matter that Mr. Butler was

24  handling for Mr. Heebe.  I don't want to disclose the content

25  of it, but it was clearly attorney/client communication.  I saw

1   that, and Mr. Gibbens and I spoke about that as well.

2          But I did not, as has been described, pick it up and

3   take it and go somewhere with it.

4          **MR. HABANS:**  May I ask, Andi, to put up the last page

5   of Exhibit 9, please?

6   **BY MR. HABANS:**

7   **Q.**  Do you recognize that document, sir?

8   **A.**  Yes, sir.  That is the piece of handwritten correspondence

9   that accompanied a group of documents that Mr. Butler had

10   gathered for Mr. Heebe.

11   **Q.**  For the record, it shows, "From the Desk of Peter J.

12   Butler."  You know, of course, Mr. Butler is an attorney, do

13   you not?

14   **A.**  I do.  I've known him for many years.

15   **Q.**  Do you know that he also does legal work for some of the

16   entities at River Birch, as well as some of the principals?

17   **A.**  That's my understanding.

18   **Q.**  I think he's retired since, but he was at that time an

19   active lawyer; is that right?

20   **A.**  I think he's only retired since this seizure.

21   **Q.**  All right.  Is that the document that you saw was being

22   retrieved from Mr. Fred Heebe's office?

23   **A.**  It is.  In fact, it was placed in a pile on the ground.

24   **Q.**  Did you have any comment or discussion with the agent

25   after identifying that?

**A.**   No, sir.  And, in fact, at no time did I receive any
protestations or suggestions that I had done or was doing
anything improper.

**Q.**   So no one told you that they disagreed with your conduct?

**A.**   No, sir.  It wasn't until I came back to bring Billy and
myself some lunch that Billy had told me that he had been put
out and that we weren't permitted to go back in.  And, in fact,
we made efforts -- I made phone calls to Judge Moore's chambers
to try and get relief.  He was unavailable.  I tried
Magistrate Knowles and he was unwilling to get involved because
Judge Moore had signed the order.

**Q.**   So you tried to call the court twice and did not have an
opportunity to speak to either of the magistrates?

**A.**   No.  I spoke to Judge Knowles and explained the -- you
know, what was going on, and he said because Judge Moore had
signed the original search warrant that he was unwilling to get
involved.

**Q.**   All right.  Finally, how many times had you been to this
location before?

**A.**   I had never been to that location prior to that day.

**Q.**   All right.  Did you see anyone who identified himself as a
member of the clean team or a taint team performing the
function outside of Peter Butler's office that you were
performing, trying to preserve privileged communications with
your client?

1  A.   No, sir.  In fact, it was just the opposite.  In fact,

2  after our complaint about what was being done, Mr. Zummer

3  reported to Billy that the agents were, in fact, reinstructed

4  and that they were going to bring documents to the clean team

5  from the rest of the office.  The problem was is that they

6  would review them in the first instance.

7  Q.   Do you have any knowledge of some boxes in one of the

8  offices that bore a very large label that said "Attorney/Client

9  Privileged Documents"?

10  A.   Yes, sir.

11  Q.   What was your knowledge, generally, of those documents,

12  sir?

13  A.   Those were documents that we had assembled and had given

14  to the client.  And I don't want to go into the contents of

15  it --

16  Q.   I'm not asking you to.

17  A.   -- because I don't want to waive the privilege.

18  Q.   Right.

19       But those were documents that were attorney work

20  product in the sense that you assembled them and they

21  communicated information from you to the client?

22  A.   That's correct.

23  Q.   Have you since learned that those documents were taken by

24  the agents?

25  A.   It's my understanding, conferring with Mr. Gibbens, that

1   we have not -- those have not been returned to us.

2   **Q.**   Is it also correct that this morning Mr -- that is Agent

3   Bezet said that he had read those after he concluded that he

4   didn't think they were privileged?

5   **A.**   I'm sorry, Mr. Habans, would you --

6   **Q.**   Well, it's in the record.  I apologize for arguing another

7   witness' testimony.

8              **MR. HABANS:**  Hold on one second, please.

9                    That's all I have.  Thank you.

10                   One second.

11                   No further questions, Your Honor.

12             **THE COURT:**  Okay.  Nothing from the plaintiff?

13                   Okay.  Mr. Perricone.

14                        **CROSS-EXAMINATION**

15  **BY MR. PERRICONE:**

16  **Q.**   Good afternoon, Mr. Schonekas.

17  **A.**   Good afternoon, Mr. Perricone.  How are you?

18  **Q.**   I'm wonderful.  How are you?

19  **A.**   Great.  Good to see you, Sal.

20  **Q.**   So we've been lawyers about the same time, huh, about 33

21  years?

22  **A.**   '78 is when I graduated.

23  **Q.**   During the 33 years of being an attorney, you practiced a

24  lot of criminal law?

25  **A.**   I wouldn't say a lot, no, sir.

1   **Q.**  Have you never -- let me rephrase that.

2         You have never been on a search warrant where the FBI

3   is conducting a search of a premises, have you?

4   **A.**  No, sir, that was --

5   **Q.**  This is the first time, isn't --

6   **A.**  Could I finish?

7         **THE COURT:**  Okay.  Whoa, whoa, whoa, whoa.  Let him

8   finish his answer.

9   **BY MR. PERRICONE:**

10   **Q.**  What's your answer?

11   **A.**  This was the very first time that I got to go on a -- to

12   actually go to the premises while the search was going on.

13   **Q.**  And in the 33 years of being an attorney, have you ever

14   heard of an attorney being allowed in by the FBI to a search

15   while the premises is being searched, while the client's being

16   searched?

17   **A.**  From other people I've learned that that has occurred on

18   occasion.

19   **Q.**  Where?  Where was that done?

20   **A.**  This was anecdotal from another lawyer.

21   **Q.**  Anecdotal?

22   **A.**  Yes, sir.

23   **Q.**  But you have no personal knowledge that the FBI allowed a

24   defense attorney on the premises during the search?

25   **A.**  My understanding is that Mr. Gibbens placed a call to

1  Mr. Kennedy and they allowed us to enter.

2  Q.   Did you hear my question?

3  A.   I thought I answered it, but go ahead and try it again.

4  Q.   Did you ever hear of this being done before, personal

5  knowledge?

6  A.   Sir, this was the first time that I had been personally

7  involved where I've been -- where they were gracious enough to

8  allow me to enter.

9  Q.   Gracious enough.  I agree with you.

10       You're familiar with the term "crime fraud exception"

11  to the privilege?

12  A.   I am, yes, sir.

13  Q.   Would you agree with me that the crime fraud exception to

14  the attorney/client privilege allows prosecutors and agents to

15  review documents wherein the attorney is an active participant,

16  or maybe even an unwitting participant, in a criminal

17  enterprise?

18  A.   Under circumstances where the attorney is given notice and

19  the client is given notice and the opportunity to traverse the

20  contention by the government, in fact, I have firsthand

21  experience with that, sir.

22  Q.   I do too.

23       When is that usually done, sir?

24  A.   When is what done?  The traversing?

25  Q.   Yes, sir.

1    **A.**   It occurs when the warrant is issued, the search warrant

2    or the subpoena is issued to the attorney.  The attorney and

3    the client are given notice.

4    **Q.**   So let me see if I understand you, Mr. Schonekas.  You're

5    telling us and telling this court --

6    **A.**   There's case law, Mr. Perricone.

7    **Q.**   I don't -- if you've got the case law, I'd like to see it.

8    **A.**   It will be in our post-hearing brief.  You'll get a chance

9    to see it.

10              **THE COURT:**  Whoa, whoa, whoa, whoa.  Come on.

11              **THE WITNESS:**  I'm sorry.

12              **THE COURT:**  Ask a question, give an answer --

13    **BY MR. PERRICONE:**

14    **Q.**   I want to understand your testimony is clear,

15    Mr. Schonekas.  You're telling us that when the agent applies

16    for a search warrant, he's supposed -- and the attorney's

17    office is on the premises to be searched, he's supposed to

18    notify that attorney or that attorney's counsel before the

19    search?

20    **A.**   My understanding is is that the client is supposed to get

21    notice so that he can traverse the government's contention that

22    they're entitled to the information.

23    **Q.**   Prior to the search?

24    **A.**   Yes, sir.  If not, it would be moot, Mr. Perricone,

25    because --

1  Q.    My sentiments exactly.

2  A.    -- if you can get it -- excuse me.  If you can get it

3  without that opportunity, then the cow's out of the barn.  In

4  fact, I had this occur with, gee, the federal judge on the

5  Fifth Circuit from Lafayette.  Help me with his name,

6  Mr. Perricone.

7            MR. HABANS:  Davis.

8            THE WITNESS:  Judge Davis.  Judge Davis conducted a

9  hearing where we did exactly that when they attempted to get

10  information relating to my client from his attorney.

11  BY MR. PERRICONE:

12  Q.    You know anything in Rule 41 that requires the FBI or the

13  U.S. Attorney's Office to notify the attorney prior to the

14  issuance of a search warrant?

15  A.    No, sir, there's not a requirement under Rule 41.  But if

16  you read the cases, Mr. Perricone, you'll learn about that.

17  Q.    Well, I hope you educate me, Mr. Schonekas.

18  A.    We're going to try.  Thank you.

19            THE COURT:  All right.

20  BY MR. PERRICONE:

21  Q.    Are you the final arbiter -- the defense attorney, are you

22  the final arbiter when you're on the scene that if a document

23  is privileged or not?

24  A.    No, sir, obviously not, because I protested and your

25  people continued anyway.

**Q.** Right.

You are not the final arbiter and you did protest.
Do you think a defense attorney, such as yourself, has the
right to control a search while it's in progress, sir?

**THE COURT:** I think that's irrelevant. Move on to
something else.

**MR. PERRICONE:** No, ma'am, with all due respect, he
opened the door on this. He said he --

**THE COURT:** Okay. I'm really not interested in any
of this particular line of questioning; but if you want to do
it, do it, but do it fast because we're not going to go past
today. So you've got today -- a reasonable hour today to
finish all the evidence you want to put in. So if you want to
go down some rabbit hole that I'm not interested in, fine.

**MR. PERRICONE:** I hear you.

**THE COURT:** Okay.

BY MR. PERRICONE:

**Q.** You called the magistrate to try to stop the search,
didn't you?

**A.** I attempted to limit the search, yes, sir.

**Q.** You tried to stop the search, didn't you?

**A.** I tried to limit the search, sir.

**Q.** Have you ever seen a clean team in operation,
Mr. Schonekas?

**A.** No, sir, I have not, if that's what you call what was done

1   there.

2           **MR. PERRICONE:**  Nothing further, Your Honor.

3           **THE COURT:**  Okay.  Anything else?

4           **MR. HABANS:**  No redirect, Your Honor.

5           **THE COURT:**  All right.  Take a seat.

6           **MR. SCHONEKAS:**  Thank you, Judge.

7           **THE COURT:**  Okay.  Next witness.

8           **MR. GIBBENS:**  Your Honor, we have no further

9   witnesses.

10          **THE COURT:**  All right.  From the government,

11  Mr. Kennedy?

12          **MR. KENNEDY:**  Yes, Your Honor.  Call Special Agent

13  Michael Zummer, please.

14              Your Honor, since the plaintiffs have no further

15  witnesses, we'd ask that the other agents they subpoenaed be

16  released from their subpoenas, please.

17          **MR. GIBBENS:**  We have no objection to that, Your

18  Honor.

19          **THE COURT:**  That's fine.

20          (WHEREUPON, **Michael Zummer**, having been duly sworn,

21  testified as follows.)

22          **THE DEPUTY CLERK:**  Please state your full name and

23  correct spelling for the record.

24          **THE WITNESS:**  My name is Michael, M-I-C-H-A-E-L,

25  Zummer, Z-U-M-M-E-R.

1      DIRECT EXAMINATION

2    BY MR. KENNEDY:

3    Q.    Good afternoon, Special Agent Zummer.  Could you tell the

4    Court who you work for, please?

5    A.    I work for the FBI.

6            THE COURT:  Spell it again for us.

7            THE WITNESS:  Yes, ma'am.  My last name is

8    Z-U-M-M-E-R.

9    BY MR. KENNEDY:

10   Q.    You're an FBI agent?

11   A.    Yes, sir.

12   Q.    Approximately how long?

13   A.    I'd say a total of over six years.

14   Q.    You say a total, is there an -- I guess a lapse in between

15   years?

16   A.    Yes.

17   Q.    Could you explain your educational background to the

18   Court, please?

19   A.    I graduated from Duke University in 1993 with a degree in

20   political science; and I went to Stanford Law School from 2003

21   with a year break there and graduated in 2007.

22   Q.    So in addition to being an FBI agent, you're a licensed

23   attorney as well?

24   A.    Yes.

25   Q.    Were you involved in the search warrant of 2000 Belle

1   Chasse Highway?

2   A.   Yes.

3   Q.   Were you involved in the initial search itself?  I mean,

4   the beginning, were you there for the entirety?

5   A.   I was there from very early on in the search.  I didn't

6   make the initial contact with people there.  Then I stayed

7   through the document search from the boxes of documents.  I

8   didn't stay while the computers were finished up.

9   Q.   Okay.  When you were searching -- or when you went to the

10  premises, were you assigned a particular search area, or how

11  did that go about?

12  A.   At first, I was assigned to assist with the protective

13  sweep and to make sure there weren't any other personnel left

14  in the office, and then I actually helped try to identify areas

15  where -- who worked in specific parts of the office.

16  Q.   How did you go about doing that?

17  A.   It was -- actually, it was difficult because there were no

18  name tags or name plates, but I -- sometimes I'd look at

19  documents that were on the desk, sometimes people had mail that

20  they brought in from home, to try to determine whose desk it

21  was, and I tried to look at the phones to see if whether there

22  were any names or extension numbers.

23  Q.   So you made these determinations on scene?

24  A.   Yes.

25  Q.   When you -- after making these determinations, were you

1  able to determine if there were any other businesses operating

2  within 2000 Belle Chasse Highway other than what was listed in

3  the search warrant?

4  A.   Yes.  I mean, there appeared to be other entities

5  operating within the same space.

6  Q.   But did those entities appear to you to have any separate

7  office space or to be segregated out from any other businesses?

8  A.   No.  There was all -- it was all one common office area.

9  Q.   Okay.  Now, the search itself, you said that you were

10  upstairs and you were going into the search.  What areas did

11  you initially search?

12  A.   I believe the first area that I started reviewing

13  documents, other than to find out who was working in specific

14  areas, was by the reception area.

15  Q.   Okay.  Who was searching with you at that time?

16  A.   There was Richard Voyles helped me initially.  Then we

17  were there for a period of time and Task Force Officer Gordon

18  Hyde with the New Orleans Police Department assisted us, and I

19  believe one other agent, possibly Elaine Shall.

20  Q.   Okay.  While you were assisting that, were you able to see

21  attorneys for the plaintiffs or attorneys for the entity River

22  Birch on the scene?

23  A.   Yes.  Sometime after I started searching the reception

24  area, yes, attorneys for --

25  Q.   Okay.  Did you interact with those attorneys?

1  A.    I did not interact specifically with them at that time.

2  However, one attorney, Mr. Schonekas, who was identified to me,

3  I believe by Agent Voyles, started screaming at Detective Hyde

4  when he was reviewing a document.  Actually, right soon after

5  Detective Hyde began helping us in that area.

6  Q.    As a result of Mr. Schonekas screaming at you, what did

7  you do?

8  A.    I actually didn't do anything that -- immediately.  I sat

9  while the altercation or --

10  Q.    Could you explain how this altercation took place; what it

11  was, please?

12  A.    What happened is is Detective Hyde was reviewing a

13  document, I think out of the filing cabinet, and Mr. Schonekas

14  was a few feet behind him and kind of walked up without really

15  announcing himself and just started screaming at him like he

16  was yelling at a dog.

17  Q.    Okay.  What was he screaming?

18  A.    Yelled it was attorney/client privileged material, that he

19  couldn't review it.

20  Q.    Okay.  As a result of that, did you have an opportunity to

21  see what took place after that?

22  A.    Yes.

23  Q.    What was that?

24  A.    Well, Detective Hyde looked back at him and didn't say

25  anything initially and then returned to reviewing the document.

1   Then Mr. Schonekas yelled at him again.

2   **Q.**   Okay.  Was that document eventually seized?

3   **A.**   No.

4   **Q.**   In the course of reviewing documents, did you determine

5   whether or not, in fact, they are relevant to the proceedings?

6   **A.**   They were not relevant.

7   **Q.**   Okay.  Is that the reason why it was not seized?

8   **A.**   Correct.

9   **Q.**   So, therefore, it didn't have anything to do with the

10  scope of the search warrant?

11  **A.**   Correct.

12  **Q.**   Now, was that your only interaction with either

13  Mr. Schonekas or Mr. Gibbens?

14  **A.**   Well, I would speak to Mr. Gibbens because I've known him

15  for a long time and tried to be friendly.  Mr. Schonekas, I

16  didn't know.  That was the first time that I can ever recall

17  seeing him.

18         However, after the -- after Mr. Schonekas yelled at

19  Detective Hyde, and I think it ended by Detective Hyde telling

20  him to talk to his supervisor, and afterwards when we began

21  reminding everybody on the search team that we had a clean team

22  on-site and if you had anything that you thought was

23  potentially privileged to bring to the clean team, I decided to

24  go talk to the clean team.

25  **Q.**   Well, let me back you up a little bit.  You said the

1  decision was made to talk to the members of the investigative

2  team.  When did that take place?

3  **A.**  Soon after the altercation with Mr. Schonekas and

4  Detective Hyde.

5  **Q.**  The reason being is did you -- well, as a result of what

6  you did, you said that you then went and talked to the

7  investigative team?

8  **A.**  Correct -- or I talked to --

9  **Q.**  Excuse me, the taint team?

10 **A.**  Yes.

11 **Q.**  What was that conversation, please?

12 **A.**  Well, I went in there because the conversation was to

13 remind them of what attorney/client privileged material was and

14 to give them advice based upon my previous experience as a

15 clean agent.

16 **Q.**  Okay.  Could you explain what that previous experience is,

17 please?

18 **A.**  I've been the clean agent at least four times.  I've, in

19 fact, been the lead agent on searches of law firms twice.

20 **Q.**  Okay.  What do you do as a lead agent or as a taint agent?

21 **A.**  Well, primarily, you look for, and what I told them, is

22 you look for what's within the scope of the warrant to -- you

23 know, to make sure that you're only taking what's within the

24 scope of the warrant.  Then usually you take those documents

25 and take them back to put them in evidence.  Then usually

1  assist the U.S. Attorney's Office in the review to make sure

2  whether or not -- to determine whether or not they're

3  privileged.

4         Sometimes that actually involves -- in one case I

5  dealt with Mr. Habans in reviewing records that were seized in

6  a search warrant.

7  Q.   Okay.  In this particular circumstance, as your experience

8  as a taint agent, you said that you also had conversations with

9  other agents in the investigative team?

10 A.   Oh, after -- on the search site of River Birch?

11 Q.   Yes.

12 A.   Yes.

13 Q.   Did there come a point in time when you advised them

14 whether or not they needed to take any documents to the taint

15 team itself?

16 A.   No, actually, I didn't -- I mean -- no.

17 Q.   Are you aware of documents being taken to the taint team

18 to be reviewed?

19 A.   Yes.

20 Q.   Approximately how many times or how many documents?

21 A.   I think, from what I understand, it was about 20

22 documents.

23 Q.   That was for the taint team to review for potential

24 privilege?

25 A.   Yes.

1    **Q.**    So when they're originally there, are they assigned to
2    Peter Butler's office?
3    **A.**    Yes.
4    **Q.**    Okay.  Was the taint team involved in the search of
5    anywhere else in the office?
6    **A.**    No.
7    **Q.**    Why not?
8    **A.**    Because they were assigned -- they were assigned to look
9    specifically at Peter Butler's office so as not to -- again, to
10   limit any chance of breaking or violating the attorney/client
11   privilege for Mr. Butler or to taint them in some way regarding
12   the investigative services.
13   **Q.**    Would that then compromise their ability to act as a taint
14   team if they were involved in the search of the rest of the
15   office?
16   **A.**    Yes.
17   **Q.**    In your experience as an agent, both as a taint agent or
18   as just an investigative agent, have you ever come across areas
19   where boxes or file cabinets have been mislabeled or not
20   labeled?
21   **A.**    Yes.
22   **Q.**    What do you do as a result of that?
23   **A.**    You review the documents for the contents to see whether
24   or not they actually -- whether or not they fit the labeling or
25   whether they're within the scope of the warrant or any of the

1    other potential issues that we do dependent upon what our --
2    what operation we're doing.
3    **Q.**    In this particular circumstance, is that the reason why
4    you went ahead and looked in the file cabinets that were --
5    that had other properties named on them?
6    **A.**    Oh, absolutely.
7    **Q.**    In your search, did you -- particularly the storage room
8    L, I'll refer you specifically to a picture --
9            **MR. KENNEDY:**    Wait a second, Your Honor.
10           This is Government's Exhibit No. 30.
11   **BY MR. KENNEDY:**
12   **Q.**    Did you have an opportunity to search that particular
13   storage area?
14   **A.**    Yes, I did.  I was one of a few agents that did.
15   **Q.**    In that storage area, could you explain to the Court what
16   was located inside of there, please?
17   **A.**    A large number of boxes and filing cabinets.
18   **Q.**    Were some of them labeled and some of them not labeled?
19   **A.**    Yes.
20   **Q.**    Did you go through all of those boxes?
21   **A.**    Either I did or other agents did.
22   **Q.**    Did you discover River Birch documents in storage room L?
23           **MR. KENNEDY:**    I'm referring, Your Honor, "L" to the
24   government's chart in particular.
25           **THE COURT:**    Okay.

1          **THE WITNESS:**  Yes.

2     **BY MR. KENNEDY:**

3     **Q.**   Now, the -- did you also find in storage room L documents

4     related to other businesses?

5     **A.**   From what I recall, yes.

6     **Q.**   Okay.  Were those documents seized?

7     **A.**   No.

8     **Q.**   Was that the case in the rest of the office space in which

9     you had an opportunity to go through and look at, were there

10    areas that contained both River Birch and non-River Birch

11    materials?

12    **A.**   Yes.

13    **Q.**   Now, as far as three boxes that were located in what's

14    later come to be known as Lea Forbes' office, did you have an

15    opportunity to seize or take three boxes that were labeled on

16    the outside as "Confidential and Privileged"?

17    **A.**   I actually carried boxes for other agents who had searched

18    the office.

19    **Q.**   Did you look through those boxes at all?

20    **A.**   No.

21    **Q.**   Do you know whether they were looked through on the scene

22    at all?

23    **A.**   The agents -- as I recall, the agents asked me, I think

24    they pointed out the "Privileged and Confidential," or whatever

25    sheet of paper was on the outside.  I asked them whether they

1    had looked through it or if there was anything privileged and
2    confidential in there and they said no.  So we -- I helped them
3    carry it to the evidence control point.
4    Q.   Just because something says "Privileged and Confidential,"
5    on the outside, are you going to take it at face value?
6    A.   No, definitely --
7    Q.   Why not?
8    A.   Based upon past experience, there -- it is often,
9    especially the term "Privileged and Confidential," and any such
10   phrases tend to be overused and, frankly, we have probable
11   cause to search the area for a reason, and we can't trust the
12   people that we're searching.
13   Q.   Based upon your experience as an FBI taint team agent, as
14   well as an attorney, what do you consider to be privileged
15   material as it relates to the scope of the warrant?
16   A.   It would be any communication between a -- a confidential
17   communication between a lawyer and a client that is intended
18   for the purpose of obtaining legal advice.
19   Q.   Would you consider documents that are gathered from an
20   outside source to be privileged and confidential?
21   A.   No.
22             **MR. KENNEDY:**  One second, please.
23             **THE COURT:**  Yes.
24             **MR. KENNEDY:**  I tender the witness, Your Honor.
25   Thank you.

1    **CROSS-EXAMINATION**

2    **BY MR. GIBBENS:**

3    **Q.**    Good afternoon, Agent Zummer.

4    **A.**    Good afternoon.

5    **Q.**    You said that Mr. Schonekas was screaming at Agent Hyde.

6    He wasn't screaming at him.  He was speaking in a loud voice,

7    but it wasn't screaming, was it?

8    **A.**    It was definitely -- I was in the Marine Corps for five

9    years; it was screaming.

10   **Q.**    It wasn't -- you don't remember him saying, "Excuse me,

11   sir.  Those are privileged documents, sir"?  You would remember

12   the "sir" part if --

13   **A.**    No.  No, I don't remember the "sir" part.  I remember

14   yelling and screaming in a hostile, unprofessional manner.

15   **Q.**    So you don't remember addressing him as "sir"?

16   **A.**    Me addressing him as sir?

17   **Q.**    No.  You don't remember Mr. Schonekas addressing

18   Officer Hyde as "sir"?

19   **A.**    No, I don't remember that at all.

20   **Q.**    The actual document that Mr. Hyde was looking at came out

21   of a Calypso Bay file cabinet; correct?

22   **A.**    I don't know.

23   **Q.**    You didn't take a look and see what it was he was reading?

24   **A.**    I did, and I saw the "Schonekas" letterhead and that was

25   not --

1  **Q.**  Was it not about a lawsuit involving Calypso Bay and it
2  was taken out of a Calypso Bay cabinet?
3  **A.**  I don't remember if it was Calypso Bay.  I recall it was a
4  lawsuit and we put it down.
5  **Q.**  You spoke about talking to the members of the
6  investigative team about issues about attorney/client
7  privilege.  That happened after the search was underway, those
8  conversations?
9  **A.**  Yes.  By me, yes.
10 **Q.**  Right, by you.
11         Ordinarily, this would be something you would do
12 before a search; correct?  In your previous clean team
13 experiences, you would have talked about privileged documents
14 before executing a search?
15 **A.**  Actually, not necessarily.  In fact, we're all trained at
16 Quantico what attorney/client privilege is.  We're all aware of
17 it.  We all know to come, if we have a problem, and talk to
18 whoever is in charge of the search.  Usually, the agents do not
19 necessarily need to discuss attorney/client privilege because
20 they're looking for what's within the scope of the warrant,
21 particularly if we were searching a law office.
22         So when I've done that in the past, generally, the
23 agents looking through look for what's in the scope of the
24 warrant; and if there's an issue of privilege, that would be
25 dealt with later.

1  Q.   In this case there was an issue with privilege and so you

2  had to go instruct the investigating team how to handle

3  attorney/client privileged documents?

4  A.   I went to speak to them because the issue had arisen and I

5  thought that it was best to remind them of what they had

6  already been trained to do, and, again, based upon my

7  experience doing it, to help them out.  Also, again, because

8  they were doing -- the original reason for them being there was

9  because it was, you know, a lawyer had an office in the office

10  suite and, therefore, you know, that was why they were doing

11  it.

12  Q.   Right.

13       But the rest of the team, outside of the lawyer's

14  office suite, nobody was instructed before the search about how

15  to handle attorney/client privilege, aside from their

16  general -- you know, whatever general training you would have?

17  A.   No.  Aside from general training, no.

18  Q.   So in this search, if the general search team did not send

19  a document to the clean team as being potentially privileged,

20  documents would not -- that's the only way that a document

21  would get to the clean team; correct?

22  A.   Yes.

23  Q.   So if the general search member decided -- saw a document

24  and decided, "I don't think this is privileged," it would not

25  go to the clean team and no further investigation of that

1   document would be made?

2   A.   No.  Except for, you know, a review by the case agents

3   after they got it back to the office.

4   Q.   You mentioned concerns about mislabeled cabinets.  Did you

5   find any mislabeled cabinets in this search?

6   A.   I can't remember.

7   Q.   Ms. Forbes' office, the three -- the boxes with the piece

8   of paper on it saying "Confidential, Attorney/Client

9   Privileged," you would agree that that is at least an

10  indication that those contained privileged documents; right?

11  A.   Actually, no.  I mean, I think it's so overused that

12  it's -- and, frankly, when you're searching a subject's office,

13  to me it's just -- it's an example of probably a subject

14  attempting to evade or trying to hide documents that are

15  incriminating.

16  Q.   Well, you don't think -- I mean, nobody in that office had

17  any idea that you all were executing a search that day?

18  A.   I believe they were all aware there was an investigation

19  ongoing.

20  Q.   If they were aware of an investigation, then it would be

21  not unusual that they would be preparing documents for their

22  defense and consulting with lawyers, trying to do their own

23  investigation; correct?

24  A.   That's true.

25  Q.   Now, these boxes, were they reviewed on the scene or were

1    they not reviewed on the scene?  I'm unclear about that.

2    **A.**    My understanding is that they were reviewed on the scene

3    and nothing privileged was found in there -- or nothing

4    potentially privileged was found in there, that -- I was told

5    there was no communication with any attorney in those boxes.

6    **Q.**    Are you aware of a red binder, a red folder that was in

7    one of those boxes?

8    **A.**    Only from the photograph that I was shown in preparation

9    for this hearing that I remember.

10   **Q.**    If I told you that an identical copy of the contents of

11   that red binder was returned as privileged as something that

12   was taken out of Mr. Butler's office, do you have any reason to

13   disagree with me on that?

14        **MR. KENNEDY:**  Judge, I'm going to object.  He's

15   already testified he didn't know the contents of the box.

16        **THE COURT:**  Sustained.

17   **BY MR. KENNEDY:**

18   **Q.**    The clean team would have reviewed everything in those

19   boxes?

20   **A.**    In the box -- which boxes are you talking --

21   **Q.**    That were labeled "Attorney/Client Privilege"?

22   **A.**    The one from Mr. Forbes' office?

23   **Q.**    From Lea Forbes' office.

24   **A.**    No.

25   **Q.**    Would the clean team have reviewed all of those boxes?

**A.**   No, no.  The search team would have decided whether or not
there was a potential privilege there.

**Q.**   So the search team took the box labeled "Attorney/Client
Privilege," and only sent to the clean team what the search
team believed might be privileged?

**A.**   I don't -- I don't know what the search team did because I
wasn't there when they did it.  So -- but they would have made
a determination whether or not there was a potential privilege
and that would not be based simply upon how the subjects
labeled the box.

**Q.**   Where did you bring those boxes?

**A.**   I brought them, I believe, to the evidence control point.

**Q.**   Okay.  So you brought -- you did not bring them to the
clean team.  You brought them to the lunch room where they were
logging everything in?

**A.**   Not that I recall.

**Q.**   You don't recall bringing them to the clean team?

**A.**   No, I don't recall bringing anything.  I don't recall.

**Q.**   So do you have any firsthand knowledge that those boxes --
that anything in those boxes went to the clean team?

**A.**   No.

        **MR. GIBBENS:**  I have no further questions.

        **THE COURT:**  Anything else?  Oh, sorry.

1    CROSS-EXAMINATION

2  BY MR. HABANS:

3  Q.   Good afternoon, Mr. Zummer.  I'm Bob Habans and I

4  represent Jim Ward.

5  A.   Good afternoon, Mr. Habans.  It's good to see you again.

6  Q.   Good to see you.

7        I understand that Detective Hyde was with the NOPD;

8  is that right?

9  A.   Yes.

10  Q.   Well, in view of the fact that he hasn't been to Quantico,

11  I assume -- and maybe he has and I'm just unaware of it --

12  where did he get his training regarding attorney/client

13  privileged information?

14  A.   I don't know.

15  Q.   Well, did you all have a -- since you all invited other

16  law enforcement agencies to participate in this search, rather

17  than keeping it in-house at the FBI, what did you all do, or to

18  your knowledge, to make certain that these agents who were

19  searching for information were properly schooled and had the

20  requisite skills to protect privileged documents?

21  A.   I don't know that anything was done.

22  Q.   You know that nothing was done; isn't that a fair

23  statement?

24  A.   Well, I don't know what the training and experience of the

25  IRS and HUD agents are, and I --

1   **Q.**   Pardon me.  I meant you don't know of anything that was

2   done -- you know that nothing was done in anticipation of this

3   search to specifically focus the searching agents on protecting

4   the privilege of attorneys and clients in this search?

5   **A.**   I don't know what Agent Bezet or Supervisory Special Agent

6   Smith did with regard to other agencies.

7   **Q.**   Now, with regard to -- you've mentioned attorney/client

8   privilege, attorney/client privilege, and you've defined it in

9   your own way.  What about attorney work product?  That's

10  privileged as well --

11  **A.**   It is.

12  **Q.**   -- under certain circumstances?

13  **A.**   But I believe the issue and the concern was Mr. Butler's,

14  as the attorney who was being searched.

15  **Q.**   Well, isn't it, respectfully, somewhat naive to think that

16  all these businesses wouldn't have lots of attorney/client

17  privilege and attorney work product because they employ

18  attorneys and you knew that?

19          **MR. KENNEDY:**  Judge, it's speculative and

20  argumentative as to what other businesses had.

21          **THE COURT:**  Overruled.

22          Go ahead.  You can answer the question.

23          **THE WITNESS:**  Could you repeat the question?

24  BY MR. HABANS:

25  **Q.**   I said:  Isn't it naive to think that businesses being

1  conducted at this level with all these commercial activities

2  without having lots of attorney/client privileged information

3  and lots of attorney work product within the books and records

4  of the companies being searched, not just the lawyer's office?

5  **A.**   I think that it's -- no, I don't think it's naive.  I

6  think that it is unreasonable to expect that with that much

7  potential work product privilege, you know, that we would be

8  able to have a clean team for every single search that we did

9  of a business.

10  **Q.**   Well, wouldn't it be reasonable, since you've used that

11  term, if an attorney has -- if there's letterhead from an

12  attorney or if there are labels that say "Attorney/Client

13  Privileged Documents," that, at a minimum, those would not be

14  reviewed by the investigative team, but rather would be

15  immediately delivered into the custody of the taint team so

16  that people -- and the reason those people are not part of the

17  investigative team is so that this privileged information

18  doesn't contaminate the investigation?

19          **MR. KENNEDY:**  Judge, again, it's speculation on the

20  part -- he can ask what they did in this particular case, but

21  that's argument at this point too.

22          **THE COURT:**  Well, no.  Go ahead.  You can answer it.

23          **THE WITNESS:**  Actually, what I think, to be honest, I

24  think that you are going to create more of a disturbance for

25  the business if you did it that way.  I think what is more

1   reasonable is to determine what's within the scope of the

2   warrant, and then if the issue arises in the review of these

3   documents for the U.S. Attorney's Office, frankly, to deal with

4   it.

5   **BY MR. HABANS:**

6   **Q.**   You didn't think it was inconvenient to the business to

7   tie them up for 11 hours and to subpoena all of their

8   employees?

9   **A.**   I think that we would have tied them up for far longer if

10  we had done it the way you suggest.

11  **Q.**   Well, you could have worked all night and then you would

12  have done it right, huh?

13              **THE COURT:**  All right.  Let's move on.

14              **MR. KENNEDY:**  Objection.

15              **THE COURT:**  Let's move on.  Sustained.

16  **BY MR. HABANS:**

17  **Q.**   Now, the three boxes or so that bore that label "Attorney

18  Work Product," on the face of the box, you didn't take those --

19  the agents didn't take those to the clean team or the taint

20  team, they took them to the kitchen.  I think you had some term

21  of art like "Document Assembly Room," or something like that.

22  I don't know what your FBI lingo is.

23              But the point is:  That was taken to the common

24  universe of all of the documents being seized from the office;

25  right?

1  **A.**   I believe it was, as best as I can recall.

2  **Q.**   That's what I think you said.

3        And, therefore, even though you were alerted to the

4  possibility that those were privileged documents, they weren't

5  directed at that moment in time to the clean team; is that

6  correct?

7  **A.**   At the time it was taken to the evidence control point,

8  which is the term I used, they were determined to not be

9  privileged or not even potentially privileged.

10 **Q.**   Well, the reason that that determination was made was

11 after review; is that right, sir?

12 **A.**   Yes.

13 **Q.**   So even the thing bears a label that says,

14 "Attorney/Client Privilege," you ignored that label and rather

15 than directing it to the clean team to make that decision, it

16 was reviewed by the investigative agents, including the case

17 agent, Mr. Bezet?

18 **A.**   I don't know if Mr. Bezet looked at it on-site or not.

19 But it was reviewed by the investigative team.  They found no

20 communication.  It's also very easy to determine whether or not

21 something is a communication with an attorney.  They looked --

22 they probably looked through the records and saw no

23 communication to an attorney.  That can be done without going

24 through the entire content of the documents.

25 **Q.**   Well, once again, you're completely, completely ignoring

1    work product.  You're only dealing with communications.

2          MR. KENNEDY:  Judge, I'm going to object.  This has

3    been gone over exhaustively.

4          THE COURT:  It's asked and answered several times.

5    So something new or have a seat.

6    BY MR. HABANS:

7    Q.   In the other case that you brought out gratuitously that

8    you and I worked together on reviewing records seized from an

9    attorney's office, isn't it true that in that case the U.S.

10   Attorney refused to even look at the documents until after the

11   clean team finished --

12         MR. KENNEDY:  Objection.  That's not relevant here,

13   Judge.

14         MR. HABANS:  It is.

15         THE COURT:  Well, he brought it up, so go ahead.

16         MR. KENNEDY:  Well, he brought it up just to show his

17   experience, but not as to what the particulars were with

18   Mr. Habans.

19         THE COURT:  Answer the question.

20         THE WITNESS:  I believe that was the case.

21         MR. HABANS:  That's the right way to do it.

22              Thank you.

23         THE COURT:  All right.  Anything else?  Anybody else?

24         MR. WALSH:  No, Your Honor.

25         MR. CASTAING:  No, Your Honor.

1           **THE COURT:** Any redirect?

2           **MR. KENNEDY:** No, Your Honor.

3           **THE COURT:** All right. You may step down. Thank you

4 very much.

5                  Anybody else?

6           **MR. KENNEDY:** Yes, Your Honor. We were just

7 discussing it. I'm sorry.

8           **THE COURT:** We have a conference at 2:30. I have a

9 conference in ten minutes. So do you want to get started or do

10 you want to just recess until I'm done with the conference?

11 How many more witnesses do you have?

12           **MR. PERRICONE:** I got two.

13           **MR. KENNEDY:** Two more witnesses, Your Honor.

14           **THE COURT:** Two. Okay. Not long winded?

15           **MR. KENNEDY:** We don't think so.

16           **THE COURT:** Who are they?

17           **MR. PERRICONE:** Jim Mann and Scott Downie.

18           **THE COURT:** Okay. All right. Why don't we recess

19 until I'm done with this conference. I saw one of the parties

20 is already here. So maybe they'll already be in the back.

21           **MR. PERRICONE:** Okay.

22           **THE COURT:** Okay. We'll recess and I'll be right

23 back as soon as I can.

24           **THE DEPUTY CLERK:** All rise.

25           (WHEREUPON, the Court took a recess.)

1          **THE DEPUTY CLERK:**  All rise.

2          **THE COURT:**  Have a seat.

3          (WHEREUPON, **Scott Downie**, having been duly sworn,

4     testified as follows.)

5          **THE DEPUTY CLERK:**  Please state your full name and

6     correct spelling for the record.

7          **THE WITNESS:**  My name is Scott Downie, D-O-W-N-I-E.

8                     **DIRECT EXAMINATION**

9     **BY MR. PERRICONE:**

10    **Q.**    Mr. Downie, how are you employed, sir?

11    **A.**    I'm with the FBI.

12    **Q.**    In what capacity?

13    **A.**    I'm a computer forensic examiner.

14    **Q.**    Can you tell the Court a little bit about your educational

15    background?

16    **A.**    Yes, sir.  I went to LSU, graduated with a bachelor's of

17    computer engineering.

18    **Q.**    In what year?

19    **A.**    That would be 1998.

20    **Q.**    How long have you been a computer forensic examiner?

21    **A.**    Yes, sir, since June 2002.  So about eight and a half

22    years.

23    **Q.**    2002.

24          Mr. Downie, just for accreditation, have you ever

25    been qualified as an expert witness in computer forensics?

1  A.   Yes, sir.

2  Q.   In what courts?

3  A.   I believe it was the Northern District of Florida, New

4  Hampshire, and one that I can't recall right away.

5  Q.   Can you tell the Court what a computer forensic examiner

6  does for the FBI?

7  A.   Sure.  The primary job of a computer forensic examiner is

8  to preserve and examine digital evidence.

9  Q.   What is digital evidence in layman's terms?

10  A.   Digital evidence is anything that results-- any type of

11  information that would be stored in a digital device:  A cell

12  phone, thumb drive, hard drive, computer, GPS unit.  Anything

13  that was electronic and stores information that could have

14  evidence on it is considered digital evidence.

15  Q.   Did you participate in a search of 2000 Belle Chasse

16  Highway, Gretna, Louisiana --

17  A.   Yes, sir.

18  Q.   -- on September 23rd, 2010?

19  A.   Yes, sir.

20  Q.   In what capacity did you participate in that search?

21  A.   We were brought in -- our unit is the CART unit, it's the

22  Computer Analysis and Response Team, and we're called to the

23  searches to help identify and preserve digital evidence.

24  Q.   In preparation for your duties on that search, did you

25  have an opportunity to read the search warrant?

1  A.   Yes, sir.

2  Q.   What part of the search warrant did you read?

3  A.   We read the actual search warrant itself and the

4  Attachment B, the list of items to be seized.

5  Q.   You didn't read the affidavit?

6  A.   No, sir.

7  Q.   What's the purpose of reading just the search warrant and

8  the attachments and not the affidavit?

9  A.   For the -- for the actual search and the acquisition of

10 the evidence, all of the background information of how we got

11 the search warrant isn't really applicable.  That doesn't come

12 in until the actual examination phase, especially if we have to

13 make a biographical dictionary to break passwords or anything

14 like that.  So we don't really involve ourselves with the

15 affidavit until much later in the case.

16 Q.   Now, when you went to 2000 Belle Chasse Highway on

17 September 23rd, 2010, what was your understanding what your

18 function was to be?

19 A.   To simply identify and preserve digital evidence.

20 Q.   You were aware there were computers on-site?

21 A.   Yes, sir.

22 Q.   Did you know how many computers were on-site?

23 A.   No, sir.

24 Q.   Did you know what types of computers were on-site?

25 A.   No, sir.

1    Q.   Did you know companies were using these computers on-site?

2    A.   We were told it was a company called River Birch.

3    Q.   When you arrived that -- well, wait a minute.  What time

4    did you arrive that day at 2000 Belle Chasse Highway?

5    A.   I believe the case agent had us show up for around the

6    7:30 range.

7    Q.   7:30 a.m.?

8    A.   Yes, sir.

9    Q.   Can you tell the Court what you did next once you got

10   there?

11   A.   I'm not an actual agent and so we actually wait in the car

12   while the agents secure the facility, resolve any problems that

13   arise from executing the search warrant; and then once the

14   place is secure, then they signal for us to come in.

15   Q.   When you got there, did you take any instructions from any

16   agents?

17   A.   Yes, sir.

18   Q.   What agent gave you any instructions?

19   A.   The primary agent we received instructions from is the

20   case agent, Mr. Bezet.

21   Q.   What did Mr. Bezet, if anything, what did he tell you?

22   A.   Basically, that the place is secure, we could look around.

23   We have a typical procedure when we go in, we identify wireless

24   access points, places where there's an outbound connection to

25   the Internet where someone could connect into the network and

change the evidence.  So we try to isolate the network as much
as possible.

Just like they seal off the facility to do their
physical search, we seal off the network so that we can do a
search for all the digital evidence and no one can change it
from outside or nearby.

Q.    Did you understand that morning what the scope of the
search warrant was?

A.    Yes, sir.

Q.    Can you relate to the Court what you understood the scope
of the search warrant to be?

A.    The scope of the search warrant was -- that pertained to
me was computers, any type of computer file, any type of
electronic document that pertained to River Birch or any of its
financial transactions.

Q.    Is the search of computers a specialty within the FBI?

A.    Yes, sir.

Q.    Why is that so, sir?

A.    There's a lot of training involved with the computers.
It's whenever you go on scene and they have running servers,
running applications, businesses depend on these.  Some are
realtime applications where computers are writing to other
computers.  It's extremely important to carefully examine those
computers.

If you just go in and turn them off, you could either

1   destroy their evidence or the servers might not work after

2   you're finished.  So there's a lot of situations where you have

3   to be aware of how to -- how to get the information without

4   destroying it or corrupting it.

5   **Q.**   Is that your paramount concern when you're on-site

6   searching a computer, not to destroy digital information or the

7   computers?

8   **A.**   Our primary concern is to stay within the bounds of the

9   search warrant.  The second concern is to make sure that we

10  don't destroy any evidence, to make sure that we don't

11  interrupt anything that we shouldn't be.

12  **Q.**   When you got there, did you know where to look for the

13  servers or computers?

14  **A.**   No, sir.

15  **Q.**   Who led you, if anyone, to those servers or computers?

16  **A.**   I believe it was one of the CART examiners that's actually

17  an agent.  When he went in with the initial search, he had

18  identified the server room.

19  **Q.**   Do you know where that room was?

20  **A.**   I forget which room it was.  I believe it was room D.

21          **MR. PERRICONE:**  Could I see -- have your paralegal --

22  I think it's your Exhibit 10, ma'am.

23  **BY MR. PERRICONE:**

24  **Q.**   Take a moment, Mr. Downie, and orientate yourself to the

25  Frank Lloyd Wright rendition of the third floor of 2000 Belle

1 Chasse Highway?

2 **A.** (WITNESS COMPLIES.)

3      Gotcha.

4 **Q.** All right. Can you, by looking at that, tell us where you

5 were led to that morning to conduct the search?

6 **A.** That would be room 8.

7 **Q.** Okay. Room 8. Why do you -- why does that leap out at

8 you as being room 8 as opposed to any other room there?

9 **A.** It's -- well, the room I was in had two closets in them,

10 one that contained the servers and one was a communication

11 closet.

12 **Q.** All right. So in that rendition in room 8, we see two

13 closets essentially, huh?

14 **A.** Yes, sir.

15      **MR. PERRICONE:** The Court's indulgence for one

16 moment.

17      **THE COURT:** Yes, sir.

18 **BY MR. PERRICONE:**

19 **Q.** I'm going to show you what's been marked for

20 identification as Government's Exhibit 12, and I'll put this on

21 the ELMO.

22      **MR. PERRICONE:** Kim, can you kill that for a minute?

23 **BY MR. PERRICONE:**

24 **Q.** Mr. Downie, can you see that?

25 **A.** Yes, sir.

Q.    Have you ever seen that before?

A.    Yes, sir.

Q.    What is that?

A.    That's the communication closet that --

Q.    What is a communications closet?

A.    A communication closet is merely where all the cables in the building come to, or where all the cables on that floor, I guess in this case.  What it is is where all the networking cables, the phone cables, any cabling that they use for connecting devices goes into that closet, and that's all the connections.

Q.    Is that a fair representation of what you saw that morning?

A.    Yes, sir.

Q.    Standing there --

            THE COURT:  You actually understand what all that -- hang on.  You actually understand what all that stuff is?

            THE WITNESS:  A good portion of it.  The bottom part is all CAT-5 cabling, it's computer cabling, and it can be computer or phone.  But the bottom part of that is really messy.  So what each cable goes to, no.  But the different types of cables, they're just connections.  You know the little plugs in the walls, that's what all those little connections on the top are.  They're just plugs where they plug in.

            THE COURT:  Okay.  I'm sorry.

1          **THE WITNESS:**  That's all right.

2          **MR. PERRICONE:**  You had to ask him, huh?

3    BY MR. PERRICONE:

4    Q.   When you were looking at that, did you know what companies

5    or company were associated with what device there?

6    A.   Oh, no, sir.

7    Q.   I'm going to show you what I've marked for identification,

8    it's already been admitted into evidence, as Government's

9    Exhibit 13.

10         This is also in the room you already identified;

11   right?

12   A.   Yes, sir.

13   Q.   Can you see that picture?

14   A.   Yes.

15   Q.   Can you tell us what that is?

16   A.   That's the other closet, the one that backed up to the

17   hallway.  That closet is the one that contained all the

18   servers.

19   Q.   Those are servers?

20   A.   Yes, sir.

21   Q.   By looking at that picture, can you tell what company or

22   companies were associated with which computer?

23   A.   No, sir.

24   Q.   Okay.  As a result of not knowing what was where, did you

25   have an occasion to call a Mr. Manzella?

1  A.   Yes, sir.

2  Q.   Who, to your knowledge, was Mr. Manzella?

3  A.   He was presented to me as their IT person.

4  Q.   He does not work for the FBI?

5  A.   No, sir.

6  Q.   He is whose IT person?

7  A.   The person -- the IT person for River Birch, the one that

8  controls the servers.  He's the one that -- that I believe he

9  was contracted to manage the servers.

10 Q.   Did Mr. Manzella show up?

11 A.   Yes, sir, he did.

12 Q.   Did you talk to Mr. Manzella?

13 A.   Yes.

14 Q.   What did you all discuss with each other that morning?

15 A.   Our first discussions were to ascertain a broad picture of

16 their setup, do they run encryption, do they have any real

17 applications, what type of things are running on there, to help

18 us proceed with the acquisition of the evidence and to not

19 destroy anything that, you know, could be lost if we take the

20 wrong thing offline.

21 Q.   Did Mr. Manzella assist you in any way?

22 A.   Yes, sir.

23 Q.   What did he do?

24 A.   He, basically, went through and told us what each server

25 was for, told us its function, told us what applications they

1    ran on it, which users had access to it.  He provided us with

2    the passwords for the server so that we could log onto them.

3    Pretty much, he helped us ascertain the setup of those servers.

4    **Q.**   Mr. Downie, did you demand the passwords from Mr. Manzella

5    or did he give them to you?

6    **A.**   No, sir.  We asked him and he provided them to us.

7    **Q.**   Why is it important to have the passwords to get into

8    these devices?

9    **A.**   Oh, you can't actually -- you can't actually shut down the

10   server without logging onto it; otherwise, someone could just

11   walk up and press a few keys and shut the server down and then

12   your server is offline.

13          So what the servers require is they require you to

14   log in.  Once you log into the server with certain privileges,

15   then you are allowed to actually shut the server down.

16   **Q.**   Was this done to preserve the integrity of the documents

17   stored on these devices?

18   **A.**   Yes, sir.  If we don't actually shut the server down in

19   that manner, then the only -- I can't get access to it to copy

20   that information off it.  So our only recourse then is just

21   pull the plug from the back of it.  Anytime you pull the plug

22   on a running system, you're likely to corrupt some of the data.

23   **Q.**   During your search or whatever duties you were doing, did

24   Mr. Manzella stay with you?

25   **A.**   Yes, sir.

1    Q.    You didn't tell him to leave?

2    A.    No, no.  He was there the entire time.

3    Q.    He actively participated and assisted you?

4    A.    He didn't assist me, but he actively was -- he was there

5    and went through the whole process.  I went through the whole

6    process with him, told him everything I was doing, and he

7    basically witnessed the acquisition of the servers.

8    Q.    Tell the Court what you did exactly, without getting too

9    technical, but tell us what you did.

10   A.    Sure, sure.  The first thing was then to identify which

11   servers were in the scope of the search warrant, which servers

12   pertained to us and which servers really didn't have any

13   evidence on them, and we were able to isolate four of the

14   servers that pertained to our needs.  The other six, we left

15   them alone.  Then --

16   Q.    You said -- go ahead, sir.  I'm sorry.

17   A.    That's all right.  Then once we identify those servers,

18   then we develop a plan of how we're going to actually acquire

19   the information, what order we're going to take them down in,

20   how we're going to connect to them, how we're going to pull the

21   information off to, one, do it as quickly as possible; and two,

22   to do it as safely as possible.

23   Q.    When you say "Safe as possible," what's on your mind when

24   you say "Safe as possible"?

25   A.    Safe as possible so that we're not -- we're not -- moving

1  their hardware around as little as possible.  Whenever you have

2  servers that sit on a shelf, usually they sit there for years

3  at a time.  If you start disassembling and taking on the -- I

4  mean, and just pull the hard drive out of the internal of the

5  server, you could nick a piece of RAM or you could damage the

6  internal component in some way; or even just stirring up the

7  dust on the inside of a computer, sometimes it will be enough

8  to mess up one of the connections and they won't work

9  afterwards.

10      So we really try to minimize the interaction we have

11 with these servers.  So, develop a plan of how we're going to

12 pull the information off to preserve their servers, because we

13 want them to work afterwards.  We want, when we leave there, to

14 have actually little impact of us being there.

15      **MR. PERRICONE:**  The Court's indulgence for one

16 minute.

17      **THE COURT:**  Yes, sir.

18 **BY MR. PERRICONE:**

19 **Q.**  I want to show you what I've marked for identification as

20 Government's Exhibit 38.

21 **A.**  Sure.

22 **Q.**  Have you seen that before?

23 **A.**  Yes, sir.

24 **Q.**  I want to draw your attention to the top -- oops, sorry --

25 the top of the picture.  I don't know if it's clear or not.

1    Let me zoom in a little bit.  You can see I'm somewhat of a
2    Luddite myself.
3            Do you see that -- where the end of my finger, it
4    says, "Willow Firewall"?
5    A.   Yes, sir.
6    Q.   What, if anything, did that tell you that morning?
7    A.   A firewall is essentially like a big filter.  It usually
8    sits between the Internet and your internal servers and filters
9    out traffic you don't want.  In most cases, malicious traffic.
10   You don't want that traffic coming into your network and a
11   firewall is just a big filter.  It prevents that traffic from
12   coming in.
13   Q.   You see down here on those computers it looks like they're
14   pink stickies?
15   A.   Yes, sir.
16   Q.   Who put that there?
17   A.   I did.
18   Q.   What is on those pink stickies; can you tell us?
19   A.   As we went through the servers with Mr. Manzella and he
20   explained to us what the servers were for, I would label on a
21   sticky note and put it on the server.  The sticky notes are
22   what we use to mark things so that we can remember what they
23   are.  As we go through the process of acquiring the servers, we
24   can write which ones are done, which ones still need to be
25   done, that kind of thing.

1          It's just a labeling system that we use.

2  Q.   Now, in connection with your analysis and, I guess for

3  lack of a better term, search, is what you're doing; right?

4  A.   Yes, sir.

5  Q.   In connection with your search, did you find any documents

6  that related to a company known as River Birch?

7  A.   We didn't -- and this is a discrepancy in the term

8  "search."  We don't actually search through the computers

9  on-site.  When we --

10  Q.   Correct me.  What did you do?

11  A.   What we do is when we ascertain which ones belong in the

12  search warrant, we acquire -- we just bulk-acquire the server.

13  And what that means is we'll take the hard drive and just copy

14  the entire hard drive onto one of ours.  To actually search

15  through the records on-site would have -- would tie up the site

16  for weeks at a time to identify all the records that go to --

17  that were pertinent to the case agent.

18  Q.   So what did you do, mirror -- do you know the process of

19  mirroring?

20  A.   Yes, sir.  In the case of these, we imaged the hard

21  drives; and that is what is we took their hard drive, copied it

22  to one of ours in a big file, and the big file is a

23  representation of their hard drive.

24  Q.   In the process of doing this, did you lose any data?

25  A.   No, sir.

**Q.** Did you -- to your knowledge, did you find any documents
or data related to a company known as River Birch?

**A.** Like I said, we didn't actually interpret the data. We
didn't actually look at it. We verified that we had an
accurate copy and we make sure that we can just see the file
system, that all the files are there, but we don't actually
open documents and go through the contents of those documents
on-site.

**Q.** I'm going to show you what I've marked for identification
as Government's Exhibit 39. Mr. Kennedy is going to give the
plaintiffs -- I've got to get that word straight, plaintiffs --
a copy.

　　　　Take a look at that if you will.

　　　　**MR. GIBBENS:** We haven't seen this before, Judge.

　　　　**THE COURT:** Let's find out what it is from the
witness and then carry on from there.

　　　　　Is this something the witness can identify?

　　　　**MR. PERRICONE:** Oh, yeah.

　　　　**THE COURT:** Okay.

**BY MR. PERRICONE:**

**Q.** Did you compile this document?

**A.** Yes, sir.

**Q.** Can you tell the Court what it is?

**A.** Sure. This is basically our log of -- of what we captured
on scene, the images that we made. At the top --

1  Q.    Wait a minute.

2         MR. PERRICONE:  Can I display it to you, Your Honor?

3         THE COURT:  Any problems with my taking a look at it

4  while you all look at it?

5         MR. GIBBENS:  That's fine, Judge.  I mean, I still

6  don't know what it is.

7         THE COURT:  Okay.  We're going to find out together.

8         MR. GIBBENS:  It wasn't exchanged when we exchanged

9  exhibits.

10        MR. KENNEDY:  Judge, just to clarify something,

11 that's something that Mr. Downie just printed out this

12 afternoon at our lunch break.  Right before we came up here we

13 realized it might be relevant to his testimony pursuant to the

14 other witnesses.

15        THE COURT:  All right.  Let's take a look at it and

16 see what it is.

17        MR. CASTAING:  What's the number?

18        MR. KENNEDY:  39.

19        MR. PERRICONE:  39.

20 BY MR. PERRICONE:

21 Q.    Mr. Downie, can you tell us what that is, sir?

22 A.    Yes, sir.  The top section is our hard drives.  We

23 brought -- let's see.  We brought 11 hard drives on the scene.

24 Q.    That's -- these are FBI hard drives?

25 A.    Yes, FBI hard drives.  We show up -- they're forensically

1   clean, which means we've taken the hard drive and written zeros
2   from start to finish to make sure there's no information on
3   there from any previous case or any manufacturer information or
4   anything, like, on these.  They're completely pristine hard
5   drives.

6           And we take those hard drives and we use them to
7   acquire the computers there in the office.  So, for instance,
8   hard drive 1 -- we'll take the top one -- it's a Samsung, HD
9   502, 500 gig hard drive, and there's the serial number of it.
10  And "SRD" is me.  I used that hard drive.

11          On the bottom it just details which computers are on
12  which hard drive.  So for hard drive 1, it shows that I
13  performed -- I captured two computers, and it explains which
14  computers I put on those hard drives and how large those
15  computers were.

16          We do this on scene to keep track of, one, which ones
17  we're copying and how much space we're using on our hard drive
18  for when we need to go get another one before we go capture a
19  computer.
20  Q.   That's -- those 11 hard drives are the same thing, what
21  you brought with you to help mirror the computers on-site;
22  right?
23  A.   Yes, sir.
24  Q.   Now, in the middle of the page, a third of the way down,
25  it says "Image Log."  What is that, sir?

1    A.    The image log, that's the images that we made.

2    "Mirroring," "imaging," they're very synonomous terms.  We call

3    them, for technical reasons, "images," that we make an image of

4    their server or an image of their computer.  That's just the

5    log of which computers were saved to which hard drives.

6           So, for instance, the hard drive 1 that I mentioned

7    earlier, that had -- we put two servers onto that one hard

8    drive.

9    Q.    Okay.  For the record, so the record's clear, the data

10   you've put into this document is in a columnar fashion; right?

11   A.    Yes, sir.

12   Q.    Now, it starts with "Date," "Hard drive," "Examiner,"

13   "Room," "Image" and "Employee," and then "Gigabyte," and God

14   only knows what the other stuff means.

15   A.    The right-hand side is just administrative work that we

16   have to fill out.

17   Q.    The date is September 23rd, 2010, I'm looking at HD 1.  Do

18   you see that?

19   A.    Yes, sir.

20   Q.    It says "Examiner, SRD."  That's you; right?

21   A.    Yes, sir.

22   Q.    In room D, that's FBI designation D, which was plaintiffs'

23   8?

24   A.    Yes, sir.

25   Q.    And image S1.  What's "S1" mean, sir?

1    A.   I just label -- usually, what we do is we call a computer,

2    say, room D, computer 1, or room M, computer 1.  In this case,

3    when we could ascertain which user it belonged to, we would

4    call it the user's name.  So the S1 and S4, that's just server

5    1, server 2, server 3 and server 4.  It was just a way to label

6    them, to number them.

7    Q.   Then it says, "Employee, Willow/River Birch File Server"?

8    A.   Yes, sir.

9    Q.   Why did you write that down?

10   A.   Mr. Manzella explained that the computer S1, server 1, was

11   the Willow/River Birch file server.

12   Q.   Documents on that computer were commingled?

13   A.   Yes, sir.  They had the files for Willow and River Birch.

14   Q.   The next one, HD -- the next line, S2.  It says,

15   "Willow/River Birch E-mail Server."  Who told you to put that

16   down?  Who gave you that information?

17   A.   Mr. Manzella provided that information.

18   Q.   Okay.  Then there's other entities and people there; is

19   that correct?

20   A.   Yes.

21   Q.   Mr. Manzella helped you put that together; right?

22   A.   No.  Usually, the case agent or the person that's

23   acquiring the evidence looked for either mail on their desk, or

24   usually the phones will say who sits at a location, like it

25   will have their name on the phone.  So, usually, we're able to

1    ascertain who actually sits there.

2             Furthermore, when we pull the image, we can see who

3    logged on.  You can see their user name of who logged onto the

4    system to figure out who was actually at that computer.  So on

5    most of them we were able to figure out who the person was.

6    **Q.**   How many gigs of information do you estimate was on-site

7    at 2000 Belle Chasse Highway?

8    **A.**   The on-site, I'm not sure.  We actually copied about 4.7

9    terabytes, which is about 4,700 gigs.

10            **THE COURT:**  What's that mean in paper?

11            **THE WITNESS:**  Ooh.  What does that mean in paper?

12            **MR. PERRICONE:**  How many trees?

13            **THE WITNESS:**  I think the general stat they use is a

14   gigabyte is worth paper stacked up to the Washington

15   Monument -- the height of the Washington Monument.  So 4,700 of

16   those, I think is what the general term is.

17            **THE COURT:**  That's the amount of data that was on

18   those --

19            **THE WITNESS:**  If it was text -- but text is extremely

20   small and so... it's hard to compare computers versus paper.

21   If it was all text, it would be a lot.  If it was pictures or

22   movies, not very much.  It's hard to relate that.

23            A typical -- if you want to relate to e-mails,

24   millions of e-mails in 4.7 terabytes.

25

1   BY MR. PERRICONE:

2   Q.   Mr. Downie, were you alerted that there was an attorney's

3   office somewhere embedded in River Birch's operation?

4   A.   Yes, sir.

5   Q.   Did you -- or were you alerted to the concept of

6   attorney/client privileged information?

7   A.   Yes, sir.

8   Q.   Did you take any steps to segregate in your operation

9   potentially privileged information from non-privileged

10  information?

11  A.   On the servers, no -- computers, no.  We don't make that

12  determination on-site.

13  Q.   What is your understanding who makes that determination

14  ultimately?

15  A.   With the computers it's really impossible to do that

16  on-site in a timely fashion.  So we've set up a procedure where

17  we bulk-take the evidence that's applicable to the search

18  warrant.  Then when we get back, it's sent to a -- what they

19  call a taint team.  It's the people that are separate from the

20  investigation that go through and identify any attorney/client

21  privileged information that may be on there.

22          Then as forensic examiners tell us which items that

23  we need to exclude and then we can take that evidence, pull

24  those files out of there and provide to the investigative team

25  only the evidence that is not confidential or private in

1  nature.

2  **Q.**   Okay.  At any time did anyone who identified themselves as

3  Mr. Gibbens or Mr. Schonekas offer any assistance in any way in

4  what you were doing?

5  **A.**   Not to my knowledge.

6  **Q.**   Are you familiar with a piece of software known as

7  QuickBooks?

8  **A.**   Yes, sir.

9  **Q.**   Did you have an occasion to seize an installation of a

10  software program known as QuickBooks?

11  **A.**   Yes, sir.  I was called to room L.  I didn't catch which

12  number it was on the previous document.  It was a storage room

13  where they had a bunch of computer software, Windows

14  installation disks, other applications, and one of them was

15  QuickBooks and they were asking -- I was, basically, asked

16  which one we need to take.

17       My judgment was to leave everything except for the

18  QuickBooks software, that we needed to take that.

19  **Q.**   Mr. Downie, why is that important to take the software

20  known as QuickBooks?

21  **A.**   The QuickBooks files are very proprietary to QuickBooks.

22  There's not another application that will read a QuickBooks

23  file.  If you have a Microsoft Word document, you can open it

24  in Word Perfect or you can open it with just a regular Windows

25  Notepad.  You can actually see the contents of that document.

1    But QuickBooks is very proprietary.

2         It's also very proprietary to the version of

3    QuickBooks that you use.  So if I were to go out and buy

4    QuickBooks and they were using an older version, I would have

5    to upgrade their files to work with my software and I would be

6    changing their files; and any time you upgrade or change, as we

7    know, you have the possibility of losing certain pieces of

8    information.

9         So whenever we find QuickBooks, we try to take that

10   version so that we can actually open their files without

11   changing them.

12   **Q.**   If you didn't have that version, what could happen, if

13   anything?

14   **A.**   If we didn't have that version, like I said, we would have

15   to go out and buy a new version, most likely a newer version;

16   and then to get them to read their files, we would have to

17   upgrade their files, and you can lose information that way.

18   **Q.**   So you took that piece of installation software to

19   preserve the integrity of other people's documents?

20   **A.**   Yes.  So that we could read them in their true form, in

21   their current state.

22   **Q.**   As we sit here today, and I understand the search was

23   September 23rd, 2010, as we sit here today, February 24th,

24   2011, what is the status of your analysis?

25   **A.**   I'm actually not involved in the analysis.  A different

1  CART examiner is involved in the analysis and they're still --
2  still working on the analysis of those -- all of those
3  computers and those four servers.
4  Q.   That is pursuant to the search warrant, as you understand
5  it; right?
6  A.   Yes, sir.
7          MR. PERRICONE:  The Court's indulgence for a moment?
8          THE COURT:  Yes, sir.
9          MR. PERRICONE:  I'm going to tender the witness, Your
10 Honor.
11          We would like to move those -- Exhibit 39 into
12 evidence.
13          THE DEPUTY CLERK:  And 38?
14          MR. GIBBENS:  No objection, Your Honor.
15          MR. PERRICONE:  39.
16          THE COURT:  39, okay.
17          THE DEPUTY CLERK:  38 is not in.
18          MR. PERRICONE:  38's not in?  I move 38 in too.
19          THE COURT:  Okay.  Those are in.
20          MR. PERRICONE:  37?
21          THE DEPUTY CLERK:  I don't have 37.
22          MR. KENNEDY:  Judge, just to clarify, I think when
23 Agent Bezet looked at the photographs previously he had said
24 they only go up to 36, but they actually go up to 38.
25          THE COURT:  Okay.  So 37, 38 and 39 now.

1      MR. KENNEDY:  So we would offer 37 and 38 at this

2  time.

3            THE COURT:  And 39?

4      MR. KENNEDY:  And 39, previously, yes.

5      THE COURT:  Okay.  Those are admitted.

6            Mr. Gibbens?

7      MR. GIBBENS:  Yes, ma'am.

8                      CROSS-EXAMINATION

9  BY MR. GIBBENS:

10  Q.   Agent Downie, you testified that you -- all you did with

11  these 4,700 gigabytes was capture the images on the -- capture

12  that data on the scene; correct?

13  A.   Yes, sir.

14  Q.   You did not have any idea what it was that you were

15  taking?

16  A.   The actual files on there, no.  We can't go through and

17  look at the files that are on them.

18  Q.   So you didn't know if you were taking River Birch,

19  Shadowlake, Willow, you just knew you were copying computers?

20  A.   Oh, correct.

21  Q.   You knew what Mr. Manzella had told you, which was that of

22  these four severs, two of the servers were Shadowlake's;

23  correct?  S3 and S4?

24  A.   Yes, sir.

25  Q.   But you still took those despite having no information

1  that there was anything of River Birch on there?

2  A.   Actually, we don't make the determination of what's taken.

3  What I do is I go with the IT guy, figure out what the servers

4  are, take him for his word, confirm his word.  We'll sit

5  down -- one of the servers I believe was a RDP server, it's a

6  remote connection server.  We'll log onto that server to

7  validate what it's actually there for.

8         Then we present all that information to the case

9  agent, and the case agent makes the determination of what

10 servers we take and which ones we don't.

11 Q.   Okay.  So the case agent's determination in this case was

12 take everything without even looking to see what it was?

13 A.   No, sir.  His determination in this one was to take the

14 Shadowlake servers because he had information that the files

15 for River Birch were commingled between the Shadowlake and the

16 Willow and the River Birch servers.

17 Q.   Are you aware of what that information was?  Did he tell

18 you?

19 A.   No, sir.

20 Q.   He just told you, "I have information so we're taking

21 them"?

22 A.   Well, he indicated he had information that the files were

23 all commingled between those servers.  There was a Shadowlake

24 server that we did not take.

25 Q.   Did he tell you that he had information that there was

1  nothing commingled on that one?

2  A.    No.  It was an application server, and I'm sorry, I forget

3  what the application was, but it was a proprietary application.

4  Honestly, I forget what the application actually was.  But in

5  our ascertaining -- in our looking through that server, that

6  application wouldn't have had any information that was

7  pertinent to our search warrant, so we did leave that and we

8  didn't copy it.

9  Q.    As far as all the rest of these computers, you know, Nita

10  Bertacci, Chris Bartholemy, Michelle Morales, all the different

11  names on here, those also were taken -- they were just copied,

12  but there was no examination on the scene of what those

13  computers contained?

14  A.    Correct.

15  Q.    There were video surveillance cameras at that office;

16  correct?

17  A.    I didn't personally witness any.

18  Q.    Okay.  Were you aware of those cameras being disconnected

19  by any members of the computer team?

20  A.    No.  I didn't know of any that I disconnected, and I don't

21  know of any that others would have disconnected.

22  Q.    As far as Mr. Manzella, you said that you didn't -- you

23  didn't -- well, you asked him to assist you in the passwords

24  and in finding out what's on the computers and that type of

25  thing; correct?

1   A.   Yes, sir.

2   Q.   Did you tell him that he didn't have to do that?

3   A.   We explained to him -- one of the first questions that we

4   asked, "Is there any encryption," and the reason being is

5   because the passwords are extremely critical for encryption.

6   And with them not running any encryption, I don't need their

7   passwords.  If they choose not to provide their passwords, it's

8   fine.  I can power off the servers by unplugging them and then

9   I can copy all the data, and I'll walk out with the same data.

10              But if he can provide us passwords, we can log onto

11  those servers and shut them down in a manner that will -- that

12  makes sure that they work after we're done.  Because powering

13  off the computers in that manner, although I'll get what I

14  want, it could possibly corrupt the operating system or files

15  on that server and it may not work when we're finished.

16  Q.   But were you aware -- did you tell Mr. Manzella that he

17  did not have to stay for the entirety of that 11-hour search?

18  A.   I don't remember that conversation coming up.  I'm sorry.

19  Q.   And you -- when you went into that search, you believed --

20  well, you read the warrant itself; correct?

21  A.   Yes, sir.

22  Q.   Your understanding was that that warrant was for River

23  Birch; correct?

24  A.   No, sir.  That warrant was for 2000 Belle Chasse Highway.

25  Q.   It didn't mention the offices of River Birch?

1   A.   No, sir.

2          MR. GIBBENS:  Can I have one second, Your Honor?

3          THE COURT:  Yes, sir.

4   BY MR. GIBBENS:

5   Q.   The employee list on this image log, were you -- did you

6   ask or did you, you know, determine in any kind of way what

7   companies these different employees worked for?

8   A.   No, sir.

9   Q.   Okay.

10         MR. GIBBENS:  No further questions, Judge.

11         THE COURT:  All right.  Any redirect?

12         MR. HABANS:  Can I ask a couple of questions, Your

13  Honor?

14         THE COURT:  Oh, I'm sorry.  Go ahead.  Sure.

15                      CROSS-EXAMINATION

16  BY MR. HABANS:

17  Q.   Good afternoon, sir.  I'm Bob Habans.  I represent Jim

18  Ward.  I have just a few questions.

19  A.   Yes, sir.

20  Q.   I understood in your early testimony that you said that

21  there were four computers or servers, your terminology,

22  whatever it was, that were imaged and you left six alone?

23  A.   Yes, sir.

24  Q.   What did that mean?  What do you mean you left six alone?

25  A.   We didn't copy the information from them.  We'd either log

1   onto them or verify that the information Mr. Manzella was
2   providing was correct.  He identified first some of them as
3   firewalls.  So we would have him switch that computer -- notice
4   there's only two monitors.

5   Q.    I think I can cut this short.

6   A.    Sure.  Okay.

7   Q.    The ones that were firewalls, you didn't image?

8   A.    Correct.  But we looked at them to verify that they were
9   actually firewalls.

10  Q.    I understand.  I appreciate that.

11         We're talking -- were there any servers that had
12  data, e-mails, information on it, that you didn't take?

13  A.    The one that I know about was the Shadowlake application
14  server, and, like I said, I forget which application was
15  running on it.

16  Q.    When you say "application," sir, you basically mean that's
17  a program; is that right?

18  A.    It's a program but it performs functions of that company.
19  Like I said, I don't remember what that application is or what
20  functions and data it handled.  But on his description of that
21  application, we ascertained that it wouldn't contain any of the
22  records that we were looking for and so we did not copy that
23  computer.

24  Q.    All right.  I assume that since you said the agent who was
25  in charge of the search made that decision, who was that agent?

1  A.   That was Jerry Bezet.

2  Q.   All right.  I notice on Exhibit 39 -- Government's Exhibit

3  39, it's two items from the bottom, the second item from the

4  bottom says "Peter Butler"?

5  A.   Yes, sir.

6  Q.   Did you image the file or the server that had Peter

7  Butler's documents on it?

8  A.   The server?

9  Q.   Yes.

10 A.   If he put his files on one of the four servers there,

11 then, yes, sir.

12 Q.   Then I'm not understanding your form.  Because it says

13 "Image Log"?

14 A.   Yes, sir.

15 Q.   And I see "Peter Butler" as the identification for 1,000

16 gigabytes that were captured by your assistant "LDJ."  Did I

17 read that wrong?

18 A.   No, sir, that's correct.

19 Q.   So then the answer is you all did image Peter Butler's

20 1,000 gigabytes on one of your hard drives; is that right?

21 A.   Yes, sir.

22 Q.   Okay.  Let me ask you this:  I know you're not involved

23 directly in the search or the review or the analysis of the

24 images captured, but somebody else is taking care of that;

25 right?

1    A.    Yes, sir.

2    Q.    If somebody else signed onto the files involving, just by

3    way of example, 1,000 gigabytes of Peter Butler's files and

4    somebody is studying those to figure them out or whatever,

5    would you be able to -- as a computer expert, would you be able

6    to go in and identify based on some logging in which agents had

7    access to Peter Butler's 1,000 gigabytes?

8    A.    Yes, sir.  That information is actually staged in my

9    office.  Our office is under lock and key 24/7.  We have a

10   separate facility for our evidence.  So that case is up in our

11   office.  And so when agents want to review it, they can come

12   down and they can get access to our office and review their

13   evidence with us there.  We'll help them review the files,

14   especially cases like this that have a lot of evidence.

15         But, yes, we can control who has access to that

16   evidence.

17   Q.    Do you know the identities of some of the agents who are

18   generally reviewing these files at the present time?

19   A.    I do not, no.

20   Q.    Have any of them come to your office and asked for help to

21   access or review anything?

22   A.    They do, but it's all with the actual CART examiner that's

23   helping them with their review.

24   Q.    But if we needed to get a list of all the agents who have

25   accessed some of these documents that arguably were not River

1  Birch, you would be able to give us a list of who, when and
2  what they accessed within your office; right?
3  **A.**   I don't know that we can cover when and what documents
4  they looked at specifically; but in general, they could tell
5  you who's accessed these documents.
6  **Q.**   Well, let's just say if it was access to Peter Butler's
7  1,000 gigabytes, could you identify, yes, that was access to
8  Peter Butler's 1,000 gigs?
9  **A.**   Yes.  But I couldn't tell you -- we don't log who opens
10 each individual file.  We don't keep that detailed of a log.
11 **Q.**   Well, wouldn't the agent have some code or identification
12 when he accesses seized records?
13 **A.**   No, sir.
14 **Q.**   But you say you could identify which agents were in your
15 office accessing this?
16 **A.**   Yes, sir.  It's only been one or two.  I --there's not
17 many.
18 **Q.**   Well, do you know who those one or two were?
19 **A.**   No, sir.
20        **MR. HABANS:**  All right.  No further questions.  Thank
21 you.
22        **THE COURT:**  Okay.  Anything?  Any redirect?
23        **MR. PERRICONE:**  No, ma'am.
24        **THE COURT:**  Okay.  You may step down.
25        **THE WITNESS:**  Thank you.

1          **THE COURT:**  Thank you, sir.

2          **MR. PERRICONE:**  The United States calls Jim Mann.

3          (WHEREUPON, **James Mann**, having been duly sworn,

4    testified as follows.)

5          **THE DEPUTY CLERK:**  Please state your full name and

6    correct spelling for the record.

7          **THE WITNESS:**  James Mann, J-A-M-E-S, M-A-N-N.

8                        **DIRECT EXAMINATION**

9    BY MR. PERRICONE:

10   **Q.**   Mr. Mann, how are you employed, sir?

11   **A.**   I am the financial crimes and computer crimes supervisor

12   as an Assistant U.S. Attorney for the Eastern District of

13   Louisiana, U.S. Attorney's Office.

14   **Q.**   How long have you been an Assistant U.S. Attorney, sir?

15   **A.**   Approximately 20 years.

16   **Q.**   Before you were an Assistant U.S. Attorney, did you have

17   any previous federal law enforcement experience?

18   **A.**   Yes.  I was a United States Postal Inspector.  I began

19   that in 1984 and I ended that in September of 1987.  So I was a

20   federal law enforcement agent.

21   **Q.**   Mr. Mann, in your capacity as the financial crimes

22   supervisor, did you ever have to help agents put search

23   warrants together?

24   **A.**   Yes.  I acted as their legal adviser.

25   **Q.**   Okay.  What exactly can you tell the Court you do in

1 participating with the agents in getting and securing a search
2 warrant?

3 **A.**  Certainly.  The agents put together the affidavit.  They
4 acquire all the facts from whatever evidence and information
5 they collect.  I review that affidavit for probable cause.  I
6 always review the attachments to the search warrant for the
7 items to be seized and the place to be searched.

8      The magistrate -- and we take it to a magistrate
9 judge usually in this district.  You can take it to a United
10 States District Court judge, and I've done that before both as
11 an agent and as an Assistant U.S. Attorney, and accompanied the
12 agent to the magistrate as an Assistant U.S. Attorney.

13      But in this district, we take it to a magistrate.
14 The magistrate in this particular district usually requires the
15 Assistant U.S. Attorney, or always requires, to put our
16 initials at the top of the search warrant to indicate that we
17 have reviewed the warrant and that we have reviewed it and it
18 satisfies the probable cause standard before he actually reads
19 it.

20 **Q.**  Do you or any other Assistant U.S. Attorney that works for
21 you go beyond what the agents represent in the affidavit to be
22 true or not?

23 **A.**  No, we're not investigators.  They're in charge of
24 collecting the information, and we do not collect the
25 information.  We assist them with getting them court orders to

1  collect the information, such as the search warrant, such as a

2  grand jury subpoena, or any other court orders or any way we

3  can help them assist them to collect that information.

4  **Q.**   Do Assistant United States Attorneys supervise searches

5  once a warrant is signed by a magistrate?

6  **A.**   No.  What we do is we act as their legal adviser.  Should

7  they have any questions while the search warrant is being

8  executed, we are available to answer questions, and that

9  usually is the lead attorney or the attorneys assigned to that

10 particular case wherein the agents are conducting or executing

11 that search warrant.

12         Now, when I was a U.S. Postal Inspector, that

13 supervision is a term of art.  I did, in fact, was the -- acted

14 as an affiant on several occasions and also was in other roles,

15 not the affiant, but was one of the searchers or had a specific

16 role.  When I was the affiant -- usually, that is the

17 supervisor of that particular warrant unless, you know, it's an

18 unusually big case and you have an agent supervisor that you

19 report to, and that could potentially be the supervisor of the

20 warrant while it's being executed.

21         But the -- let me just make it clear:  The agents are

22 the supervisors of the warrant.  They're trained in search and

23 seizure and they know how to protect the scene and acquire

24 evidence, how to log it in, and that is entirely up to them at

25 that point.

**Q.**   Now, have you ever participated in the preparation of a search warrant to search an attorney's office?

**A.**   Yes, many times, both as a United States Postal Inspector and as an Assistant U.S. Attorney.  There are special permissions and authorizations you have to acquire and let the main Department of Justice know if an attorney is the -- part of the search warrant execution.

There are -- you send memorandums, the affidavit to the Main Justice, OEO -- it's called the Office of Enforcement -- and they review it and authorize it at that point.  Because, you know, we have -- or we take precautions and safeguards if there's possibly any attorney/client privilege or attorneys involved in the execution of a search warrant.

**Q.**   In fact, Main Justice, particularly the Office of Enforcement Operation, has to approve the search of an attorney's office even before we go to a magistrate; is that correct?

**A.**   That is correct.

**Q.**   When a search is going to be conducted at an attorney's office, is it required for you to notify the attorney or the counsel for that attorney before the search?

**A.**   No.  Rule 41 of the Federal Rules of Criminal Procedure has no such requirement to notify an attorney or any individual prior to the search warrant.  Because you want to obtain

1   evidence, usually because you think the evidence is going to

2   disappear, and you don't want to have notification -- prior

3   notifications to the individuals on a search warrant.

4           That's as opposed to a grand jury subpoena, where

5   they have prior notifications that you intend to seize such

6   documents.

7   Q.   When you're looking at a search warrant with the agent

8   sitting with you for sufficiency or whatever, is it in your

9   mind that documents can be secreted in locations, containers or

10  folders or boxes belying what the actual document actually is?

11  A.   Yes, and let me explain why I know that.

12          From my prior experience as a federal law enforcement

13  agent and my training there, and then consequently I've carried

14  that along, I didn't leave that out of my life as an Assistant

15  U.S. Attorney, and, of course, I was an Assistant District

16  Attorney for the Jefferson Parish District Attorney's Office,

17  it is not unusual that people conceal and try to avoid

18  detection of their criminal activity and mislabel information.

19          You have to -- when you're an agent, you have to

20  independently corroborate all the -- when you have an order to

21  search, you have to independently corroborate the information,

22  and a duty to corroborate that information, despite what it may

23  be labeled.

24          For instance, the most blatant example that I can

25  think of would be the William Jefferson search warrant where he

1  put cash into food containers and secreted them into a freezer
2  making it appear to be if an agent looked into the freezer,
3  "Oh, those are food containers," and wouldn't look any further.
4          Those are the kinds of examples, the reason why the
5  agent has to look beyond just mere labels or of the people --
6  as Agent Zummer put it, you know, it's a trust situation.
7  We're looking at criminal activity of the folks when we serve a
8  search warrant and we don't necessarily trust those individuals
9  to do the right thing and give us the right information when we
10  execute a search warrant.
11  Q.   Mr. Mann, I want to take you back to September 23rd, 2010.
12  Were you working that day?
13  A.   I'm sorry, repeat that day.
14  Q.   September 23rd, 2010, were you working that day?
15  A.   All right.  I guess I slipped into neutral.  Yes, I was
16  working that day.
17  Q.   Did you have an occasion to become aware that a search
18  warrant was being executed at 2000 Belle Chasse Highway in
19  Gretna, Louisiana?
20  A.   Yes, and I'll tell you how I became aware of that.  I was
21  in the chambers of Judge Moore, not in his courtroom, but in
22  the chambers of Magistrate Judge Moore at approximately
23  10:00 a.m. that morning and I was there on another matter to
24  get Judge Moore's authorization.  It's a sealed matter, so I'd
25  prefer not to -- I'm prohibited from going into that at that

1    time.  But I was there to get a sealed matter -- on a sealed

2    matter to get his authorization.

3           In any event, I learned for the first time that the

4    search warrant was being conducted because Judge Moore, during

5    our discussions on this particular matter, he made the

6    transition into the River Birch search warrant and said, "Jim,

7    you know, I've been contacted and, you know, by Kyle Schonekas

8    and Billy Gibbens and they're complaining to me vociferously

9    about the warrant and want me to shut down the warrant that I

10   had signed, you know, for the River Birch."

11          And he says, "I can't do that.  That's not

12   appropriate for me to do that.  I've already authorized the

13   search warrant.  And they've called me several times.  I think

14   it's improper."

15          And I said, "Well, Judge," I said, "I knew that they

16   were going to do a search warrant at some time in the future,

17   but I wasn't aware of when."  I hadn't, you know, weighed in on

18   the search warrant, hadn't reviewed the affidavit, hadn't

19   helped them prepare anything, reviewed it for probable cause,

20   although Brian Klebba, who works in my unit, was assigned with

21   Greg Kennedy.  Greg Kennedy is a supervisor in the office and

22   he's the lead attorney on the River Birch case.

23          But it only came to my attention because Judge Moore

24   was upset with being contacted and asked for the search warrant

25   to be stopped by Mr. Schonekas and Mr. Gibbens.

**Q.**   Mr. Mann, did you have an occasion thereafter to talk to
either Mr. Gibbens or Mr. Schonekas?

**A.**   Yes, and let me tell you how that came about.  I was in
there for some period of time with Judge Moore and he not only
brought it up once, he brought it up twice.  There wasn't much
I could weigh in on with Judge Moore, although I inferred that
he wanted me to somehow take care of the situation, you know,
weigh in on it with the U.S. Attorney's Office.

        And as a supervisor, and the case was in my unit
through Mr. Klebba, after I finished, and it was approximately
about 11:00, I went down to find Mr. Kennedy -- Mr. Kennedy --
and to speak with him.  I went down to find Mr. Kennedy and he
was not available.  I had his secretary, Laura Orth, try to
locate him, and she wasn't able to locate him.  Immediately, I
called his cell phone and did what, you know, was necessary,
because I was going to advise him about the situation that I
had learned from Judge Moore.

        Consequently, he was not available.  I went to seek
Mr. Klebba, who was the -- sort of the secondary AUSA on the
case to inform him of that matter.  He was not available
either.  And that's not unusual.  I mean, it's around lunchtime
or whatever --

        **THE COURT:**  Can we fast forward.  Let's fast forward.

        **THE WITNESS:**  Sure.  Certainly.

1   BY MR. PERRICONE:

2   Q.   Did you talk to Mr. Gibbens?

3   A.   I talked to Mr. Gibbens.

4   Q.   How did that come about?

5   A.   Well, it came about -- eventually, I went to see the U.S.

6   Attorney, Jim Letten.  I told him about what had happened.  He

7   advised me that he had heard something about the warrant, that

8   the agents were being harassed at the site and interfered with

9   their execution of the warrant.  He advised me to call the

10  agent -- supervising agent on the scene --

11  Q.   Who was that?

12  A.   -- and that was Peter Smith.

13  Q.   Did you talk to Peter Smith?

14  A.   I placed a call to Peter Smith.  Peter Smith, I asked him,

15  I said, "Peter, what's going on with the execution of the

16  warrant?"

17  Q.   So Letten asked you to call Smith?

18  A.   Yes.

19  Q.   Okay.

20  A.   He asked me to call the -- he didn't know who the

21  supervising agent was, but he asked me to call the supervising

22  agent.  I learned it was Peter Smith.  So I asked Peter, I

23  said, "What is going on out there?  What problems are you

24  having?"  He told me that, "The attorneys, Mr. Gibbens and

25  Mr. Schonekas, are running loose around the search scene.

1   They're interfering with the search.  They're harassing the

2   agents.  They're eavesdropping.  They're telling them not to

3   take documents.  They're picking up documents.  It's very hard

4   for me to control the situation."

5           And, you know, Mr. Smith -- Agent Smith sounded like

6   he was under a little bit of duress because he said,

7   "Initially," he said, "I was told that they were allowed to

8   come on the scene."  And he says, "I don't know what to do now

9   because they're interfering with the" -- "they're picking up

10  evidence and interfering with the evidence."

11          So I said --

12  **Q.**   What did you do next?

13  **A.**   I said, "Well, it came to my attention" -- you know,

14  from -- afterwards from Mr. Kennedy -- "I would not have

15  allowed anybody to interfere or be present on the scene.

16  They'd have to move to a neutral site."  But he was very

17  generous, apparently, with Mr. Gibbens and Mr. Schonekas to

18  allow them to go into the very execution of the search warrant.

19          I told Agent Smith, I said, "Look, they're not

20  allowed to interfere with you.  That's a violation of law."  I

21  said, "You have my authorization, if he gets out of hand to

22  arrest" -- you know, and he was talking about Mr. Gibbens at

23  the time -- I said, "Mr. Gibbens or any other attorney that's

24  interfering in your execution of the warrant."  Then, of

25  course, that's pursuant to 18, U.S.C., 1509, obstruction of

1  court orders.

2          Which part, Mr -- and at that point Mr -- or Agent

3  Smith handed the phone to Billy Gibbens.  I was not expecting

4  to talk to Mr. Gibbens, but he handed the phone to him -- and

5  forgive me if I say "Billy."  Billy worked in my unit.  I've

6  known Billy for a long time, recommended him -- you know, you

7  and I recommended him for his job to Mr. Letten.  And, you

8  know, he was a very good friend.

9  Q.   So what --

10 A.   He answered the phone.  He said, "This is Billy Gibbens."

11 I said, "Billy, this is Jim Mann."  I said, "Billy," I said,

12 "What's going on?  What's your problem?"

13 Q.   What did he say?

14 A.   Billy told me, he said, "They're taking documents" --

15 "attorney/client privileged documents that they shouldn't

16 have."  And I said, "Billy," I said, "usually, we have

17 safeguards in effect.  We have clean teams who review such

18 documents.  I" -- you know -- "That would be appropriately

19 addressed, I'm sure.  So, you know, what else is your problem?"

20          He said, "Well, they're taking documents they

21 shouldn't have.  It's attorney/client privileged documents."  I

22 said, "Well, we've been over that."  I said, "I told you what

23 my answer was to that.  Any other problems that you have?"

24 Q.   Did he have any other problems?

25 A.   No.  He said, "No, that was it."  I said, "Well, Billy, I

need to talk to you about a matter."  I said, "The agents have
just told me, and what I can find out, you know, hearing this
from Judge Moore, that you're interfering with their execution
of the warrant."

Billy said, "Well, how are they interfering" --- "how
am I interfering?  Can you tell me what they're saying how I'm
interfering?"  I said, "Billy, I'm not having this debate with
you.  It's enough, the fact that you're interfering with the
execution of the warrant.  You know better than that.  You
can't interfere with court orders.  So I have" -- "I want to
tell you" -- and, you know, it's not that I enjoy doing this,
but, you know, as an Assistant U.S. Attorney, I have a job to
do, and I won't hesitate to do it again.  It's only happened
two times in my career, where I've had to tell an attorney
that, "I will authorize your arrest if you don't stand down and
not interfere further with the agents in their execution of the
warrant."

I asked him, I said, "Do you understand what I just
told you?"  He said, "Yes."  And I thought that he went off at
that point and I thought maybe the -- Peter Smith was going to
get back on the line.  Nobody came back on the phone.  I hung
up and I subsequently, because of that, I wanted to make sure
that the message got across clear.  So I contacted Howard
Schwartz, who is the ASAC for the FBI, and told him about my
conversation with Peter Smith and then subsequently with Billy

1    Gibbens.

2              That probably occurred around 11:00, 11:30 that

3    morning on September 23rd.

4    **Q.**   Mr. Mann, I've got one final question for you.  What is

5    your understanding, sir, of who the final arbiter is if a

6    matter is attorney/client privileged or not?  Who's the final

7    arbiter in that?

8    **A.**   The court.

9              **MR. PERRICONE:**  Thank you.  I tender the witness.

10                        **CROSS-EXAMINATION**

11   **BY MR. HABANS:**

12   **Q.**   Good afternoon, Mr. Mann.  I represent Jim Ward.  I'm Bob

13   Habans.  We've known each other a long time.

14   **A.**   A long time.

15   **Q.**   You indicated that this warrant -- you know, I'm looking

16   at the copy I have.  Can --

17             **MR. HABANS:**  I'm assuming we can't lower that down,

18   can we?

19   **BY MR. HABANS:**

20   **Q.**   Well, I have a copy that I can't read the handwriting

21   that's at the top.  It must have been made from another version

22   of this.

23             **THE COURT:**  You can use the ELMO, Mr. Habans, if you

24   want.

25             **MR. HABANS:**  Thank you, Your Honor.  That's a good

1  idea.

2  **BY MR. HABANS:**

3  **Q.**   At the very top, here, there seems to be a time, it looks

4  like 18 something, and then "Search Warrant," is written in

5  handwriting.  And next to it, I'm assuming, may be the initials

6  on there?

7  **A.**   It looks like it could be initials.

8  **Q.**   Do you know who -- you told us all about the procedures

9  for search warrants and legal advising and so on.  Do you know

10  who initialed this search warrant?

11  **A.**   Well, I would assume that Greg Kennedy probably initialed

12  the warrant.

13          **MR. KENNEDY:**  Judge, I'll readily admit, I believe

14  that those are my initials to the right of that.

15          **THE COURT:**  Okay.

16          **MR. HABANS:**  Thank you.  That's all I needed to

17  establish.

18          **THE COURT:**  Okay.  Thank you.

19  **BY MR. HABANS:**

20  **Q.**   So then when you testified earlier about procedures and

21  legal advice and reviews of warrants, I don't believe you said,

22  "This warrant."  You did not have anything to do prior to the

23  review and presentation to the Court for the issuance of a

24  search warrant with this warrant?

25  **A.**   No, I didn't have any preparation or input into this

1  particular warrant.

2  Q.   And if I understood correctly, you came into contact with

3  the execution of this warrant after being in Judge Moore's

4  court?

5  A.   Yeah.  Judge Moore first informed me about this matter,

6  that Mr. Gibbens and Mr. Schonekas had called him and asked him

7  to stop the search.

8  Q.   Now, when you say they had called him, the information

9  that you received, did he say he had spoken to them or they had

10  spoken to his law clerk and left their cell numbers and asked

11  to be called back?

12  A.   My recollection is that they had spoken to him.

13  Q.   That was what you inferred from what Judge Moore told you?

14  A.   That's what he represented.  That would be -- that would

15  be my understanding.

16  Q.   Now, as a legal adviser, and you weren't the legal adviser

17  on this warrant, what would you expect of an attorney in your

18  office who was serving as the legal adviser and authorizing the

19  issuance of this warrant with respect to instructing the

20  participants in the execution of the warrant, including NOPD

21  officers and maybe IRS officers and other agencies?

22         What would you expect the attorney who was the legal

23  adviser to the agents to tell them regarding making certain

24  they didn't violate privileged materials that were at the site

25  of the search?

1    A.    I don't know what was done on this particular warrant, but
2    I can tell you what I would do.  Is that what you want to know?
3    Q.    I'm asking you what you would expect would be the
4    high-road, professional thing to do?
5    A.    What I would do, Mr. Habans, is because this particular
6    warrant was -- there was precautions already built into it,
7    because it went to OEO to be approved because of the attorney
8    office that was within the scope of the warrant, I would
9    definitely have -- speak with the affiant or the supervising
10   agent.
11              And I would just make sure that -- what their
12   procedures were to establish a clean team, a taint team, to
13   review such materials should they receive it, and to be
14   cautious and be aware that, you know, if those materials are
15   received that they're handled in the proper protocols
16   established by that agency pursuant to attorney/client
17   privileged communications.
18   Q.    Now, I understand that would be Peter Butler's office is
19   the office -- the attorney office you understood was within the
20   confines of 2000 Belle Chasse; right?
21   A.    Well, as I know today.
22   Q.    As you know today.  I'm curious, because in the warrant
23   itself, if after going to OEO and getting authorization from,
24   quote, Main Justice, closed quote, to execute a search warrant
25   that included the execution of a search warrant in a lawyer's

office, can you explain to me why the legal adviser in the U.S.

Attorney's Office did not require the agents on Attachment A to

Exhibit No. 1, that is Plaintiff's Exhibit 1, why it just says,

"The offices of River Birch Landfill," and doesn't say, "And

Attorney Peter Butler"?

        **MR. PERRICONE:**  I would object at this time, Your

Honor.  It calls for speculation.

        **THE COURT:**  Yeah.  I don't think we want to have U.S.

Attorney's commenting on other U.S. Attorney's conduct, so I

will sustain the objection.

        **MR. HABANS:**  Well, okay.  I'll withdraw that.

        **THE COURT:**  It's not helpful.

        **MR. HABANS:**  Mr. Mann has given us his version of how

it should be done.  May I ask him if he had done it whether he

would have added it?

        **MR. PERRICONE:**  Same objection.

        **THE COURT:**  I don't think so.  We don't need that.

I'm not sure who the expert is, so...

**BY MR. HABANS:**

**Q.**   I know you have some after-acquired knowledge, sir.  Do

you know if anyone in the U.S. Attorney's Office, under your

supervision or otherwise, met with the agents and advised them

how to handle privileged documents that were found outside of

Peter Butler's office?

**A.**   In this particular case, I'm not aware of any -- how they

1   conducted that -- those communications with the agents between

2   our office and the agents.

3   **Q.**   And, therefore, as regards supervision of NOPD officers

4   and such like that who may have been reviewing privileged

5   information, there was no one there from the Department of

6   Justice, either a supervisory FBI agent or someone from your

7   office, directing the searching agents not to read privileged

8   information and somehow sequestering those for a taint team or

9   a clean team review?

10   **A.**   Well, your question, you know, "Submitted to me," means

11   that I should have known that information.  I'm not aware of

12   that information; but the FBI, of course, is a member of the

13   Department of Justice.  So I would think that the agents are

14   there to handle that appropriately; and they're well qualified

15   and trained, as far as I'm concerned, to handle that correctly.

16   **Q.**   Well, have you been here for the testimony?

17   **A.**   Yes.

18   **Q.**   Well, you heard that the agent -- the police officer

19   wasn't instructed -- or many of the agents weren't instructed

20   about privileged items being discovered in the offices, other

21   than Peter Butler's office, until after a complaint was raised.

22   You're aware of that, are you not?

23   **A.**   I heard that testimony, but I'm not aware of what the

24   police officer would have known and would have not known about

25   attorney/client information and what his training procedures

1    were.

2    **Q.**   I know it's been characterized different ways, and I won't

3    go there, but, in effect, the complaints made by Billy Gibbens

4    and Kyle Schonekas regarding privileged information was being

5    reviewed was, in fact, acted upon, at least to a limited

6    degree, in response to their complaints, wasn't it?

7    **A.**   I don't know that.  But when you're out on a search, and

8    as an agent -- when I was an agent, when you're out on a search

9    you have to make a cursory look -- a preliminary look at the

10   information to make any kind of determination.  You're not

11   prohibited at all from reading information even if it turns out

12   later to be attorney/client information.

13   **Q.**   Well, wouldn't you expect that a cursory look of a lawyer

14   letterhead would be sufficient stimulus to have it referred to

15   the taint team for further review before the investigative case

16   agents look at it?

17   **A.**   No.  I wouldn't say that that's always the case.

18   **Q.**   I didn't say "always."  I said:  Wouldn't that be the

19   prudent thing to do?

20   **A.**   No, I don't think so.  And you have to, like, look at the

21   document.  It may not be attorney/client privilege at all.

22   **Q.**   Respectfully, we agree to disagree.

23           **MR. HABANS:**  Thank you.  I have no further questions.

24           **THE COURT:**  All right.  Anybody else?

25           **MR. SCHONEKAS:**  No, Judge.

1    **MR. WALSH:**  No, Your Honor.

2    **THE COURT:**  Any redirect?

3    **MR. PERRICONE:**  No.

4    **THE COURT:**  All right.  You may step down.  Thank

5    you.

6              Anybody outside?  Inside?

7    **MR. PERRICONE:**  The United States submits and we're

8    prepared to argue.

9    **THE COURT:**  Okay.  Let me -- first of all, let me

10   ask:  Does either side wish to provide any additional briefing?

11   **MR. GIBBENS:**  Yes, Your Honor, I think we would, if

12   the Court agrees.

13   **THE COURT:**  That's fine.  Because there's actually a

14   couple things I would like both sides, perhaps, to address.  I

15   don't know that I want to take argument if we're going to have

16   subsequent briefing, I'd rather just have it written.

17   **MR. KENNEDY:**  Judge, can we briefly address a few

18   things while they're fresh in our mind?

19   **THE COURT:**  Yeah.  But let me ask you a couple of

20   things, if I could --

21   **MR. KENNEDY:**  Sure.

22   **THE COURT:**  -- and, Mr. Kennedy, you're probably the

23   appropriate person to ask.

24   **MR. KENNEDY:**  Yes, Your Honor.

25   **THE COURT:**  Have you either returned the originals or

1    provided copies of everything that was seized?  I'm talking

2    about documents.  I realize the computer servers were simply

3    copied.  So they still have the computer severs.  But in terms

4    of documents that were taken from the premises, have you either

5    returned the originals or provided copies of everything that

6    you took?

7              **MR. KENNEDY:**  No, Judge.  What we did, in accordance

8    with your order, was things that were strictly River Birch, we

9    retained.  We did not copy those.  Because those are -- as I

10   explained in our briefings, there were numerous documents that

11   were taken that related only to River Birch.  So the Court in

12   its court's order said, "Retain those."

13             The things that we determined were shared

14   between River Birch and other entities were, in fact, copied

15   and returned to the plaintiffs.

16             **THE COURT:**  Okay.  Do you have any problem with

17   copying everything that you took and providing copies to them?

18             **MR. KENNEDY:**  I don't believe so, Judge.  It will

19   take a little bit of time to do so, but we'll be happy to do

20   that.

21             **THE COURT:**  Okay.  Because I think that would -- if

22   nothing else, if we can get -- well, do you think a week?  Can

23   you get it done in a week?

24             **MR. KENNEDY:**  Sure, Judge, I believe so.  I'll check

25   with the agent.  I don't think that will be a problem.  I'll

1  certainly notify the Court.

2  I would like to point out as far as all the

3  computer stuff, that already has been copied --

4  **THE COURT:**  They already have that?

5  **MR. KENNEDY:**  Yes, ma'am.

6  **THE COURT:**  Okay.  So for a week -- next Thursday, if

7  you would, provide to them copies of everything that you took,

8  and if there's any -- do you have any particular reasons why

9  you need to keep the originals of these documents?

10  **MR. KENNEDY:**  Yes, Judge, because those are the

11  original documents.  Those are the best evidence in this

12  particular case.

13  **THE COURT:**  Okay.  Well, provide them copies by next

14  Thursday of everything that you took.  Then you all at that

15  point can start reviewing and raising privilege issues with me.

16  And I realize to some extent you feel the cow's out of the barn

17  and all that, but at least we can start making some

18  determinations about privilege, because you'll have copies of

19  everything.

20  **MR. SCHONEKAS:**  That would be great, Judge.

21  **THE COURT:**  Okay.  Go ahead, brief argument you said

22  you wanted to make at this point.

23  **MR. KENNEDY:**  Yes, Your Honor.  One second.

24  **THE COURT:**  Also, you can be doing that, the same

25  with the hard drive, obviously, since you still have that

1  material.

2          **MR. KENNEDY:**  Well, Judge, you know what, since

3  they've gone first, if they don't wish to argue, I would

4  certainly ask for rebuttal --

5          **THE COURT:**  All right.

6          **MR. SCHONEKAS:**  Since we're going to brief, I think

7  we'd save a lot of time with just briefing all this.

8          **THE COURT:**  Well, okay.  So you want to waive your

9  opening [*sic*] argument, Mr. Schonekas?

10          **MR. SCHONEKAS:**  Yes, I think so, Judge.  You know the

11  issues.

12          **THE COURT:**  Okay.  They're going to waive their

13  opening [*sic*] argument.

14          **MR. KENNEDY:**  I'm just making sure, Judge.

15          **MR. SCHONEKAS:**  We'll just have rebuttal.

16          **MR. GIBBENS:**  Just as one housekeeping issue, though,

17  Judge, I forgot to introduce clip 1, that was the only video

18  clip that we played, and I would like to offer that at this

19  time.

20          **THE COURT:**  Okay.  Kim, do you know what clip 1 is?

21          **MR. GIBBENS:**  I'll have to give a separate disk with

22  that because the only one I have is --

23          **THE COURT:**  It's that coming in by the elevator and

24  all that business?

25          **MR. GIBBENS:**  Yes.  Yes, ma'am.

1                  **THE COURT:**  Okay.

2                  **THE DEPUTY CLERK:**  Do you want that to be Exhibit 33?

3              **MR. GIBBENS:**  That will be -- yeah, 33.  Yes.

4                  **THE COURT:**  All right.  So they've waived the opening

5     [*sic*] comments.

6              **MR. KENNEDY:**  Judge, I'll be brief.  I know the

7     Court's heard a number of arguments.  I'm not going to go into

8     documents.

9                      I would simply ask the Court to look at the

10    particular items that the government has submitted for a

11    determination of whether or not, in fact, file cabinets are, in

12    fact, labeled, if they're next to other file cabinets that are

13    labeled but, therefore, were also commingled in certain storage

14    areas as testified to by the agents, such as storage room L.

15                     Judge, throughout the entire process, the

16    government has never said that there weren't documents of other

17    businesses located at 2000 Belle Chasse Highway, and the agents

18    contemplated that.  And I would ask the Court to look to

19    Attachment B, but then go beyond that.  It is a sealed

20    document, but the affidavit is available to the Court to review

21    to determine the relevancy of the items that were, in fact,

22    taken, and determine the relevancy of the items that the agents

23    determined were within the scope of the search warrant itself.

24             **THE COURT:**  Let me ask you something, because Agent

25    Bezet -- is that the correct --

1        **MR. KENNEDY:**  Bezet, Your Honor.

2        **THE COURT:**  -- Bezet seemed to be implying, at least

3   through part of his testimony, that he thought -- he was kind

4   of ignoring Attachment A and he, basically, was saying, "I have

5   authority to search everything at 2000 Belle Chasse Highway,

6   Third Floor," and then he was kind of resisting the notion that

7   it was somehow limited to River Birch.

8             Are you all taking that position, that it was

9   not limited to River Birch?

10       **MR. KENNEDY:**  Judge, what we're saying is that the

11  search warrant itself, the actual search warrant, says "2000

12  Belle Chasse Highway."  And a further description is, "The

13  offices of River Birch Landfill as described," and the picture

14  shows that.  But what we -- what Agent Bezet is saying is that

15  he had -- he believed at that time that there were only River

16  Birch offices, but the warrant allowed for the search of 2000

17  Belle Chasse Highway.

18       **THE COURT:**  Okay.  Well, are you taking the position

19  that you were not restricted to River Birch?

20       **MR. KENNEDY:**  Judge, I'm taking the position that the

21  agents were allowed to search 2000 Belle Chasse Highway --

22       **THE COURT:**  On what basis?

23       **MR. KENNEDY:**  -- and that they, in turn, went

24  upstairs and, basically, went through the entirety of the

25  offices located at 2000 Belle Chasse Highway.

1    So I guess in a roundabout --

2    **THE COURT:**  So you're taking the position that

3  Attachment A didn't restrict the search at all?

4    **MR. KENNEDY:**  No, I'm not taking that, Judge.

5    What I'm saying is that they believed that the

6  only thing that was located at 2000 Belle Chasse Highway were

7  the actual offices of River Birch itself.  So, therefore, they

8  believed that they were within the confines of Attachment A

9  that allowed for the search of 2000 Belle Chasse Highway.

10    2000 Belle Chasse Highway and River Birch

11  Landfill, as described in Attachment A, are one and the same,

12  according to the agents.  So they believed that they had the

13  right to search the entirety.

14    I'm not saying that they had -- that they

15  believed that they were -- had the right to go beyond River

16  Birch.  But their belief was they stayed within the scope of

17  the search warrant itself.

18    **THE COURT:**  Okay.

19    **MR. KENNEDY:**  So --

20    **THE COURT:**  Based on the things they did and didn't

21  do when they were out there.  Okay.

22    **MR. KENNEDY:**  Yes, Your Honor, that's what we're

23  saying.  So, basically, what they did is they went to 2000

24  Belle Chasse Highway, the offices of River Birch, and searched

25  that.

1          **THE COURT:**  Just to reaffirm, your intention would be

2    that they were there to search for River Birch data --

3          **MR. KENNEDY:**  What their intention was --

4          **THE COURT:**  -- and documents?  I'm saying, "Your

5    intention."  I mean, you all -- it's your warrant essentially.

6          **MR. KENNEDY:**  You mean it's the government's, Your

7    Honor, or me personally?

8          **THE COURT:**  Well, you signed off on the warrant.

9    What I want to know is what your intention -- your belief was

10   is that they were authorized to search 2000 Belle Chasse

11   Highway but for documents and data of River Birch.  Am I

12   correct or not?

13         **MR. KENNEDY:**  No.  What I'm trying to clarify is what

14   I signed off on is that they were going to search for the

15   particular items that related to the affidavit on the search

16   warrant, and I'm not going to go into what was in that.  I

17   would ask the Court to review that and determine whether or not

18   they were limited to River Birch based upon what is contained

19   in the affidavit or the search warrant itself.

20         **THE COURT:**  All right.

21         **MR. KENNEDY:**  What Attachment B simply said was,

22   "These are the things that we will look for in order to satisfy

23   the affidavit itself."  In order to go in and say, "The

24   affidavit allows us to look for these types of documents, this

25   type of evidence, but here's what it is and we think it might

1  be there."

2         **THE COURT:**  Well, do you think Attachment A and

3  Attachment B have no connection to each other?

4         **MR. KENNEDY:**  No, Your Honor, I believe they are

5  synonomous with each other.  But I think that they all have to

6  take --

7         **THE COURT:**  Well, they're not synonomous.  But do

8  you -- I mean, do you -- Attachment B follows A.  Attachment A

9  says River Birch.  Attachment B -- I would read it to mean you

10  can look for all of these things on Attachment B in -- that

11  relate to River Birch -- that are River Birch's.

12         **MR. KENNEDY:**  Right, Your Honor, but all of those

13  relate to the affidavit.  I don't think you can remove the

14  affidavit from the attachments.  That's the purpose of the

15  affidavit, to inform the court, "These are the beliefs -- this

16  is what we believe to be a violation of law at this point, this

17  is what we believe to be the criminal behavior."

18         And these are -- and the attachments simply say,

19  "This is what we expect to find."  That's the purpose of

20  sealing the document so that it doesn't get out all the things

21  that are related to the investigation, to all of the things

22  that the agents know, all of the things that they believe that

23  they might find at that particular thing.

24         The attachments merely show what it is we might

25  be looking for to bear out what's in the affidavit.  That's why

1  the affidavit is so important to the attachments.  I think you
2  can't take these in a vacuum.  I think the Court has to look at
3  all three of those in conjunction with each other in order to
4  determine whether or not the agents went outside the scope of
5  the warrant, and that's what we're asking this Court to do.
6        THE COURT:  Okay.  I don't believe I've seen the
7  affidavit.
8        MR. KENNEDY:  I think that that would clear up a
9  number of items, Your Honor, as to what the agents were doing
10  in this particular case and why they were seizing items.  I
11  think that it's of the utmost importance to know what is
12  contained in that affidavit in order to better understand the
13  attachments.
14        THE COURT:  Well, and I understand why Mr. Gibbens is
15  standing up.
16        MR. GIBBENS:  Yes, ma'am.
17        THE COURT:  He'd like to see it also.
18        MR. GIBBENS:  I mean, if the Court's going to rely on
19  it --
20        MR. KENNEDY:  Well, Judge, that's why we keep it
21  sealed.
22        THE COURT:  No, I understand.  I understand.
23        MR. KENNEDY:  You know, the whole thing is -- this
24  isn't a fishing expedition so that they can find out about our
25  investigation.

1          THE COURT:  No, I understand.  I understand.

2          MR. KENNEDY:  But certainly we seal that document so

3     the Court has the knowledge.

4          THE COURT:  Okay.  If you can provide that to me.

5          MR. KENNEDY:  I'll be more than happy to, Judge.

6          THE COURT:  Tomorrow I'm going to be in Baton Rouge,

7     but Monday it would be helpful.

8          MR. SCHONEKAS:  Judge, we'd vehemently object.  The

9     reason being is they want to say that you can use that for

10    justification for the search warrant, but we're not going to

11    let you know whether there's a basis for it or not.

12          So how can we defend against this or insist that

13    the search was overreaching when you want to use as a basis

14    something I'm not going to tell you about.

15          MR. KENNEDY:  Judge, Judge Moore bases his probable

16    cause on the affidavit.

17          THE COURT:  Don't talk me out of it.  I'm

18    comfortable.  I would like to see the affidavit, so provide it

19    to me by Monday, if you would.

20          MR. KENNEDY:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. KENNEDY:  The other thing we would just point out

23    is that all the things that were reasonably known to the agents

24    at the time of the search showed that there was no callous

25    disregard on the part of the agents.  They went in -- they went

1 in with a reasonable belief based upon what Peter Smith

2 previously knew.  And he testified here that he went into that

3 office.  He's interviewed Jim Ward there.  He went there.  He

4 interacted with Peter Butler.  Peter Butler was there once they

5 arrived.

6          He learned at that particular time that Peter

7 Butler was housed with inside of that office.  And, therefore,

8 there was no belief -- upon his independent observation, the

9 knowledge that he had at that particular time, that he then

10 transferred into the application for the search warrant to give

11 the description, that he had any reason to belief that there

12 were other businesses located.

13          It's based upon the officer's reasonable belief

14 and experience as to what he knew at the time of the

15 application of the search warrant and subsequently what they

16 would have learned afterwards.  They didn't learn anything

17 different afterwards, Your Honor.  They did not.  What they

18 learned is that there were documents found out.  And the

19 government has never denied that they would expect to find --

20          **THE COURT:**  I think you need to slow down.

21          **MR. KENNEDY:**  I apologize, Your Honor.  I get a

22 little excited sometimes.

23          I think what is borne out is that the government

24 has never said that it did not expect to find documents related

25 to other businesses within Belle Chasse Highway.

1    **THE COURT:**  All right.

2         **MR. KENNEDY:**  As a matter of fact, the attachments

3    clearly point that out.

4              Judge, one other thing I'd really like to point

5    out here, which I think is pertinent, is interestingly enough,

6    we have a table of attorneys here representing all sorts of

7    folks that are related to 2000 Belle Chasse Highway.  The one

8    person that's missing here is Peter Butler.

9              Interestingly enough, he's not a party to this

10   lawsuit.  So River Birch is trying to have -- these gentlemen

11   are trying to have their cake and eat it too in a certain

12   regard.  They're trying to say, "Peter Butler is a separate and

13   independent law firm.  It has nothing at all to do with River

14   Birch."

15             But at the same time, they're coming here and

16   arguing that to go in and search Peter Butler's office was

17   violative of the search warrant.  Therefore, they're trying to

18   say, "We have dominion and control over whatever is contained

19   within Peter Butler's office, but at the same time he's

20   separate and independent."  It's a contradictory argument, Your

21   Honor.

22             If anything, it supports the government's

23   position that Peter Butler was an employee, in a sense, of

24   River Birch.  He was housed there.  He was working as in-house

25   counsel.  Just because somebody has a letterhead certainly does

1    not mean that it's an independent and separate law firm.  It
2    merely may say that he's also practicing law as well as
3    representing River Birch as an in-house counsel.
4              **THE COURT:**  Okay.
5              **MR. KENNEDY:**  Everything that it says is 2000 Belle
6    Chasse Highway.  Judge, there's nothing at all that delineates
7    any one of those particular -- those particular businesses at
8    all.
9              Judge, just to answer Mr. Habans' last question
10   regarding what an AUSA would do regarding whether or not
11   further descriptions would have been included.  Certainly, you
12   know -- and hindsight's 20/20, Your Honor -- you know, if we
13   went back in time and if the agents knew what they -- what they
14   perceived them to have known now, would they have included it?
15   I don't know, Your Honor.  We can all speculate as to it.  But
16   the point is is what was known to them at the time was relayed
17   to the magistrate, was relayed to me based upon their
18   reasonable belief.
19             So what the Court has to go on is, "What did the
20   agents know at that particular time when they asked for the
21   application for the search warrant?"  Whatever we may know
22   subsequent to that is irrelevant; and it should not be
23   considered as far as what I may do in a particular situation or
24   what any other AUSA may do in a particular situation because
25   it's not relevant to the proceedings whatsoever at all.

1          Judge, what I would also ask, and we will put

2   this in our brief, and I will provide this to the Court now,

3   there's actually a case that's very similar to the facts and

4   circumstances of this case.  It's a 1987 case out of the

5   Eleventh Circuit.  Certainly, we'll put that in our post-brief.

6          THE COURT:  All right.

7          MR. KENNEDY:  But in that particular circumstance,

8   which was found by the Eleventh Circuit, there was a business

9   that actually was gone into and actually contained seven

10  separate businesses.  What the court found was that the agents

11  went in there and they basically learned once they got there

12  that there was one entrance, there was one receptionist, there

13  was one mail address.

14         THE COURT:  Slow down.

15         MR. KENNEDY:  There was a common space accessible to

16  all.  There was an eating area -- an entire office common to

17  everybody.  And, Judge, in that particular circumstances, the

18  agents went in.  When they went in, there were actually seven

19  distinct office spaces that were located within that case --

20  or, excuse me, those premises.

21         The court still found, based upon what the

22  officers knew at that particular time, that they were

23  reasonable in going and executing a search warrant of the

24  entire premises, because that's what the warrant called for.

25         And here, Judge, we do not even have any

 1   separate office space at all.  What we're talking about here in
 2   a search warrant is a premises, not a business in particular.
 3   What we're talking about is a premises, this building in
 4   particular, which they were authorized to search.
 5              They went up there.  They looked at this
 6   particular business.  There is nothing in there that would
 7   indicate that there were separate and distinct offices on the
 8   premises.  Documents contained inside do not make a separate
 9   and distinct area.
10              There were a number of items found throughout
11   the office that belonged to other businesses.  There were a
12   number of items that were belonging to River Birch that were
13   found throughout the office.  And, therefore, with the
14   commingling of those particular documents, the agents had the
15   right and the authority to search the entirety of 2000 Belle
16   Chasse Highway.
17              If they wanted to have separate offices, they
18   could have easily put them on the first floor.  They could have
19   put them on the second floor.  But the fact of the matter is,
20   everything is self-contained within one office space, a common
21   area, a common office to everybody on the third floor.
22              Even though that directory says there's other
23   businesses, each part of that directory says, "Third Floor,
24   Third Floor, Third Floor, Third Floor."  When you go up
25   there -- Judge, you've had the opportunity to go in there.  I

1 would ask anybody to go in there and point out where is River

2 Birch, where is Shadowlake, where is anybody else.

3          From an independent observation, the agents are

4 supposed to figure that out because somebody has something

5 hanging on their wall, or throughout the office there's a few

6 binders here and there, to alert them that, "Hey, we're now

7 going from River Birch into Shadowlake," or "We're going from

8 Shadowlake into Heebe & Heebe."  Judge, that's not reasonable

9 based upon the experience of the agents themselves.  So I'd ask

10 the Court to consider all of that in its totality.

11          Judge, in conclusion, I would just ask the Court

12 to find that the agents here did not act in callous disregard.

13 "Callous disregard," I tried to find a definition of it, but

14 the only -- the closest I could come to is in a murder case

15 when they say "utter disregard," where it's the highest, the

16 utmost disregard for somebody's rights.

17          We don't have that here, Judge.  If anything,

18 the agents went out of their way to accommodate to limit their

19 search, to limit their disruption to River Birch's business.

20 They even called in the IT guy.  They didn't want to mess

21 around with their computers and mess them up.  They did not

22 want to take things that were unnecessary.  They did not want

23 to go beyond the scope of the search warrant.  They did their

24 best to limit it and stay within the scope of the search

25 warrant.

1          That's not a callous disregard, Judge.  They
2    could have gone in there and just seized everything, pulled
3    every computer out and walked out the door, but they did not do
4    that.  They did spent some 12 hours there, according to
5    everybody's estimation.
6          **THE COURT:**  Okay.
7          **MR. KENNEDY:**  They did everything that they could
8    possibly.  There was no irreparable harm done to them.
9    Because, as the Court can see, also at that time, business as
10   usual at River Birch.  They were not disrupted whatsoever at
11   all.
12         Thank you.
13         **THE COURT:**  Equal time.  You don't have to speak if
14   you don't want to.  You can put it in your paperwork if you
15   want.  I'm totally fine.
16         **MR. GIBBENS:**  Your Honor, we're fine.  We'll put it
17   in the brief.
18         **THE COURT:**  Okay.  Next Thursday, is that fast, soon
19   enough, too soon?
20         **MR. KENNEDY:**  Like I said, Judge, I think we can get
21   it done, but I'll certainly notify the Court if the agents
22   believe there's any problem.
23         **THE COURT:**  Well, the main thing is I want you to get
24   the documents -- copies of all documents to them by next
25   Thursday, that's priority number one.

1          **MR. KENNEDY:**  Yes, Your Honor.

2          **MR. GIBBENS:**  Yes, I think we might like to have a

3  transcript before.  I don't know if that's even possible.

4          **THE COURT:**  Yeah, I think we got realtime.  We have

5  realtime.

6          **MR. GIBBENS:**  Okay.

7          **THE COURT:**  All right.  Yeah, because if you get the

8  documents back, you have everything, then you can start doing

9  your privilege stuff and raising some of the objections you

10  have.  So maybe we don't have the urgency as before.

11          How soon can we have transcript that's

12  reasonably intelligible?  Monday.  By Monday.

13          **MR. SCHONEKAS:**  That's great.  Yeah, that's great,

14  Judge.

15          **MR. KENNEDY:**  Transcripts by Monday, Your Honor?

16          **THE COURT:**  Yes.

17          **MR. KENNEDY:**  I'm sorry, I missed that part.

18          **MR. HABANS:**  Your Honor, may I speak, please?

19          **THE COURT:**  Is this to rebut?

20          **MR. HABANS:**  No, it's just a comment.  It's a

21  request.  I would ask Your Honor not to read the affidavit or

22  sealed Exhibit C, if that's other than the affidavit.  I don't

23  know.  Is it?

24          **MR. KENNEDY:**  It is.

25          **MR. HABANS:**  It's something different.  The problem

 1    is this is a civil case and we're not getting due process

 2    because they're asking Your Honor to review documents that have

 3    been withheld from our ability to rebut.  They are arguing

 4    innuendo and inference from these documents.  We don't know if

 5    they're relevant.  We don't know what they say.  We don't know

 6    whether we can rebut what it says.

 7                   But they're asking you to decide this case on

 8    matters that we are denied.  I would ask Your Honor to give us

 9    a chance to brief that a little bit more.  Because I

10    respectfully suggest that if they're relying on the affidavit,

11    we get to see it.  They don't have to unseal it.  They just

12    have to show it to us, just like they do other sealed

13    documents.

14            THE COURT:  Okay.  Well, can you brief that by the

15    end of the day Monday, whatever reasons you have?

16            MR. HABANS:  We can, Judge.

17            MR. GIBBENS:  Yes, Your Honor.

18            THE COURT:  Okay.  I'll hold off -- I'll let you know

19    if I want to see the affidavit --

20            MR. KENNEDY:  Yes, Your Honor.

21            THE COURT:  -- after I hear from them.

22            MR. HABANS:  Has Your Honor reviewed "C" already that

23    was filed under seal?

24            THE COURT:  Yes.

25            MR. HABANS:  Okay.

1          MR. KENNEDY:  Judge, I will point out --

2          THE COURT:  But I, frankly, don't remember what it

3    said.

4                Go ahead.

5          MR. KENNEDY:  Judge, the investigation is still in

6    progress and that's the point for keeping the documents sealed

7    itself.

8          THE COURT:  No, I understand.  I understand.  It may

9    be that I'll agree with whatever they tell me and I won't look

10   at it and then I'll have to make a decision based without it.

11   We'll see.  I don't know.  We'll just deal with it.  I just

12   want to give them time to present before I look at it.

13         MR. KENNEDY:  Judge, and my understanding, the

14   defense has -- or the plaintiffs in this case have done the

15   same thing, presented a document to you ex parte that the

16   government has not had access to.  So what they're saying is --

17         MR. HABANS:  No.

18         MR. GIBBENS:  That was -- it was an identical copy of

19   a document that was seized which we contend was privileged and

20   that's why we presented it ex parte for the Court to make that

21   privilege determination.

22         THE COURT:  Okay.

23         MR. GIBBENS:  But they have the document.  We just

24   simply don't want to waive any privilege on it.

25         MR. KENNEDY:  Judge, I don't know that we have the

1  document or not, because they're privileged items.  I don't

2  have access to it.  You know, we do not.

3           What we've done is we're saying that we've

4  returned privileged items.  As a matter of fact, Judge, we've

5  got Mr. McMahon here who did the privilege review pertinent to

6  other documents and found a couple of things that are possibly

7  privileged.  We'd like to provide them to the defense at this

8  time as well.

9           **THE COURT:**  That's good.  Well, I haven't actually

10 seen the document that they're referencing either.

11          **MR. KENNEDY:**  Judge, we would also make available for

12 in camera inspection the three boxes that are obviously at

13 issue in this particular case.

14          **THE COURT:**  Well, you're going to provide copies of

15 all that to them by next Thursday.

16          **MR. KENNEDY:**  Yes, Your Honor.

17          **THE COURT:**  I would rather they make the initial

18 determination whether they think it's privileged.  I don't want

19 to get into all that.

20          **MR. KENNEDY:**  Yes, Your Honor.

21          **MR. SCHONEKAS:**  Thank you, Judge.

22          **THE COURT:**  All right.  So Monday, Mr. Habans, you'll

23 have your reasons why I should not look at the affidavit.

24          **MR. HABANS:**  With Mr. Gibbens' help.

25          **THE COURT:**  I'm sure.

1          Okay.  Then we'll take it from there.  Next

2  Thursday will be the disclosure of all the documents.  Then

3  you'll get the transcript on Monday.  Then you want a week from

4  Monday?

5          **MR. GIBBENS:**  That would be great, Judge.

6          **THE COURT:**  A week from Monday.

7          **MR. SCHONEKAS:**  Greg, is that all right?

8          **MR. KENNEDY:**  I'm sorry, I didn't hear that, Your

9  Honor.

10          **THE COURT:**  The transcript is available Monday, then

11  a week from Monday to provide --

12          **MR. KENNEDY:**  For the post --

13          **THE COURT:**  Oh, that's the day before Mardi Gras.

14          **MR. KENNEDY:**  Judge, I'm out of town the entire week

15  of Mardi Gras as well too.

16          **THE COURT:**  Okay.  Well, how about two weeks after

17  that, since again, you'll have the documents.

18          **MR. SCHONEKAS:**  That's fine.

19          **THE COURT:**  So March 14th.

20          **MR. KENNEDY:**  Judge, I get back in town on

21  March 13th.

22          **THE COURT:**  Okay.  You going skiing?

23          **MR. KENNEDY:**  I'm taking my kids to Disney World,

24  Judge.  I wish.  I'm leaving on -- right before Mardi Gras.

25          **THE COURT:**  Well, I don't care.  I'm okay with the

1    21st, if it's okay with everybody else.

2              **MR. GIBBENS:**  That's fine, Judge.

3              **MR. HABANS:**  That's fine.

4              **THE COURT:**  Okay.

5              **MR. KENNEDY:**  Thank you, Your Honor.

6              (WHEREUPON, the proceedings were concluded.)

7                              *****

8                          <u>CERTIFICATE</u>

9              I, Jodi Simcox, RMR, FCRR, Official Court Reporter

10   for the United States District Court, Eastern District of

11   Louisiana, do hereby certify that the foregoing is a true and

12   correct transcript, to the best of my ability and

13   understanding, from the record of the proceedings in the

14   above-entitled and numbered matter.

15

16

17                        <u>S/ Jodi Simcox, RMR, FCRR</u>
                          Jodi Simcox, RMR, FCRR
18                        Official Court Reporter

19

20

21

22

23

24

25